IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PENN ENGINEERING &** | : | **CIVIL ACTION** |
| **MANUFACTURING CORP.** | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No.: 19-cv-513 |
| | : | |
| **PENINSULA COMPONENTS, INC.,** | : | |
| Defendant. | : | |

## MEMORANDUM

**SITARSKI, M.J.**                                                                                                              **January 26, 2022**

Presently pending before the Court is Plaintiff's Motion to Enforce Discovery Order and for Sanctions Against Defendant Peninsula Components, Inc. (Mot. to Enforce, ECF No. 253), Defendant's response thereto (Resp., ECF No. 264) and Plaintiff's reply in further support (Reply, ECF No. 269).[1] For the reasons that follow, Defendant's motion is **GRANTED IN PART** and **DENIED IN PART**.

I.   **RELEVANT BACKGROUND**[2]

On August 30, 2021, upon Plaintiff Penn Engineering & Manufacturing Corporation's (PEM) Motion to Compel Access to Defendant's Google Ads Accounts, or in the Alternative, Production of Google Ads Reports (ECF No. 199), the Court ordered the following relief:

> Within 10 days of the date of this Order, Defendant shall provide
> Plaintiff with either: (1) all Google Ads reports listed in the URL
> emailed by Plaintiff's counsel to Defendant's counsel on May 15,

---

[1] The Honorable Gene K. Pratter referred the matter to me for disposition pursuant to 28 U.S.C. § 636(b)(1)(A). (Order, ECF No. 161).

[2] For additional facts, see my April 1, 2021, memorandum granting in part and denying in part Plaintiff's consolidated motion to compel responses to requests for production and requests for admission. (Memo., ECF No. 187). The instant memorandum includes only factual and procedural history pertinent to this dispute.

> 2021, or (2) three hours of access to its Google Ads account, limited to Plaintiff's attorneys and experts only.  If Defendant chooses the latter option, it may monitor Plaintiff's access remotely and/or in-person, and it does not have to provide any support or training to Plaintiff.

(Order, ECF No. 228).

Defendant Peninsula Components, Inc. (Peninsula) chose to provide PEM with access to its Google Ads account, but a dispute arose between the parties regarding whether PEM could also discover reports for Peninsula's Google services other than Google Ads and whether PEM could depose a Peninsula representative after receiving the reports.  After Peninsula moved for clarification of the August 30, 2021, Order, the Court ordered on October 25, 2021, that Peninsula provide the reports directly instead, because the parties could not agree upon parameters for accessing the account. (Motion for Clarification, ECF No. 237; Order, ECF No. 246).

On November 4, 2021, Peninsula produced 57 Microsoft Excel spreadsheets[3] containing Google Ads Reports or information therefrom, including nine spreadsheets from Multiview, Inc., which Peninsula retained in August 2020 to take over its Google Ads advertising campaigns. (Memo. in Supp. of Mot. to Enforce, ECF No. 253-1, at 3; Resp., ECF No. 264, at 2).  The parties met and conferred to discuss alleged deficiencies with the PEM036 Production on November 29, 2021.  (Memo. in Supp. of Mot. to Enforce, ECF No 253-1, at 3).  On December 7, 2021, PEM reduced the number of requested reports to 15 and provided Peninsula with a spreadsheet template for each and instructions regarding obtaining a complete set of data fields

---

[3] PEM asserts that Peninsula produced 57 spreadsheets.  (Memo. in Supp. of Mot. to Enforce, ECF No. 253-1, at 3).  Peninsula asserts that it produced 48 spreadsheets, in addition to an unspecified number of reports produced by Multiview. (Resp., ECF No. 264, at 2).  Thus, the Court assumes that Multiview produced nine additional spreadsheets.  Following the practice set by the parties, the Court refers to these 57 spreadsheets as the "PEM036 Production."

for all reports for all Google Ads accounts and campaigns.[4] (*Id.* at 4 (citation omitted)). Peninsula engaged its expert on Google Ads, Hochman Consulting, to handle the new production for its account and requested that Multiview make a new production for its account. (Resp., ECF No. 264, at 5). On December 9, 2021, Peninsula produced 15 comma-separated values files and one Excel file representing the reports obtained from it and Multiview's Google Ads accounts. (Memo. in Supp. of Mot. to Enforce, ECF No. 253-1, at 4).

On December 15, 2021, PEM wrote Peninsula regarding alleged ongoing deficiencies with this latest production. (*Id.* (citation omitted)). Peninsula responded on December 20, 2021, indicating that it had produced "all of the reports for all of the ad campaigns covering all time and containing all of the columns available from Google for all of Peninsula's advertising campaigns." (*Id.* at 5 (citation omitted)).

On December 27, 2021, PEM filed the instant motion seeking access to Peninsula's Google Ads account. (Mot. to Enforce, ECF No. 253, at 1). Peninsula filed its response on January 10, 2022. (Resp., ECF No. 264). PEM filed its reply on January 18, 2022. (Reply, ECF No. 269).

**II.    LEGAL STANDARD**

Rule 37 of the Federal Rules of Civil Procedure allow for the imposition of sanctions "[i]f a party . . . fails to obey an order to provide or permit discovery . . . ." FED. R. CIV. P. 37(b)(2)(A). These sanctions may include:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

---

[4] Following the practice set by the parties, the Court refers to these files as the "PEM037 Production."

>> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
>
> (iii) striking pleadings in whole or in part;
>
> (iv) staying further proceedings until the order is obeyed;
>
> (v) dismissing the action or proceeding in whole or in part;
>
> (vi) rendering a default judgment against the disobedient party; or
>
> (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

*Id.*

### III. DISCUSSION

"The Federal Rules of Civil Procedure do not impose a duty upon litigants to examine every scrap of paper in its potentially voluminous files in order to comply with its discovery obligations. Instead, the [producing] party must conduct a diligent search, which involves developing a reasonably comprehensive search strategy." *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, No. 15-6480, 2020 WL 3498161, at *2 (E.D. Pa. June 29, 2020) (quotation omitted). As the moving party, PEM bears the burden of showing that Peninsula "either withheld relevant documents or failed to conduct a reasonable search." *Id.* (citing *Enslin v. Coca-Cola Co.*, Civ. A. No. 14-06476, 2016 WL 7013508, at *1 n.2 (E.D. Pa. May 13, 2016)). This burden is "not trivial . . . ." *Id.* Because producing parties have "the best knowledge as to how documents have been preserved and maintained," they are "in the best position to determine the method by which they will collect documents." *Ford Motor Co. v. Edgewood Props., Inc.*, 257 F.R.D. 418, 427 (D.N.J. 2009).

Further, "[u]nder ordinary circumstances, a party's good faith averment that the items sought simply do not exist, or are not in his possession, custody or control, should resolve the

4

issue of failure of production . . . ." *Margel v. E.G.L. Gem Lab Ltd.*, No. 04–1514, 2008 WL 2224288, at *3 (S.D.N.Y. May 29, 2008) (quoting *Zervos v. S.S. Sam Houston*, 79 F.R.D. 593, 595 (S.D.N.Y. 1978)). To force further attempts at production, "the discovering party must make an adequate showing to overcome this assertion" that the opposing party has produced all materials to which it has access. *Golden Trade S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 525 n.7 (S.D.N.Y. 1992). Unsupported claims of "inexplicable deficiencies" in the production or that a party "has not received all of the documents to which it is entitled" do not suffice. *Ford Motor Co.*, 257 F.R.D. at 427-28; *U.S. v. O'Keefe*, 537 F. Supp. 2d 14, 22 (D.D.C. 2008).

Here, PEM points to four[5] purported deficiencies in the PEM037 Production: (1) missing reports; (2) inconsistent data; (3) missing data fields; and (4) inadequate reporting time periods. (Memo. in Supp. of Mot. to Enforce, ECF No. 253-1, at 10). It asserts that these are "the same deficiencies" as existed in the earlier PEM036 Production. (*Id.*). The Court will consider these deficiencies in the context of the PEM037 Production, the operative, updated production made by Peninsula after the parties met and conferred and PEM provided Peninsula with revised instructions.

### A. Missing Reports

PEM contends that the following seven report types are missing from the PEM037

---

[5] In addition, PEM complains that Peninsula failed to supplement its earlier productions timely by only producing reports from Multiview's Google Ads account on November 4, 2021, as part of the PEM036 Production. (Memo. in Supp. of Mot. to Enforce, ECF No. 253-1, at 3, 10, 20-21; Reply, ECF No. 269, at 13-15). However, PEM identifies no prejudice resulting from the delayed supplemental production, and it is unclear what PEM's requested relief – access to Multiview's and Peninsula's Google Ads accounts – has to do with the untimeliness. Nor does the Court find that the belated production, which nonetheless occurred several weeks before PEM filed the instant motion, entitles PEM to reimbursement of its attorney fees incurred in this dispute. *See* FED. R. CIV. P. 37(a)(5)(A) (providing for an award of expenses and fees "if the disclosure or requested discovery is provided *after* the motion was filed") (emphasis added). For these reasons, the Court declines to grant PEM's motion on the basis of the timing of the production of these materials.

Production: Ad Extension, Search Terms, Topic, Display Video Keyword, Change History, Dynamic Ad Target and Ad Report by Click Type.[6]  (Memo. in Supp. of Mot. to Enforce, ECF No. 253-1, at 15).  Peninsula responds that its Google Ads expert, Hochman Consulting, and Multiview "meticulously followed plaintiff's protocol and instructions provided by plaintiff's counsel in each tab in the spreadsheet to ensure" that all available reports were produced.  (Resp., ECF No. 264, at 5).  It attaches to its response a declaration from the partner at Hochman Consulting, Robert Jackson, who performed the search averring that he took these steps "for every specified report" in the December 7, 2021, instructions from PEM.  (Jackson Decl., ECF No. 264-4, at ¶ 5).  Peninsula identifies the reports that were available and unavailable and notes that two[7] of the allegedly missing seven reports were actually produced.  (Resp., ECF No. 264, at 5-7 & n.4).  In reply, PEM points out that no declaration from Multiview was filed.  (Reply, ECF No. 269, at 5 n.7).  It also insists that even if Peninsula complied with its instructions – which PEM disputes – such compliance does not establish compliance with the Court's Order.  (*Id.* at 2-3, 6).

Within seven days, Peninsula shall obtain from Multiview and file a declaration attesting to its efforts to produce the reports from its Google Ads account, as set forth in Peninsula's response.  However, it is not clear what can be done for PEM beyond providing this further assurance regarding the steps taken by those responsible for the PEM037 Production.

---

[6] PEM also complains that Peninsula produced 16 reports it did not request in the revised December 7, 2021, instructions.  (Memo. in Supp. of Mot. to Enforce, ECF No. 253-1, at 15). Peninsula explains that it produced these reports from Multiview's Google Ads account "[t]o ensure complete compliance with the Court's Order, and to match the scope of its previous [PEM036] production . . . ."  (Resp., ECF No. 264, at 6).

[7] Peninsula states that the Search Terms and Change History Reports were, in fact, produced to PEM.  (Resp., ECF No. 264, at 5 n.4).  PEM appears to acknowledge this fact in its reply.  (*See generally* Reply, ECF No. 269 (not refuting that Search Terms Reports were produced); *see also id.* at 11 (discussing the contents of the Change History Reports from Peninsula's and Multiview's accounts)).

Peninsula asserts that it has repeatedly requested that the parties' experts meet and confer regarding "all technical issues related to the generation and production of Google Ads reports," but that PEM has declined all such requests. (Resp., ECF No. 264, at 10). Further, after PEM informed Peninsula of alleged deficiencies in the PEM036 Production, Peninsula engaged Hochman Consulting, "an Internet marketing agency that has provided Internet marketing consulting to hundreds of businesses over the last 15 years," to handle the new PEM037 Production. (Jackson Decl., ECF No. 264-4, at ¶ 1). Hochman Consulting assigned Jackson, its partner for the last 15 years, to the project. (*Id*.). Jackson is "familiar with [the] Google Ads program and all steps necessary to generate Google Ads reports." (*Id.*). This experienced partner at an established firm followed the directions provided by PEM and obtained the reports set forth in Peninsula's response. (*Id.* at ¶ 5). PEM complains that these efforts do not fulfill Peninsula's discovery obligations, but PEM has failed to state what Peninsula should have done differently. *See Winn-Dixie Stores, Inc.*, 2020 WL 3498161, at *2 (producing party need only implement a "reasonably comprehensive search strategy"). Indeed, if the Court were to grant PEM access to Peninsula's accounts, it would presumably take the same steps that it instructed Peninsula to take.

PEM has failed to carry its burden of demonstrating that Peninsula has withheld or failed to search appropriately for the Google Ads Reports. *See id.* The Court declines to grant relief to PEM on the basis of the allegedly missing reports, except that Peninsula shall file the referenced Multiview declaration within seven days.

    **B.**     **Inconsistencies Among the Reports**

PEM alleges that the reports that were produced "contained inexplicable inconsistencies." (Memo. in Supp. of Mot. to Enforce, ECF No. 253-1, at 12). It reproduces in its opening brief

7

five of Peninsula's known "dynamic ads"[8] that PEM claims do not appear in any produced report. (*Id.* at 5-6). It further observes that none of the reports include so-called "curly brackets" – "{" or "}" – which PEM insists are "the telltale sign for dynamic ads . . . ." (*Id.* at 7). In addition, it asserts that "four ads listed in the Ad Report did not appear in the Ad Report by Click Type." (*Id.*). Unlike the allegedly absent dynamic ads, PEM does not identify these four ads.

Peninsula counters by directing PEM to testimony and an exhibit from the deposition of Samantha Kramer from ThomasNet, the vendor that ran its Google Ads program between October 2018 and September 2019. (Resp., ECF No. 264, at 9). At the deposition, an Ad Groups Report including the terms from the supposedly missing dynamic ads was marked as an exhibit, and Ms. Kramer testified how terms from different columns in the report would come together to populate the ads. (Kramer Dep. Tr., ECF No. 264-1, Ex. 7 at 24:3-5, 27:20-31:4; *see also* Ex. T-4c to Kramer Dep. Tr., ECF No. 264-1, Ex. 6). Peninsula also points to a recent Ads Report similarly listing the terms for these ads in separate columns, as well as a third report, produced as part of PEM037, referencing several "dynamic search ads" and "expanded dynamic search ads." (Ads Report, ECF No. 264-1, Ex. 8; Hochman Decl., ECF No. 264-3, at Ex. 1). In addition, Peninsula cites the declaration of Jonathan Hochman, the founder of Hochman Consulting, who clarifies that the "curly brackets" referenced by PEM would only appear in reports if the Dynamic Keyword Insertion (DKI) feature is used. (Hochman Decl., ECF No. 264-3, at ¶ 6). Hochman explains that Peninsula instead used Dynamic Search Ads (DSAs), a "closely related" feature but one which does not generate "curly brackets." (*Id.*). Finally, Peninsula states that Jackson and Multiview "did not alter, delete, or modify" the contents of any

---

[8] Dynamic ads are "ads in which the exact language used by the Internet searcher is inserted in the ad itself," such as: "Get your [PEM fasteners] here at Pencom." (*See* Memo. in Supp. of Mot. to Compel, ECF No. 199-1, at 3 & n.2).

reports. (Memo. in Supp. of Mot. to Enforce, ECF No. 264, at 5, 7 (citing Jackson Decl., ECF No. 264-4, at ¶¶ 5-7) (additional citations omitted)).

In reply, PEM asserts that Hochman's declaration regarding Peninsula's nonuse of DKI conflicts with his statement in his expert report that "[t]he type [of dynamic ads] relevant to this case are ads that include the [DKI] feature." (Reply, ECF No. 269, at 11-12 (citation omitted)). It further observes that in his declaration "Hochman failed to explain how Google Ads would insert a search user's search terms such as 'pem fasteners' into Defendant's DSAs." (*Id.* at 12). Citing a Google support webpage, it notes that to generate the headline of a DSA, Google Ads uses, first, the title of the client's website and, second, the most common phrases in the website. (*Id.* (citation omitted)). According to PEM, therefore, it is "absurd" to believe that "pem" phrases appear in the title of Peninsula's website or are among the most commonly occurring phrases in the contents of the site. (*Id.*). Instead, it concludes that "Hochman either misled the Court with his expert report or is now misleading the Court with his current declaration." (*Id.*).

Peninsula has provided an explanation for the allegedly missing ads specifically identified by PEM: whereas PEM may have expected to see these ads set forth in the reports as or similar to how they appeared on Google, they are instead memorialized in the form of separate columns from which terms were drawn to form the dynamic ads. (Kramer Dep. Tr., ECF No. 264-1, Ex. 7 at 24:3-5, 27:20-31:4). Peninsula points to two reports reflecting the ads in this format, as well as a third referring to them as "dynamic search ads" and "expanded dynamic search ads" (although not, apparently, listing the terms used to formulate the ads as in the other two reports). (*See also* Ex. T-4c to Kramer Dep. Tr., ECF No. 264-1, Ex. 6; Ads Report, ECF No. 264-1, Ex. 8; Hochman Decl., ECF No. 264-3, at Ex. 1). It also explains why the reports do not include "curly brackets": according to Hochman, only DKI, not DSAs, generates them, and Peninsula used DSAs. (Hochman Decl., ECF No. 264-3, at ¶ 6). PEM notes that Hochman's explanation seemingly contradicts the statement in his expert report that the "relevant" dynamic

ads in this matter "include" DKI, but if this statement is, as PEM suggests, untrue, PEM will have the opportunity to demonstrate that to the jury during Hochman's cross-examination. Hochman avers that he did not "alter, delete or modify"[9] the contents of any reports, and PEM's identification of possible topics for impeachment of Hochman does not demonstrate otherwise. (Jackson Decl., ECF No. 264-4, at ¶¶ 5-7).

For these reasons, the Court will deny PEM's motion insofar as it is based on any purported inconsistencies in the reports.

### C. Missing Data Fields

PEM also insists that the PEM037 Production is missing many data fields or columns of requested and readily available information. (Memo. in Supp. of Mot. to Enforce, ECF No. 253-1, at 13). It claims that the Google Ads Report in the production compiled by Hochman Consulting contains only 153 of 209 available data fields. (*Id.*). Similarly, PEM contends that many of the reports generated by Multiview are "unusable displays of rows and columns of numbers," and it provides excerpts and examples of such reports. (*Id.*). It argues that without information regarding the "Campaign ID" and "Ad Group ID," it cannot "accurately identify to which ad group each row refers since an ad group may look identical but perform differently in different campaigns." (*Id.* at 14-15). PEM complains further that Peninsula included in the production "mundane data fields that add no new information . . . ." (*Id.* at 15).

Peninsula's response is essentially the same as its response to the allegation that it did not produce all reports. Citing its supporting declarations, it maintains that it "followed all protocols and instructions provided by plaintiff for each of its requests and produced all reports with all data available from Google Ads and from its and Multiview's accounts." (Resp., ECF No. 264,

---

[9] Multiview shall include a similar averment, if true, in its declaration to be submitted by Peninsula.

at 10). It flatly denies that Jackson or Multiview deleted any "data delivered by Google in any way." (*Id.* at 5 (citations omitted)). It also notes its past requests for an expert meet-and-confer regarding the technical issues surrounding the production. (*Id.* at 10). It asserts that PEM has provided no basis beyond unsupported "bare allegations" that any data was withheld, let alone that any supposedly missing data is relevant. (*Id.* at 9).

      PEM replies that Peninsula's repeated insistence that it did not delete any data from the reports "rings hollow" because it has not disclosed whether the "so-called 'default settings'" for its Google Ads account were ever "altered or modified" prior to the creation of the reports. (Reply, ECF No. 269, at 4). It posits that it is "likely" or "more than likely" that "someone" must have intentionally changed the settings in the account because, in PEM's view, no "competent business entity[ ] would regularly generate unusable reports in the ordinary course of its business . . . ." (*Id.* at 5). It observes that, other than describing the settings as "default," Peninsula has never ever explicitly stated that they "were exactly as have been since the creation of Defendant's Google Ads accounts or that no changes have ever been made to the selection of columns in its Google Ads accounts." (*Id.* at 4 n.5). Although PEM argues that it is "irrelevant" whether Peninsula complied with its "advice" about how to generate the data and information in the reports, it also maintains that Peninsula's claim of compliance is "false" because the PEM036 Production and Multiview's portion of the PEM037 Production contain "identical" defects. (*Id.* at 8 (citing Memo. in Supp. of Mot. to Enforce, ECF No. 253-1, at 13-15) (emphasis omitted)). PEM insists that these allegedly identical defects must have resulted from Multiview copying the Google Ads settings used in the earlier PEM036 Production. (*Id.*). In purported support of this theory, PEM points to the fact that one of Peninsula's attorneys who had access to the account

used to generate the PEM036 Production shared a report from that account with Multiview. (*Id.* at 9).[10]

PEM's focus on Peninsula's use of "default" or "predetermined" settings is a red herring. Although Peninsula used such settings in the earlier PEM036 Production, there is no indication that it did so in the PEM037 Production under consideration here. (*See* Resp., ECF No. 264, at 2-4 ("All available data in the predefined default reports was downloaded and produced as *PEM036*.") (emphasis added)). Instead, Peninsula insists that in the PEM037 Production its expert and Multiview "meticulously follow[ed] the protocol provided by plaintiff." (*Id.* at 5; *see also* Jackson Decl., ECF No. 264-4, at ¶ 5 (declaring that he followed the steps provided by PEM)). This protocol or advice included specific instructions, *inter alia*, to "select every data field available for that report by clicking the check box next to each and every data field" and to "ensure that the status is 'ALL' or the most comprehensive status for every report . . . ." (Dec. 7, 2021, Ltr., ECF No. 253-3, at Ex. 2).

PEM remains steadfast that Multiview, in particular, did not follow these instructions for the PEM037 Production because "the reports allegedly generated by Multiview for PEM037 contain defects *identical* to those found in the PEM036 reports generated by" Peninsula. (Reply, ECF No. 269, at 8 (emphasis in original)). However, PEM has failed to provide any specific examples to substantiate this assertion. For example, it reproduces reports generated by Multiview in the PEM037 Production showing unintelligible data fields of the repeating letter "x" followed by a number at the end, but nowhere does it indicate that these reports appeared in the PEM036 Production, which, presumably, would have been the case had Multiview merely repeated the efforts undertaken by Peninsula there. (*See id.* at 13-14). Nor is the Court

---

[10] PEM again notes that Multiview has not provided a declaration regarding the steps it took in regard to the PEM037 Production, but, as noted above, this Court will direct Peninsula to obtain one and file it.

persuaded to PEM's view by the email from Peninsula's counsel to Multiview sharing a report from what would become the PEM036 Production. This November 3, 2021, email was sent even before Peninsula made the PEM036 Production, weeks before it received from PEM or shared with Multiview the instructions that would guide the PEM037 Production. (*See* Dec. 7, 2021, Ltr., ECF No. 253-3, at Ex. 2).

In short, PEM offers nothing more than "a conclusory allegation premised on nefarious speculation" that Peninsula, either on its own or through Multiview, has withheld[11] available data or information from the reports in the PEM037 Production. *Ford Motor Co.*, 257 F.R.D. at 427. As such, the Court will deny PEM's motion to the extent that it is based upon allegedly missing information.

### D. Inadequate Reporting Time Periods

Finally, PEM claims that Peninsula "limit[ed] the reporting time period of the Change History Report to December 8, 2019 through December 8, 2021," thus "carefully avoiding the time period, 2017 through 2019," and concealing relevant information. (Memo. in Supp. of Mot. to Enforce, ECF No. 253-1, at 7). Citing Google's support pages, Peninsula counters that only two years of change history are available at a time and attaches the report covering the prior two years, which Peninsula asserts was already produced at PEM54860-55361. (Resp., ECF No. 264, at 8 & n.5 (citations omitted)). PEM does not address this specific issue further in its reply. (*See generally* Reply, ECF No. 269). Instead, it claims that the 2019 to 2021 Change History report indicates that Peninsula's and Multiview's Google Ads accounts remained active until at least late October, 2021, not, as claimed by Peninsula, only until August 2021. (*Id.* at 11).

---

[11] Because PEM has failed to make the requisite showing that Peninsula has withheld any information, the Court does not resolve the parties' disagreement regarding the relevance of the information. (*See* Reply, ECF No. 269, at 9-10).

The Change History Report attached to Peninsula's response covers the period of 2017 through 2019, and PEM does not argue otherwise. (Change History Report, ECF No. 264-1, at Ex. 5). However, PEM is correct that the Change History Reports attached to PEM's reply also include entries beyond August 2021, when all ad campaigns were allegedly paused. (Change History Reports, ECF No. 269-1; Resp., ECF No. 264, at 4 n.2). Although this observation is potentially relevant to the merits dispute, insofar as it indicates that a greater length of time is at issue, it does not affect the discovery dispute presently before me. The instructions PEM provided to Peninsula for the PEM037 Production on December 7, 2021, directed or requested that Peninsula "ensure that the time period is 'all time' for every report . . . ." (Dec. 7, 2021, Ltr., ECF No. 253-3, at Ex. 2). Peninsula insists that it followed this instruction, has submitted a supporting declaration from its expert, and will submit another from Multiview, to the extent that, as Peninsula claims, Multiview also followed this instruction. Thus, PEM has received post-August 2021 reports and information, whether "Peninsula paused all of its campaigns" at that time or not. (Resp., ECF No. 264, at 4 n.2). Accordingly, the Court will deny PEM any relief on the basis of allegedly truncated reporting periods.

### IV.    CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part PEM's motion. Within seven days, Peninsula shall file a declaration from Multiview attesting to its efforts surrounding its part in the PEM037 Production. The Court otherwise denies PEM's motion.

BY THE COURT:

  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge