# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PENN ENGINEERING &** | : | |
| **MANUFACTURING CORP.,** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PENINSULA COMPONENTS, INC.,** | : | **No.  19-513** |
| *Defendant* | : | |

## <u>M E M O R A N D U M</u>

PRATTER, J.                                                                                          AUGUST 24, 2022

PennEngineering designs and manufactures various fasteners and other types of industrial and mechanical equipment.  PennEngineering's products are advertised and sold using one of its trademarks in either the "PEM Family of Marks" (based on the name of its holding company), or other registered or common law marks.  Peninsula Components allegedly sells fasteners using marks that are identical to some of PennEngineering's marks.  PennEngineering alleges 22 counts of Lanham Act and common law trademark infringement, trademark counterfeiting, and unfair competition.

Peninsula filed a motion for partial summary judgment with five subparts, and PennEngineering filed five partial summary judgment motions that generally align with those subparts.  Because there are core factual disputes regarding the likelihood of customer confusion, the Court will deny the dueling summary judgment motions, except as to three narrow issues: (1) hidden use of trademarks for keyword conquesting, (2) counterfeiting, and (3) claims based on 20 registered marks and 31 common law marks not used by Peninsula.  On these three issues, the Court grants partial summary judgment for Peninsula.  For the remainder, a jury will have to resolve the nuts and bolts of the parties' extensive disputes.

## BACKGROUND

PennEngineering and Peninsula are competitors in the market for industrial fasteners. PennEngineering is the industry leader, while Peninsula represents itself as a "second source or an alternate source" for industrial clients.  Hr'g Tr. at 43:18, Doc. No. 308; Pl.'s Resp. to Def.'s Statement of Material Facts, Doc. No. 283-25 ¶ 22 (discussing PennEngineering's market share of over 75% for an undefined market).  PennEngineering previously challenged Peninsula's advertising tactics as trademark infringement and unfair competition in a 2007 lawsuit that ostensibly concluded with a settlement.  In its Second Amended Complaint in the present litigation, PennEngineering raises claims based on trademark infringement and unfair competition for 24 registered trademarks in the "PEM family," as well as over 100 other registered and common law trademarks.  Second Am. Compl. ¶¶ 23, 28, Doc. No. 211.  Peninsula contends that its conduct is aggressive competition within the bounds of applicable law.

In keeping with the parties' litigious history, discovery disputes in this litigation were legion and numerous.  The parties filed 35 motions to compel and 7 sanctions motions, along with a battery of other discovery disputes.  The Court referred the discovery disputes to a Special Discovery Master (first Magistrate Judge Timothy Rice and then Magistrate Judge Lynn Sitarski, both of whom demonstrated admirable skill and patience).

Now, at the close of discovery, the parties have filed six dueling partial motions for summary judgment.  These six motions—without even counting the opposition, reply, and sur-reply filings—involve over 13,000 pages of briefing and attachments.  From this voluminous record, the parties ask the Court to determine that there are no disputes of material fact.

## Legal Standard

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 252. "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Nathanson v. Medical College of Pa.*, 926 F.2d 1368, 1380 (3d Cir. 1991).

## Discussion

Given the overlapping nature of the six partial motions for summary judgment, the Court will analyze the motions in the context of PennEngineering's underlying claims for trademark infringement and false advertising.

## I.   Trademark Infringement

Although, in its Second Amended Complaint, PennEngineering asserts claims across many of its registered and common law trademarks, its summary judgment motions focus on its "PEM" and "Double Squares" trademarks. Hr'g Tr. at 33:11–14, Doc. No. 308. PennEngineering alleges that Peninsula has infringed on its PEM trademarks through a combination of activities including use of the trademarks in Google Ads keywords and cross-reference charts. PennEngineering also asserts that Peninsula infringes on its marks by offering a "square-in-square" clinching nut similar

to PennEngineering's "Double Squares Marks" and selling counterfeit versions of PennEngineering's products.  Second Am. Compl. ¶¶ 47–52, Doc. No. 211.  Peninsula raises several defenses to these trademark infringement claims, asserting that its use of trademarks in Google Ads and cross-reference charts is fair use that is not likely to cause confusion, that the "Double Squares Marks" are invalid trademarks because they are functional designs, and that its limited reselling activities are permitted by the first sale doctrine.  PennEngineering and Peninsula both move for summary judgment on these trademark infringement claims and defenses.

Courts analyzing trademark infringement claims for competing goods use the so-called *Lapp* factors:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods . . . are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc*., 237 F.3d 198, 215 (3d Cir. 2000) (citing *Interpace Corp. v. Lapp, Inc*., 721 F.2d 460, 463 (3d Cir. 1983)).  Each of PennEngineering's

trademark infringement claims raise issues to which the Court will apply these *Lapp* factors (or a modified subset).

### A. Keyword Conquesting (Doc. Nos. 259 & 261)

First, both parties seek summary judgment on the "keyword conquesting" theory of trademark infringement. PennEngineering moves for summary judgment on Peninsula's use of its "PEM" trademark—hidden and visible—for keyword conquesting. Doc. No. 261-1 ¶¶ 117–120. Peninsula argues that the Court should reject PennEngineering's theory of keyword conquesting as a form of trademark infringement because there is no likelihood of confusion (except as to two instances where the use of "PEM" showed up in an advertisement). Mem. in Supp. of Def.'s Mot. for Partial Summ. J., Doc. No. 259-1, at 14. The Court will separately address the hidden and visible uses of "PEM" for keyword conquesting.

#### 1. *Hidden Uses of Trademark for Keyword Conquesting*

PennEngineering defines keyword conquesting as "the practice of one company using, purchasing or bidding on internet search terms or keywords that contain the brand, tradename, trademark, or service mark of a competitor to trigger that company's paid advertisements." Mem. of Law in Supp. of Pl.'s Mot. to Compel, Doc. No. 250-1, at 1. Under this theory, PennEngineering argues that Peninsula's use of its trademarks as keywords that trigger advertisements in search results (through Google AdWords) causes initial interest confusion. Initial interest confusion applies where "similar marks could ultimately affect a consumer's consideration of the defendant's product as well as affect the plaintiff's goodwill with its customers." *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 293 (3d Cir. 2001). This is akin to a "'bait and switch scheme.'" *Id.* at 294.

The first advertisement below is an example of what PennEngineering labels infringing conduct by Peninsula (using its "PenCom" website):



Ex. 59, Doc. No. 262-13, at ECF 203.    Another court in this district has explained Google's AdWords program as follows:

> Among other services, Google provides an internet search engine that finds websites related to terms provided by internet users. An internet user seeking information will enter various terms into a space provided on Google's website, and Google's computers will search its database for websites relevant to the terms provided. The Google search engine then will present an ordered list of relevant websites identified by the Google database with the most relevant website listed first. The Google search engine will also present a separate list of websites in a "Sponsored Links" section, either at the top or in the right margin of the search-results screen.

> Google's AdWords program is the keyword-triggered advertising program that generates the Sponsored Links section on the search-results screen. Advertisers participating in AdWords purchase or bid on certain keywords, paying Google for the right to have links to their websites displayed in the Sponsored Links section whenever an internet user searches for those words. Additionally, each time an internet user clicks on a particular Sponsored Link, Google charges a fee to the AdWords participant associated with that linked website. Businesses often participate in the AdWords program to generate more visits to their websites.

*J.G. Wentworth, S.S.C. Ltd. P'ship v. Settlement Funding LLC*, No. 06-cv-0597, 2007 WL 30115, at *1–2 (E.D. Pa. Jan. 4, 2007).

In *J.G. Wentworth*, the court rejected the Google AdWords theory of initial interest confusion because "the links to defendant's website always appear as independent and distinct links on the search result pages regardless of whether they are generated through Google's AdWords program or search of the keyword meta tags of defendant's website" and "a link to defendant's website appears on the search results page as one of many choices for the potential consumer to investigate." *Id.* at *7.  The court found that "as a matter of law defendant's actions do not result in any actionable likelihood of confusion under the Lanham Act." *Id.* at *6.  Peninsula argues that this Court should adopt the *J.G. Wentworth* reasoning and notes that the Third Circuit Court of Appeals has never adopted the initial interest confusion theory of trademark infringement as advanced by PennEngineering.   Mem. in Supp. of Def.'s Mot. for Partial Summ. J., Doc. No. 259-1, at 13–15.

Other than *J.G. Wentworth*, few courts in the Third Circuit have addressed the Google AdWords theory of initial interest confusion.  However, the courts of appeals for the Fifth and Ninth Circuits have considered the theory, focusing on whether the defendant's link that appeared in the search results would mislead consumers into believing they were being directed to the website for the trademark holder.  *See Jim S. Adler, P.C. v. McNeil Consultants, L.L.C.*, 10 F.4th 422, 428 (5th Cir. 2021); *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1025 (9th Cir. 2004).  For example, in *Jim S. Adler*, the Fifth Circuit Court of Appeals found that the plaintiff stated a viable claim for trademark infringement through the initial interest confusion theory where a search for his law firm resulted in advertisements for the defendant which displayed "generic text," were "not clearly labeled as belonging to" the defendant, and used a click-to-call

feature in which users who clicked on the defendant's advertisement were "connected by telephone to a call center" to talk to employees who did not identify themselves for the initial portion of the telephone conversation.  10 F.4th at 429.

Here, in contrast, the search results clearly identify the advertised links as belonging to Peninsula.  Specifically, Peninsula cites the following evidence to show that this case is more like *J.G. Wentworth* than *Jim S. Adler*: when a potential customer enters a keyword such as "PEM," the link to Peninsula's website appears as one of several clearly labeled search results; potential customers are not taken directly to Peninsula's page; Peninsula's website is clearly identified as belonging to Peninsula; and Peninsula's use of "PEM" is "entirely invisible" to potential consumers.  Mem. in Supp. of Def.'s Mot. for Partial Summ. J., Doc. No. 259-1, at 14.  Indeed, in Peninsula's ads that are triggered by the hidden keywords, only the word "fastener" appears as a matching term for the search, in bold.  Ex. 59, Doc. No. 262-13, at ECF 203.

Rather than disputing these points, PennEngineering asserts that the Court should look to the "synergistic effect" of what happens after a consumer clicks on the link.  Resp. to Def.'s Mot. for Partial Summ. J., Doc. No. 283, at 1.  But PennEngineering's theory of advertising as trademark infringement is fundamentally flawed.  PennEngineering complains that Peninsula "seeks to *divert customers*" through the advertisements.  Pl.'s Suppl. Mem. of Law in Supp. of All Summ. J. Mots., Doc. No. 307, at 5.  But diverting customers is a key aspect of competition.  Customer diversion does not provide a cause of action unless the competitor does so in an unlawful manner, such as by passing off its goods as the trademark holder's in a bait-and-switch scheme.  *Checkpoint Sys.*, 269 F.3d at 294.  Here, there is no dispute that the links are clearly labeled as belonging to Peninsula and there is no likelihood of confusion where the use of trademarks as trigger words is hidden from the consumer.  Therefore, the Court will grant summary judgment for Peninsula on

the "hidden" keyword conquesting portions of PennEngineering's trademark infringement claims and deny PennEngineering's opposite summary judgment motion on these claims.

### 2. *Visible Uses of "PEM" for Keyword Conquesting*

In addition to hidden use of trademarks for keyword conquesting, Peninsula asserts that there were "two mistakes by Peninsula's vendors [which] resulted in short periods of time during which a version of [PennEngineering's] trademark 'PEM' accidentally appeared in displayed ads." Mem. in Supp. of Def.'s Mot. for Partial Summ J., Doc. No. 259-1, at 11 n.4.  The claims based on these visible uses of "PEM" are not the subject of Peninsula's motion.  However, PennEngineering moves for summary judgment on its trademark infringement claims based on all of Peninsula's keyword conquesting, including these visible uses of PEM.  Doc. No. 261-1, at 29–31.  Unlike the "hidden" conquesting discussed above, the use of PEM is visible in the second advertisement below:



Ex. 60, Doc. No. 262-13, at 205.

Peninsula responds that PennEngineering has not introduced evidence of actual or likely confusion from these mistakes and that there is no likelihood of confusion because the Google search results sent users who clicked on the link to Peninsula's clearly labeled website. Def.'s Opp. to Pl.'s Mots. for Summ. J., Doc. No. 282, at 13–14. PennEngineering counters that Peninsula cites no case law in which a mistake by a vendor excuses its liability, Pl.'s Reply in Supp. of Its Mot. for Summ. J., Doc. No. 288, at 3–4, 5–6, and that it has met the *Lapp* factor for intent to cause confusion, Doc. No. 293, at 7. According to PennEngineering, "[s]ince Defendant, or Defendant's agent, must have explicitly included the trademark PEM in its keywords, there is no dispute that such inclusion was intentional and willful." Doc. No. 2937, at 7. But this misstates the standard. The relevant *Lapp* factor is "intent to confuse," not intent to use the mark. *A & H Sportswear, Inc*., 237 F.3d at 225 ("We have held that a defendant's mere intent to copy, without more, is not sufficiently probative of the defendant's success in causing confusion to weigh such a finding in the plaintiff's favor; rather, defendant's intent will indicate a likelihood of confusion only if an intent to *confuse* consumers is demonstrated via purposeful manipulation of the junior mark to resemble the senior's."). Therefore, if a jury believes that the visible use of PEM was an honest mistake by a vendor, this would not skew the "intent" *Lapp* factor in PennEngineering's favor.

However, there is a genuine factual dispute regarding customer confusion for Peninsula's visible uses of the PEM keywords in ad results. Unlike the hidden use of the PEM trademark to trigger ads, a reasonable jury could conclude that there is a likelihood of initial interest confusion from the visible use of "PEM" in Peninsula's advertisements because the advertisement is not clearly labeled. On the other hand, a reasonable jury weighing the *Lapp* factors could instead conclude that that there was no intent to confuse (rather, a vendor mistake) and that the average

Internet user's ability to understand the difference between ads and direct search results diminishes the likelihood of confusion in these limited instances. *Checkpoint Sys.*, 269 F.3d at 297 ("As with all cases involving the likelihood of confusion under the Lanham Act, courts should employ all the relevant *Lapp* factors and weigh each factor to determine whether in the totality of the circumstances marketplace confusion is likely."). Despite the few instances of visible keywords, neither party has addressed whether a *de minimis* amount of initial interest confusion subsisting over a long period of time would support a trademark infringement claim. *Id.* at 298–99. Because both parties have presented evidence to establish a dispute, customer confusion on the visible use of the trademarks in Google Ads is inescapably a question of fact for the jury. *Bijur Lubricating Corp. v. Devco Corp.*, 332 F. Supp. 2d 722, 727 (D.N.J. 2004). The Court will deny PennEngineering's motion as to the visible uses of the PEM trademark for Google AdWords.

## B. Cross-Reference Charts (Doc. Nos. 258 & 259)

Next, both parties seek summary judgment on Peninsula's affirmative defenses Number 8 (comparative advertising) and Number 9 (fair use). These defenses respond to PennEngineering's trademark infringement claims based on Peninsula's use of cross-reference charts. Peninsula argues that summary judgment should be granted for its affirmative defenses because Peninsula only nominatively uses PennEngineering's marks for comparison purposes and this is a permissible fair use of the marks. Def.'s Mot. for Partial Summ. J., Doc. No. 259, at 1; Mem. in Supp. of Def's Mot. for Partial Summ. J., Doc. No. 259-1, at 22–25. PennEngineering asks the Court to grant summary judgment for it on the same defenses, in addition to its false advertising claim based on the cross-reference charts. Mot. for Summ. J. on Def.'s Eighth and Ninth Affirmative Defenses, Doc. No. 258, at 1; Mot. for Summ. J. on Pl.'s Count for False Advertising, Doc. No. 260, at 1. Because affirmative defense Number 8 based on comparative advertising

relates to the false advertising claim, discussed *infra*, the Court begins by focusing on the fair use defense to PennEngineering's trademark infringement claims.

Peninsula publishes and makes available on its website cross-reference charts to "identify Peninsula products that are available as substitutes for [PennEngineering's] products." Doc. No. 259-1, at 15. The cross-reference charts include a column for the relevant PEM marks and a column for Peninsula's products ("PENCOM"), as shown in the example below:



Ex. 3, Doc. No. 211-1, at ECF 6.

Peninsula asserts that the use of PennEngineering's marks in its cross-reference charts constitutes a "nominative" fair use because "in the nominative context, the defendant references [the] plaintiff's product in order to describe its own." *Century 21 Real Est. Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 223 (3d Cir. 2005). Under the two-step *Century 21* approach, the plaintiff bears the burden of proof to show likelihood of confusion, and then the burden shifts to the defendant to show that the nominative use of the plaintiff's mark is nonetheless fair. *Id.* at 222. Peninsula argues that (1) PennEngineering cannot establish a likelihood of confusion and (2) even if it could, Peninsula's uses are permissible fair uses.

## 1. Likelihood of Confusion

First, Peninsula argues that there is no evidence of actual customer confusion and that PennEngineering cannot show likelihood of confusion. Likelihood of confusion is indeed a classic issue of fact. *A & H Sportswear*, 237 F.3d at 207. In nominative use cases, courts analyze likelihood of confusion using the following subset of *Lapp* factors:

(1) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(2) the length of time the defendant has used the mark without evidence of actual confusion;

(3) the intent of the defendant in adopting the mark; and

(4) the evidence of actual confusion.

*Century 21 Real Estate Corp.*, 425 F.3d at 225–26.

Each side calls upon evidence to dispute the operation of these four factors. For example, Peninsula argues that the consumers for both parties' products are primarily industrial customers, who are more sophisticated than the average consumer and have specialized knowledge of their companies' supply needs. *See Checkpoint Sys.*, 269 F.3d at 284 ("Where the relevant products are expensive, or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations."). PennEngineering responds that the fasteners cost only pennies per unit. Resp. to Def.'s Mot. for Partial Summ. J., Doc. No. 283, at 32. Peninsula also disputes whether a handful of emails sent to Peninsula[1]—which PennEngineering interprets

---

[1] Peninsula also asserts that PennEngineering also failed to produce these emails during discovery. Doc. No. 291, at 8. PennEngineering does not dispute this accusation, instead asserting that "these emails did not exist at the time discovery closed." Doc. No. 293, at 16. But, although PennEngineering filed a motion to supplement based on a late-breaking email, these are not the emails at issue in that motion. Doc. No. 310. Rather, PennEngineering appears to rely on emails from November 2021 that it did not produce to opposing counsel at any point before filing summary judgment motions in January 2022.

Litigants must supplement earlier discovery responses "in a timely manner if the party learns that in some material respect the . . . response is incomplete." Fed. R. Civ. P. 26(e)(1)(A). A party cannot continuously fish for evidence after the discovery deadline, keep the new evidence hidden from opposing counsel, submit it in support of summary judgment, and then point to the discovery deadline as justification

as attempting to reach PennEngineering instead—constitute more than *de minimis* evidence of actual confusion. *See Checkpoint Sys.*, 269 F.3d at 298–99 ("We agree with the District Court that this limited initial interest confusion (i.e., the handful of e-mails and other anecdotal evidence of mistaken consumer inquiries) was de minimis when viewed in light of the length of time the parties operated together in the United States without significant evidence of confusion.").

### 2. *Permissible Fair Use*

Peninsula also argues that, even if there is likelihood of confusion, its cross-reference charts meet the second prong for permissible fair use. Courts analyzing whether a use is a permissible fair use despite likely confusion assess the following factors:

(1) Is the use of plaintiff's mark necessary to describe (1) plaintiff's product or service and (2) defendant's product or service?

(2) Is only so much of the plaintiff's mark used as is necessary to describe plaintiff's products or services?

(3) Does the defendant's conduct or language reflect the true and accurate relationship between plaintiff and defendant's products or services?

*Century 21*, 425 F.3d at 228.

Again, the parties dispute each factor. For example, on the first factor, Peninsula argues that this case is similar to *Bijur*, where the court explained that a "commercial rival is permitted to use the original manufacturer's name truthfully to describe a replacement part." *Bijur*, 332 F. Supp. 2d at 732. But PennEngineering distinguishes cases like *Bijur* as involving replacement parts that must use the brand name to describe their function (e.g., naming a particular printer model to describe replacement cartridges). PennEngineering argues that its fasteners are "staple

---

for its nondisclosure. But Peninsula has not sought sanctions for failure to supplement or made an argument to exclude this evidence beyond a passing reference complaining about this nondisclosure. Although the Court admonishes PennEngineering for its apparent failure to fulfill its discovery obligations, the Court will not otherwise address the issue at this time. The Court resolves PennEngineering's unrelated motion to supplement the record below.

items" that do not require reference to a particular model for replacement.  Doc. No. 293, at 18.

But PennEngineering cites no case law to support this distinction.  In fact, *Bijur* draws its analysis

from the comparative advertising context (discussed further below), and it is clear that a party may

use comparative advertising for any items, including "staple" items.  *See Bijur*, 332 F. Supp. 2d at

732 (citing *G.D. Searle & Co. v. Hudson Pharm. Corp.*, 715 F.2d 837, 841 (3d Cir. 1983)

(comparative advertising for laxatives)).[2]

On the third factor, Peninsula argues that "[t]here is nothing on Peninsula's cross-reference

charts that suggests any connection or association between Peninsula and [PennEngineering], and

[PennEngineering] has not introduced any contradictory evidence."  Mem. in Supp. of Def.'s Mot.

for Partial Summ. J., Doc. No. 259-1, at 24.  But PennEngineering argues that the *absence* of

disclaimers on the cross-reference chart "suggests a manufacturer-distributor relationship, or that

[Peninsula] is a division of PennEngineering or a division of a common parent."  Resp. to Def.'s

Mot. for Partial Summ. J., Doc. No. 283, at 43; *see also Century 21*, 425 F.3d at 231 (noting that

"such a disclaimer must be considered in determining whether the alleged infringer accurately

portrayed the relationship that existed between plaintiff and defendant").  Thus, the parties dispute

whether a reasonable consumer would draw accurate inferences about their relationship from the

cross-reference charts.

Because the parties have raised factual disputes on both steps of the *Century 21* analysis

governing fair use, the Court will deny both summary judgment motions on the fair use affirmative

defense (affirmative defense Number 9).

---

[2]  PennEngineering also makes a "Bob's Burgers" argument in which it asserts that a cross-reference chart comparing types of Bob's Burgers to McDonald's burgers would constitute trademark infringement.  Doc. No. 283, at 41.  But this hypothetical demonstrates a key flaw in PennEngineering's argument:  there is no likelihood of customers confusing Bob's Burgers and McDonald's from looking at such a chart.

**C.  Functionality Defense for Use of Double-Square Marks (Doc. Nos. 257 & 259)**

PennEngineering also alleges that Peninsula has infringed its "Double Squares Marks" by producing floating fasteners that also use square-in-square designs.  A floating fastener uses an outer retainer that allows an interior nut some "float" to accommodate minor misalignment. "Double squares" refers to a fastener with an interior square that rotates with a screw and is stopped by an exterior square, within a certain amount of "float" between the outer square's corners for misaligned parts, as shown below:



Br. in Supp. of Mot. for Summ. J. on Def.'s Affirmative Defense, Doc. No. 257-1, at 2.

Peninsula argues that the two trademarks for the square-in-square design are invalid because it is a functional design and so seeks summary judgment on this affirmative defense. PennEngineering not surprisingly asks the Court to grant summary judgment against Peninsula on this affirmative defense, arguing that Peninsula is estopped from raising the invalidity defense under the terms of a prior settlement agreement.

*1.  Contractual Estoppel*

PennEngineering argues that "contractual estoppel" precludes Peninsula from raising the functionality defense because it raised this defense in prior litigation that was resolved by a settlement agreement.  PennEngineering previously sued Peninsula for trademark and patent infringement in 2007.  In that litigation, PennEngineering asserted claims based on the two

"Double Square Marks."[3]  At that time, Peninsula asserted an affirmative defense that the Double

Square Marks were invalid because they were functional design features.  Ex. 5, Doc. No. 257-6

¶ 103.  Then, the Settlement Agreement entered in that earlier case stated that the parties mutually

released "all claims, demands, damages, liabilities, costs, attorneys' fees, expenses, and causes of

action known or unknown occurring prior to the Effective Date."  Settlement Agreement & Mutual

Release § 10, Doc. No. 35.

PennEngineering has again sued Peninsula based on its continued use of the Double Square

Marks but argues that, this time, Peninsula cannot assert the same affirmative defense of

functionality.  Yet, notably, the Settlement Agreement says much but it does not preclude affirmative

defenses.[4]  *See* Settlement Agreement & Mutual Release, Doc. No. 35.  Nor does it address the

validity of the Double Square Marks or release any functionality arguments.  Settlement Agreement

& Mutual Release, Doc. No. 35.  Although some courts have applied the doctrine of estoppel to

validity challenges, such settlement agreements included provisions such as "Defendant . . . shall not

challenge or take action against [Plaintiff's] federal trademark registrations."  *Dewberry Eng'rs, Inc.*

*v. Dewberry Grp., Inc.*, No. 1:20-cv-610, 2020 WL 9215948, at *1 (E.D. Va. Sept. 4, 2020).  There

is no such provision in the Settlement Agreement here.  In essence, PennEngineering asks the Court

to enforce the Settlement Agreement in a one-sided manner without there being language in the

agreement that would permit the Court to do so.  The Court will not become a partisan draftsman.

---

[3]  The two double square trademark registrations are 1,400,893 and 3,404,061.  Ex. 3, Doc. No. 35, at ECF
2; Second Am. Compl. ¶ 28, Doc. No. 211.

[4]  PennEngineering attempts to frame the validity affirmative defense as an "Invalidity Claim" that would
be encompassed by the release provision as a potential "cause of action."  Br. in Supp. of Mot. for Summ.
J. on Def.'s Affirmative Defense, Doc. No. 257-1, at 7–8.  But an affirmative defense is not a cause of
action.  *See* Settlement Agreement & Mutual Release § 16, Doc. No. 35 ("The Parties agree that California
law shall govern this Settlement Agreement, and all claims or issues related hereto . . ."); *Morris Cerullo*
*World Evangelism v. Newport Harbor Offs. & Marina, LLC*, 283 Cal. Rptr. 3d 164, 169 (Cal. Ct. App.
2021) (noting that, under California law, "an affirmative defense in an answer cannot be a cause of action").

Further, PennEngineering does not cite a single case from the Third Circuit in which a court applies the concept of "contractual estoppel" to an affirmative defense. Instead, PennEngineering cites a Sixth Circuit case, *Beer Nuts, Inc. v. King Nut Co.*, 477 F.2d 326, 327–29 (6th Cir. 1973), in which the Court of Appeals found that a settlement agreement precluded a subsequent validity defense because the agreement released the defendant from liability in exchange for its explicit recognition of the validity of the trademark.  But here, there is no language in the Settlement Agreement in which Peninsula recognized the marks' validity.  Similarly, Peninsula points out that it appears PennEngineering draws the "contractual estoppel" theory from the patent context, in which the case law requires "clear and unambiguous" contract language waiving the invalidity defense.  *See, e.g.*, *Baseload Energy, Inc. v. Roberts*, 619 F.3d 1357, 1362 (Fed. Cir. 2010).[5]  Again, there is no such language in the parties' 2008 settlement agreement.[6]

The Court declines to apply PennEngineering's theory of contractual estoppel to preclude Peninsula's validity defense in this litigation.

### 2.  Application of the Functionality Doctrine

Turning to the merits of the validity defense, Peninsula seeks summary judgment on its affirmative defense that the two double-squares marks are invalid and unenforceable because they

---

[5]  PennEngineering attempts to distinguish the patent context, arguing that "this Court should not be the first . . . to extend the aforementioned patent-law exception to contractual estoppel of validity challenges in trademark settlement agreements."  Pl.'s Suppl. Mem. of Law in Supp. of All Summ. J. Mots., Doc. No. 307, at 3.  But the reason the Court would look to the patent context in the first place is because it is one of the only areas of case law that actually applies the concept of "contractual estoppel."  PennEngineering asks the Court to (1) adopt a novel concept from the patent context and then (2) ignore the requirement from that context that the contract language be clear and ambiguous.  PennEngineering cannot have it both ways.  Nor can PennEngineering's contortions evade the basic contract law principle that written contracts mean what they say.  *Great Am. Ins. Co. v. Norwin Sch. Dist.*, 544 F.3d 229, 243 (3d Cir. 2008).

[6]  Even if it had factual merit, this theory of "contractual estoppel" appears to be a disguised breach of contract claim.  Estoppel is an equitable doctrine subject to "flexible application" by the Court to "avoid injustice."  *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 59 (1984).  The concept of "contractual estoppel" is, in this sense, an oxymoron.  *See Estoppel*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining 34 types of estoppel without mentioning the concept of "contractual estoppel").

are "functional" designs. Although many of PennEngineering's arguments on this point are incorrect, Peninsula also fails to meet its summary judgment burden.

"The functionality doctrine keeps trademarks from usurping the place of patents." *Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*, 986 F.3d 250, 256 (3d Cir. 2021), *cert. denied*, 142 S. Ct. 420 (2021). Because "[t]rade dress protection . . . is not intended to create patent-like rights in innovative aspects of product design," it "extends only to incidental, arbitrary or ornamental product features which identify the product's source." *Shire US Inc. v. Barr Laboratories, Inc*., 329 F.3d 348, 353 (3d Cir. 2003). "The functionality doctrine 'accommodates the twin purposes behind the Lanham Act. It protects the manufacturer (and the consumer) from the copying of those features that signify a product's source (and quality) and encourages competition by preventing one manufacturer from acquiring a monopoly by attempting to trademark those features of a design essential to a successful product of that type.'" *Id.* (quoting *Standard Terry Mills, Inc. v. Shen Mfg. Co*., 803 F.2d 778, 780–81 (3d Cir. 1986)).

Trademarks are presumptively valid when they are registered, so the defendant asserting invalidity at the summary judgment stage "bears the burden of proving that they are functional." *Ezaki Glico*, 986 F.3d at 259. The Court of Appeals for the Third Circuit recently addressed ambiguity in how to define "functionality" in *Ezaki Glico*. Looking to dictionary definitions, "something is functional as long as it is 'practical, utilitarian'—in a word, useful." *Id.* at 256 (quoting *Functional* (def. 2d), *Oxford English Dictionary* (2d ed. 1989)). "[I]f a design gives a product an edge in usefulness, then it is functional." *Id.* at 257.

Here, Peninsula argues that the "Double Squares" design is functional because it stops the rotation of a nut with a particular amount of float. Peninsula cites the testimony of PennEngineering's Vice President of Product Development, Brian Bentrim, who testified about

the way the smaller square provides some float while the larger square prevents rotation, which is "necessary for the functionality of the part." Statement of Undisputed Material Facts in Supp. of Def.'s Mot. for Partial Summ. J. ¶ 3, Doc. No. 259-2. It also cites PennEngineering's expert, Carmen Vertullo, who wrote about the functionality of the square-in-square design in his Second Expert Report, and who opined that the interaction between the two square shapes "is a functional feature of" the product. *Id*. ¶¶ 4–6 (citing Ex. A, Doc. No. 259-3, at ECF 4–23). He explained that the Double Square Marks allow 0.030 inches of float in all directions. *Id*. ¶ 4. Mr. Vertullo contrasted that nested square-in-square feature with the "ornamental" outer scalloped portion of the product, which has "no function in the use of the product." *Id.* ¶ 7.[7] For good measure, Peninsula cites a prior trademark prosecution by PennEngineering for admissions that the product design is functional. *Id.* ¶ 8.

PennEngineering argues that the double-squares mark is not "functional" because it is not "essential." Resp. to Def.'s Mot for Partial Summ. J., Doc. No. 283, at 11. Recognizing that this standard directly contradicts binding precedent from the Third Circuit Court of Appeals, PennEngineering asks the Court to reject contrary language from *Ezaki Glico* as dicta. Doc. No. 293, at 5; *see also* Doc. No. 283, at 11 ("In a recent case, the Third Circuit Court [of Appeals] seemingly improperly broadened the Supreme Court's functionality test by ruling that functional

---

[7] Additionally, PennEngineering argues that Peninsula improperly pairs its two square-in-square registrations as interchangeable, when one has interior scallops and the other does not. It argues that the scallop part is not functional. Peninsula counters that "the scallops are irrelevant because [PennEngineering] alleges that Peninsula infringed the Double Square design, not the scallops, and as a legal matter, the scallops are immaterial because an entire product need not be functional to render the allegedly infringed design features functional. *See, e.g., Ezaki Glico*, 986 F.3d at 257 ('We analyze functionality not at the level of the entire product or type of feature, but at the level of the particular design chosen for feature(s).')." Reply Mem. of Def. in Supp. of Its Mot. for Partial Summ. J., Doc. No. 291, at 4. Indeed, PennEngineering's Second Amended Complaint groups the two together as its "Double Square Marks." Second Am. Compl. ¶ 51, Doc. No. 211. Therefore, the Court does not distinguish between the two marks (with and without scallops) for purposes of the dueling motions.

designs need not be essential, but useful."). But this language is not dicta. In fact, the Court of Appeals explicitly stated that this concept was the "core dispute" in the case. *Ezaki Glico*, 986 F.3d at 256 ("The core dispute here is how to define 'functional.' Ezaki Glico reads it narrowly, equating it with 'essential.' But that is not what the word means.") (internal citation omitted).

PennEngineering also introduces examples of other shapes that could be used instead of squares (e.g., double crosses) to argue that the double-square design is not essential. Resp. to Def.'s Mot. for Partial Summ. J., Doc. No. 283, at 19. But as the Court of Appeals explained, "even when there are alternatives, the evidence can still show that a product design is functional." *Ezaki Glico*, 986 F.3d at 260. In other words, functionality has no uniqueness element. Further, PennEngineering does not show that these alternative shapes would allow the same amount of float in both directions.

However, Peninsula still bears the burden of proving that registered marks are functional. *Shire*, 329 F.3d at 353. There are several ways to show functionality, such as "to show that a feature 'is essential to the use or purpose of the article,'" *Ezaki Glico*, 986 F.3d at 257 (quoting *Qualitex Co. v. Jacobson Prod. Co., Inc.*, 514 U.S. 159, 165 (1995)); that "it affects the cost or quality of the article," *Ezaki Glico*, 986 F.3d at 257; or "if the 'exclusive use of [the feature] would put competitors at a significant non-reputation-related disadvantage,'" *id.* (quoting *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32 (2001)). Mr. Vertullo's report is framed, in part, as a rebuttal to Peninsula's expert, Kent Godsted, who apparently opined that the square shape does affect the cost of the floating fasteners and that it is disadvantageous for competitors to work with alternative shapes. Ex. A, Doc. No. 259-3, at ECF 20–22. But Peninsula does not actually introduce Mr. Godsted's report at the summary judgment stage. Instead, Peninsula cites to non-legal uses of the

word "functional" by the parties and experts without analyzing what makes this particular product design a functional one under governing precedent.

PennEngineering counters these general arguments through its expert, Mr. Vertullo, who opines that the method of manufacturing the double shape designs (called "cold-forming") entails the same cost and produces the same quality for any shape, although "some shapes may be marginally easier to form than others." Ex. A, Doc. No. 259-3, at ECF 16. Mr. Vertullo also opines that "in [his] experience, engineers often insist on PEM in manufacturing assembly operations and look for the 'square-in-square' trademark to ensure they are getting a genuine PEM product." Ex. A, Doc. No. 259-3, at ECF 13. Given this evidence, there is at least at this time a genuine dispute of material fact as to whether the square-in-square design is "functional" under the *Ezaki Glico* standard. 986 F.3d at 257 (explaining that a design is functional "if it affects the cost or quality of the article," but "a design is not functional if all it does is identify its maker").

Peninsula faces a double burden on its double square argument: (1) to prove that the registered mark is functional and (2) to prove that there is no genuine dispute of material fact for summary judgment.[8] Because Peninsula has not met either burden, the Court will deny its motion for summary judgment on its functionality affirmative defense.

### D. Resold Products/Counterfeiting (Doc. Nos. 259 & 261)

Additionally, PennEngineering alleges that Peninsula has purchased and re-sold certain of PennEngineering's fastener products. PennEngineering labels this trademark counterfeiting in

---

[8] Peninsula argues that its burden to prove that a registered mark is functional does not apply to PennEngineering's common law claims. Mem. in Supp. of Def.'s Mot. for Partial Summ. J., Doc. No. 259-1, at 3. Counts 15 and 16 of the Second Amended Complaint assert common law trademark infringement based on the registered Double Square Marks. Peninsula frames this as asserting "unregistered common law rights." Mem. in Supp. of Def.'s Mot. for Partial Summ. J., Doc. No. 259-1, at 3. But courts analyze common law unfair competition claims based on *registered* marks in the same way as claims based on these marks under the Lanham Act. *Flynn v. Health Advoc., Inc*., 169 F. App'x 99, 101 n.3 (3d Cir. 2006). And

violation of Section 32 of the Lanham Act.  Second Am. Compl. ¶¶ 139–161, Doc. No. 211.

Although PennEngineering seeks summary judgment on this theory as part of its PEM trademark

infringement motion, Ex. 2, Doc. No. 261-9, at 55–56, PennEngineering provides no analysis of

the elements of counterfeiting for a Lanham Act claim.

Peninsula argues that the only times it has resold PennEngineering's products are when a

Peninsula customer requested that Peninsula obtain PennEngineering parts to fulfill part of an

order and the consumer was aware that they were receiving PennEngineering parts as ordered.

Peninsula asserts that such sales are protected by the first sale doctrine and moves for summary

judgment on certain of the counterfeiting claims.  Def.'s Motion for Partial Summ. J, Doc. No.

259, at 1.[9]

"According to the 'first sale' or 'exhaustion' doctrine, a trademark owner's authorized

initial sale of its product into the stream of commerce extinguishes the trademark owner's rights

to maintain control over who buys, sells, and uses the product in its authorized form."  *Iberia

Foods Corp. v. Romeo*, 150 F.3d 298, 301 n.4 (3d Cir. 1998).  However, there is an exception to

the first-sale doctrine for goods that are materially different when they are resold.  *Id.* at 303.  "The

purpose of the material differences test is to determine whether the allegedly infringing products

are likely to injure the goodwill developed by the trademark owner in the trademarked goods."  *Id.*

PennEngineering argues that products resold by Peninsula are "materially different"

because they are not covered by PennEngineering's warranty or customer service.

PennEngineering cites an unpublished District of New Jersey opinion for the proposition that

---

regardless, Peninsula faces the burden as the party moving for summary judgment to show no reasonable
jury could find in PennEngineering's favor on this point.

[9]  Specifically, Peninsula seeks summary judgment on counterfeiting claims related to Counts 23 through
34 of the Second Amended Complaint.  Doc. No. 259, at 1.  These counts address Peninsula's use of a
"Double Groove mark" (Reg. No. 2,077,226), "Dimple Mark" (Reg. No. 1,089,546), and a "Circle on
Pedestal Mark" (Reg. No. 5,730,730).  Second Am. Compl. ¶¶ 170–229, Doc. No. 211.

goods are "materially different" when they lack the warranty and customer service typically provided by the plaintiff. *Rockwell Automation, Inc. v. Radwell Int'l, Inc*., No. 15-cv-05246, 2019 WL 7288946, at *3 (D.N.J. Dec. 30, 2019). But in *Rockwell*, the court noted that "Rockwell has created a closed and exclusive supply chain of its trademarked goods by obligating a vertical supply network of authorized distributors to sell Rockwell trademarked goods ONLY to those customers who will NOT re-sell the goods on the gray market." *Id.* at *1. The defendant, Radwell, made misrepresentations to obtain the goods, such that the goods were unauthorized "gray" goods. *Id.* at *3. Here, in contrast, PennEngineering allows purchases without any such limitations. But PennEngineering refers to Peninsula's sales as "gray" products that are "not genuine PennEngineering Products" because resale invalidates the warranty. Resp. to Def.'s Mot. for Partial Summ. J., Doc. No. 283, at 46. Authorized distributers may sell its products and maintain the warranty, but Peninsula is not an authorized distributor. Pl.'s Sur-Reply to Def.'s Mot. for Partial Summ. J., Doc. No. 293, at 21 (citing Def.'s Opp. Ex. GG). By selling PennEngineering's products, PennEngineering argues, Peninsula implicitly holds itself out as an authorized distributor, which under PennEngineering's terms would maintain the warranty. While the Court can agree that this establishes a difference, the key issue remains whether this difference is *material*. *Iberia Foods*, 150 F.3d at 303. This is a question of law. *Id.*

"Any differences that are likely to damage the goodwill developed by the trademark owner can be deemed material." *Id.* at 304. The court in *Rockwell* addressed products for which a warranty would be important because the products were industrial automation systems. *Rockwell*, 2019 WL 7288946, at *1. Here, in contrast, each fastener costs only a few cents each. Resp. to Def.'s Mot. for Partial Summ. J., Doc. No. 283, at 32. Presumably invoking the images of King Richard III

during the Battle of Bosworth[10] or the 14th century nursery rhyme[11] or Benjamin Franklin's famous quotation[12] to emphasize that even the smallest things can lead to grave and great consequences, PennEngineering argues that complex systems depend on a small fastener working properly. However true that might be, counsel conceded that the warranty covers only the cost of the fastener. Hr'g Tr. at 39:2–15, Doc. No. 308.  In other words, if an entire system broke down because of a defect in a PennEngineering fastener, PennEngineering would reimburse its customer only for the two-cent fastener.  *Id*.  This suggests that the warranty is likely not a driving force for any customer.

PennEngineering also cites a declaration by its Global Vice President of Quality and Innovation, Rocky Pinheiro, which actually hurts its own argument.  Mr. Pinheiro states that he "is not aware of any instance" in which a purchaser filed a warranty claim after purchasing one its fasteners from a competitor such as Peninsula.  Second Decl. of Rocky Pinheiro ¶ 8, Doc. No. 283-4.  There is no evidence that purchasers of PennEngineering products from Peninsula expect a warranty or customer service.   And if a customer were to hypothetically reach out to PennEngineering for help with one of its products which the customer purchased from Peninsula, "PennEngineering would likely assist the customer the first time this occurred [and] would then advise the customer that it must purchase PEM fasteners from an Authorized Dealer in order to receive any further assistance."  *Id.* ¶ 5.

At oral argument, counsel for PennEngineering also analogized to an unauthorized used car dealer selling a Ford truck.  Such a truck would not have the original Ford warranty and dealer services but would have the Ford logo and all original parts without physical alteration.  According

---

[10]   "A horse! a horse! my kingdom for a horse!"  WILLIAM SHAKESPEARE, RICHARD III act V, sc. 4, l. 7.

[11]   "For want of a nail . . . the kingdom was lost."  JOHN GOWER, CONFESSIO AMANTIS (1390); *see U.S. ex rel. E & H Steel Corp. v. C. Pyramid Enters., Inc*., 509 F.3d 184, 187 n.4 (3d Cir. 2007).

[12]   "Beware of little expenses. A small leak will sink a great ship."  Benjamin Franklin, THE WORKS OF BENJAMIN FRANKLIN, VOL. II LETTERS AND MISC. WRITINGS 1735-1753, ch. 22 (1904).

to PennEngineering's theory of counterfeiting, the truck is "not a Ford." Hr'g Tr. at 37:8, Doc. No. 308. Yet, a material differences claim requires showing "differences that are likely to damage the goodwill developed by the trademark owner." *Iberia Foods*, 150 F.3d at 301. Unlike a fake Gucci bag that falls apart and injures an unsavvy, label-anxious customer's goodwill toward Gucci, a used Ford truck is still a Ford. PennEngineering's "ceci n'est pas une Ford" theory of counterfeiting falls flat.[13]

Here, the Court finds that a few-cent warranty and potential customer service is not a material difference in the fastener products that would injure the goodwill of the consumer toward PennEngineering. *Iberia Foods*, 150 F.3d at 303. PennEngineering has not introduced evidence from which reasonable jurors could conclude that it has established a counterfeiting claim. Therefore, the Court will grant summary judgment for Peninsula on the counterfeiting claim for the requested counts (Counts 23–34) and deny PennEngineering's motion on the same.

## II.    False Advertising (Doc. Nos. 259 & 260)

PennEngineering also seeks summary judgment on its false advertising claim. PennEngineering argues that Peninsula's use of cross-reference charts and copied performance data prove false advertising. To establish a false advertising claim under the Lanham Act, a plaintiff must prove:

1)  that the defendant has made false or misleading statements as to his own product [or another's];

2)  that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience;

3)  that the deception is material in that it is likely to influence purchasing decisions;

4)  that the advertised goods traveled in interstate commerce; and

---

[13]  René Magritte, *The Treachery of Images* (painting) (1929).

5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.

*Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011).

PennEngineering argues that both the cross-reference charts and the copied performance data are *per se* false.  "[A]lthough the plaintiff normally has the burden to demonstrate that the defendant's advertising claim is false, a court may find that a completely unsubstantiated advertising claim by the defendant is *per se* false without additional evidence from the plaintiff to that effect."  *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 590 (3d Cir. 2002).

### A. Performance Data

In its "False Data Claim," PennEngineering argues that Peninsula admits to publishing *per se* false performance data because Peninsula admitted that it reverse-engineers the parts and then assumes that the performance "should" be the same as the PennEngineering products.  Pl.'s Br. in Supp. of Mot. for Summ. J. on Def.'s False Advertising, Doc. No. 260-54, at 52 (citing Summers Dep. Tr. at 67:23).  PennEngineering describes a time-consuming and expensive process to test each of its products for performance ratings (*e.g.*, how much weight each fastener can secure).  PennEngineering introduces evidence that Peninsula publishes performance data on thousands of products that show identical performance but argues that that Peninsula has only independently tested around 51 of its products.  *Id.* at 48–50.  PennEngineering also claims that Peninsula sometimes disregards its own test results to publish PennEngineering's data instead.

To argue that the performance ratings are false, PennEngineering introduces an expert who opines that the way in which the fasteners are manufactured affects the final performance properties.  *Id.* at 52 (citing Vertullo Suppl. Third Report ¶¶ 48–49).  PennEngineering then introduces (1) an admission by Mr. Summers (Peninsula's Director of Product Development) that

Peninsula does not know how PennEngineering manufactures each part; (2) a declaration stating that PennEngineering's manufacturing process is a closely guarded trade secret; and (3) Mr. Summers's deposition testimony that Peninsula does not specify manufacturing processes for its manufacturing vendors. *Id.* at 53–56. But PennEngineering does not actually show that any particular performance rating published by Peninsula is incorrect, instead focusing on the assertion of *per se* falsity.

Peninsula argues that *per se* falsity requires showing the advertisement has no "semblance of support." *Novartis Consumer Health*, 290 F.3d at 589–90. Peninsula argues that Mr. Summers's testimony shows that the goal of the reverse-engineering program was to follow the "form and function" to achieve the same performance. Def.'s Opp. to Pl.'s Mots. for Partial Summ. J., Doc. No. 282, at 5–6. Peninsula introduces an expert, Dr. Lee Swanger, whose test results show that the performance characteristics of a subset of the products tested are the same. Ex. CC, Doc. No. 282-2, at ECF 1257. Peninsula also argues that PennEngineering's own expert conducted testing of Peninsula's products and found that the majority were consistent with the published performance data, as also confirmed by Dr. Swanger. Vertullo Third Suppl. Report ¶¶ 38–40, Doc. No. 258-42; Ex. CC, No. 282-2 at ECF 1263–69.[14] Dr. Swanger also opines that PennEngineering's expert made certain errors he acknowledged at his deposition and did not apply an objective written protocol to test the two sets of products. Ex. CC, Doc. No. 282-2, at ECF 1261.

Based on the evidence presented, a reasonable jury could conclude that Peninsula's performance data has a "semblance of support," which would defeat the *per se* falsity theory on which PennEngineering seeks summary judgment. *Novartis Consumer Health*, 290 F.3d at 589–

---

[14] Peninsula also points to its standard disclaimer that performance data are not guarantees of performance.

90.[15]  Therefore, the Court will deny PennEngineering's motion for summary judgment on its false

advertising count based on the False Data Claim.

**B. Cross-Reference Charts**

Hoping to build on its performance data arguments, PennEngineering also argues that use

of the cross-reference charts is misleading insofar as it suggests that the parts are interchangeable

when they are not (its "False Equivalency Claim") and seeks summary judgment on Peninsula's

affirmative defense for comparative advertising (affirmative defense Number 8).  Mot. for Summ.

J. on Def.'s Eighth & Ninth Affirmative Defenses, Doc. No. 258; Mot. for Summ. J., Doc. No.

261.  Peninsula, in turn, seeks summary judgment on PennEngineering's claims based on the cross-

reference charts for failure to introduce evidence of confusion.  Def.'s Mot. for Partial Summ. J.,

Doc. No. 259.

The comparative advertising defense generally follows the same analysis as the nominative

fair use defense.  *Bijur Lubricating Corp*., 332 F. Supp. 2d at 734.  PennEngineering devotes only

*one* page of *one* of its 64-page summary judgment briefs on Peninsula's comparative advertising

defense.  Pl.'s Br. in Supp. of Mot. for Summ. J. on Def.'s Eight and Ninth Affirmative Defenses,

Doc. No. 258-53, at 59.  PennEngineering seeks to apply the same *Century 21* analysis from the

nominative  fair  use  context  to  prove  its  False  Equivalency  Claim  and  defeat  Peninsula's

---

[15]  PennEngineering has also failed to meet the second prong (actual deception) for proving a false
advertising claim.  PennEngineering argues that because it seeks both damages and injunctive relief, there
is a presumption of deception. Pl.'s Br. in Supp. of Mot. for Summ. J. on Def.'s False Advertising, Doc.
No. 260-54, at 59.  This is incorrect.  PennEngineering cites *Alpha Pro Tech*, in which this Court explained
that there is no presumption when the litigant seeks *only* monetary damages.  *Alpha Pro Tech, Inc. v. VWR
Int'l, LLC*, No. 12-cv-1615, 2017 WL 3671264, at *14 (E.D. Pa. Aug. 23, 2017).  The Court applied case
law which explained that the presumption applies "only . . . when [the plaintiff is] seeking injunctive relief
*rather than* damages."  *Id.* at 14 (emphasis added).  When a litigant seeks *both* injunctive relief and
damages, there is no presumption of deception for the monetary damages claim.  *Newborn Bros. Co. v.
Albion Eng'g Co.*, 481 F. Supp. 3d 312, 344 (D.N.J. 2020).  PennEngineering does not distinguish between
the two claims in arguing it does not need to prove deception.

comparative advertising affirmative defense.  Pl.'s Br. in Supp. of Mot. for Summ. J. on Def.'s Eighth and Ninth Affirmative Defenses, Doc. No. 258-53, at 59.

PennEngineering argues that the "synergy" between the performance data publications and the cross-reference charts identifying substitute Peninsula parts creates the false impression that the fasteners are equivalent when Peninsula's fasteners are actually "knockoffs."  Pl.'s Suppl. Mem. of Law in Support of All Summ. J. Mots., Doc. No. 307, at 8.  It introduces an expert, Dr. Erich Joachimstaler, who opines that the cross-reference charts are likely to mislead customers "into believing that the corresponding [Peninsula] products are equal in quality and all other respects."  Ex. 92, Doc. No. 258-41, at 45–46.  Peninsula counters that a "substitute" chart does not mean "equivalent" and that PennEngineering has not met its burden to demonstrate that no reasonable jury could find that the products are appropriate substitutes.  Def.'s Opp. to Pl.'s Mots. for Partial Summ. J., Doc. No. 282, at 4, 9–10.  For example, even if Peninsula's products were lower quality, PennEngineering's former directors of global marketing and sales testified that a substitute is still usable if it is of lower quality.  *Id.* at 9.

Both parties return to their dispute over the application of the *Century 21* factors to the cross-reference charts, discussed *supra*.  They dispute whether a reasonable consumer would draw accurate inferences about the relationship between their products (identical versus similar) from the cross-reference charts.  Based on this dispute and the dispute over whether the products have the same performance properties in the first place, the Court will also deny the dueling false advertising and comparative advertising summary judgment motions based on the cross-reference charts.

### III.    Unused Marks (Doc. No. 259)

Peninsula also requests summary judgment in its favor for 69 marks that Peninsula claims it has never used at all.  Mem. in Supp. of Def.'s Mot. for Partial Summ. J., Doc. No. 259-1, at 27.[16]  Of the 24 federally registered trademarks and 148 common law marks that PennEngineering claims Peninsula has infringed in the Second Amended Complaint, Peninsula claims it has never used 20 of the federally registered marks and 49 of the common law marks in any manner.  *Id*. PennEngineering opposes the motion for the "unused" registered marks and a subset of the "unused" common law marks.

### A.  Registered Marks

For the unused registered marks,[17] PennEngineering argues that Peninsula has used "marks that are confusingly similar to [the] PEM family of marks."  Resp. to Def.'s Mot. for Partial Summ J., Doc. No. 283, at 48. But it does not provide any evidence of confusingly similar marks used by Peninsula.  PennEngineering simply notes that "PEM" appears within its *own* related marks (e.g., "PEMHEX") and argues it is a question of fact whether Peninsula's use of "PEM" also infringes, for example, PennEngineering's "PEMHEX" mark.  *Id.*  This misconstrues what it means for a mark to be confusingly similar:  the issue is whether Peninsula (not PennEngineering) has used marks that are similar to PennEngineering's family of marks.

PennEngineering also argues that "[a] family of marks may have a synergistic recognition that is greater than the sum of each mark."  Doc. No. 293, at 25 (quoting *Quality Inns Int'l, Inc. v.*

---

[16]  Although Peninsula initially sought summary judgment on 71 unused marks, Peninsula clarified after oral argument that this was a mathematical error.  Peninsula seeks summary judgment on 69 of the marks. Letter from S. Silver to Hon. Gene E.K. Pratter (May 17, 2022).

[17]  The 20 unused registered marks are the PEM logos registered at Nos. 889,244; 1,043,967; 1,092,108; 1,113,034; 4,331,371; and PEMFLEX, PEMHEX, PEMSERT, PEMSERTER, PEMSERTER MICRO-MATE, PEMSERTER and triangle composite, PEM SP, PEM300, AUTOPEM, MICROPEM, AEROPEM, PEM SH, PEM SH and design, PEM VM, and PEM SMPP.  Statement of Undisputed Material Facts in Supp. of Def.'s Mot. for Partial Summ. J. ¶ 28, Doc. No. 259-2; Second Am. Compl. ¶ 23, Doc. No. 211.

*McDonald's Corp.*, 695 F. Supp. 198, 212 (D. Md. 1988)).  But PennEngineering does not point to any evidence that Peninsula has infringed on such family "synergy."  The trademark family cases cited by PennEngineering involve instances where the infringing party used the prefix to suggest its product was part of the trademark family.  For example, in *Quality Inns*, McDonalds alleged that the name "McSleep Inn" infringed its "Mc" family of marks (McChicken, McMuffin, etc.).  *Quality Inns Int'l, Inc.*, 695 F. Sup. at 203, 212.  Here, there is no evidence that Peninsula used "PEM" as a prefix for its own products such that the Peninsula product could appear to be part of the PEM family.  PennEngineering does not introduce evidence as to any of the 20 registered marks that Peninsula asserts it has not used.  There is simply no evidence that Peninsula's "use of the PEM *and PEM Family Marks* creates a likelihood of confusion."  Doc. No. 261-9, at 52 (emphasis added).

Peninsula argues that any additional claims based solely on the use of "PEM" within the family would be duplicative of the PEM-based claims already alleged.  Reply Mem. of Def. in Supp. of Its Mot. for Partial Summ. J., Doc. No. 291, at 12–13.  The Court agrees and will grant summary judgment for Peninsula on the duplicative claims for the 20 registered marks not used by Peninsula.  *See Brown & Brown, Inc. v. Cola*, 745 F. Supp. 2d 588, 626 (E.D. Pa. 2010) (dismissing duplicative claims for tortious interference with contractual relations and unfair competition).

### B.  Common Law Marks

PennEngineering also opposes the motion for 19 of the "unused" common law marks.  Resp. to Def.'s Mot. for Partial Summ. J., Doc. No. 283, at 49.  PennEngineering again asserts that, although Peninsula has not used the exact common law mark at issue, it has used "confusingly similar" marks.  But this time, PennEngineering points to specific examples of similar marks for

18 of the unused marks. For example, PennEngineering asserts that Peninsula's "SF" series in its cross-reference charts is confusingly similar to PennEngineering's asserted common law marks for SFN, SFP, SFK, and SFW. *Id.*; *see also* Ex. 3, Doc. No. 211-1, at ECF 6 (cross-reference chart). Although there is no evidence that Peninsula used the SFN, SFP, SFK, or SFW marks, trademark infringement extends to use of "confusingly similar" marks such as an SF series. *Country Floors, Inc. v. P'ship Composed of Gepner & Ford*, 930 F.2d 1056, 1063 (3d Cir. 1991). Thus, the cross-reference charts support certain of its unused common law mark claims through use that could be considered confusingly similar. Peninsula does not address this argument, instead focusing on the remaining 30 unused common law marks. Reply Mem. of Def. in Supp. of Its Mot. for Partial Summ. J., Doc. No. 291, at 13.

Unlike the registered marks, PennEngineering's claims based on 18 of its common law marks (e.g., "SFN") are not duplicative of other claims. But one of the 19 common law marks— "PEM C.A.P.S."—is duplicative of the "PEM" claim as discussed above. Therefore, the Court will deny summary judgment on 18 of the 19 common law marks for which PennEngineering asserts confusingly similar use, but will grant summary judgment for Peninsula on the remaining 31 unused marks.[18]

## IV.    Motion to Supplement (Doc. No. 310)

After oral argument, PennEngineering filed a motion to supplement the record with a new "smoking gun" on the issue of actual confusion involving the PEM mark. In particular, they emphasize Exhibit 125, which is a translated May 12, 2022 email chain about a parts order in

---

[18] Peninsula represents that the 30 unused common law marks that are not disputed are S-RT, SH, SMPP, SMTSO, SMTSOB, MPP, TPS, TP4, TPXS, MS04, MSOFS, SMTSS, MSIB, PF11M, PF11MF, PF11MW, PF12M, PF12MF, PF12MW, PF7M, PF7MF, PSHP, SMTPFLSM, SMPTR, RAA, RAS, SMTRA, T, TDO and VM. Reply Mem. of Def. in Supp. of Its Mot. for Partial Summ. J. at 13, Doc. No. 291. PennEngineering has not challenged this analysis and the Court accepts it as an accurate list of the marks. The 31st mark for which summary judgment will be granted is PEM C.A.P.S., as discussed above.

Mexico.  Ex. 125, Doc. No. 310-3.  PennEngineering argues that the email chain is important evidence of customer confusion.  In the email, a purchasing manager addressed a May 10 quote request for a standoff to "Roxana, Luis, [and] José," using Roxana and Luis's Peninsula email addresses and José's PennEngineering address.  PennEngineering argues that "the fact that the [buyer] sent this request for quote to PennEngineering and [Peninsula] *collectively* is strong evidence that the [buyer] believed there is some business relationship between the two as a source of . . . PEM parts."  Mem. of Law in Supp. of Pl.'s Mot. to Suppl. Its Evid., Doc. No. 310-1, at 3.

Peninsula does not oppose the motion to supplement.  "Rather, Peninsula asks that the Court review the email string that plaintiff has submitted because it emphatically demonstrates that plaintiff truly has no evidence of confusion, actual or likely."  Resp. of Def. to Pl.'s Motion to Suppl. Its Evid., Doc. No. 312, at 1.  Almost as an evidentiary after-thought, Peninsula also argues that the email string is hearsay and PennEngineering does not introduce a witness "who will say how the email chain represents some form of confusion that is relevant to an issue to be tried."  *Id.* at 2.

In evaluating a motion to supplement, the Court considers the prejudice to each party, whether the "evidence is admissible and has probative value," and "the reasonableness of [the movant's] explanation for failing to introduce the desired evidence" by the deadline.  *Bistrian v. Levi*, 448 F. Supp. 3d 454, 484–85 (E.D. Pa. 2020).  Because Peninsula does not oppose the motion or view the evidence as harmful to its case, there is no prejudice for the Court to weigh.  PennEngineering argues that the email is admissible nonhearsay because it is not offered for the truth of the matter asserted, but rather, for the incorrect understanding the sender had regarding who could provide a quote.  *See Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 719 (3d Cir. 2004) (finding statements about the incorrect product "not hearsay because they are not

submitted for their truth; indeed, it is their falsity that shows the speaker's confusion").  And PennEngineering could not have produced the exhibits earlier because they post-date the summary judgment deadline. Although one isolated email is not enough to meet PennEngineering's summary judgment burden on actual confusion over the course of several years (and the email does not relate to the narrow claims for which the Court grants summary judgment to Peninsula), it could turn out to be relevant to the issue of confusion on PennEngineering's remaining claims at trial.

Therefore, the Court will grant the unopposed motion to supplement the record.

### CONCLUSION

For the foregoing reasons, the Court denies in full PennEngineering's motions for summary judgment and grants in part and denies in part Peninsula's motions for summary judgment.  An appropriate order follows.

BY THE COURT:

 /s/ Gene E.K. Pratter
**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**