IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PENN ENGINEERING & : 
MANUFACTURING CORP., : CIVIL ACTION
          *Plaintiff* : 
  : 
    **v.** : 
  : 
PENINSULA COMPONENTS, INC., : No. 19-513
          *Defendant* : 

## MEMORANDUM

PRATTER, J.                                         DECEMBER 28, 2023

       Various numbers "have been regarded as possessing a mystical significance, but there can be no doubt that in the extent, variety, and frequency of its use the number 3 surpasses all the rest."[1] According to the ancient Greek philosopher Pythagoras, the number three was considered the perfect number because it was the number of harmony, wisdom, and understanding.[2] It is also the number denoting time (past, present, future) and the magic number in fairy tales (three blind mice, three billy goats gruff, three wishes, etc.).[3] And, according to Penn Engineering in its latest motion for summary judgment, the number three's "the thing [w]herein [it]'ll catch the conscience of the King."[4]

       In the Court's previous summary judgment opinion, the Court found that there was a factual dispute over whether Peninsula's use of Penn Engineering's trademarks in its "PEM Family of Marks" (based on the name of its holding company) in Google search advertisements stemming

---

[1] Emory B. Lease, *The Number Three, Mysterious, Mystic, Magic*, 14-1 Classical Philology 56, 56 (1919).

[2] *Three is The Magic Number*, Welsh National Opera (Mar. 26, 2019), https://wno.org.uk/news/three-is-the-magic-number.

[3] See id.

[4] William Shakespeare, Hamlet, act 2, sc. 2.

from two ad vendors constituted an intent to confuse. Since then, a third vendor of Peninsula has shown similar ads, and Penn Engineering argues that, because there is now a *third* instance of such advertisements being shown, instead of only two, there is no longer a factual dispute that Peninsula intended to confuse consumers. Although the number three may have certain mystical qualities, the third time's not the charm for Penn Engineering here.

At the same time, Peninsula moves for summary judgment on (1) the extent that Penn Engineering's claims rely on Peninsula's use of Peninsula's website search tool and (2) the extent that Penn Engineering's claims rely on Peninsula's use of sales drawings. Like a person searching for Domino's Pizza on Pizza Hut's website could not be confused that they are purchasing Domino's Pizza when being presented with Pizza Hut options, a customer searching for Penn Engineering products on Peninsula's website that presents Peninsula products could not be confused into thinking he or she is buying Penn Engineering products. On the other hand, there is a factual dispute over the extent to which Peninsula's use of sales drawings constituted advertising. Thus, the Court grants and denies in part Peninsula's motion for summary judgment.

## BACKGROUND[5]

Penn Engineering designs and manufactures various types of fasteners sold under myriad trademarks, including "PEM" marks, Product Configuration Marks, and Common Law Marks. Penn Engineering claims that Peninsula has sold its own identical fasteners while infringing on Penn Engineering's marks. Penn Engineering brings a laundry list of claims against Peninsula, including for trademark infringement, trademark counterfeiting, and unfair competition.

---

[5]   Writing for the parties, the Court assumes their basic familiarity with the facts of this case after almost five years of continued litigation. *See Penn Eng'g & Mfg. Corp. v. Peninsula Components, Inc.*, No. 19-513, 2022 WL 3647817, at *1 (E.D. Pa. Aug. 24, 2022).

Peninsula previously produced thousands of documents in discovery related to seven alleged unlawful activities. In this case's first round of summary judgment, the Court found in favor of Peninsula on the issues of "Keyword Conquesting" and "Unlawful Gray Market sale of authentic Penn Engineering fasteners," two of those seven alleged unlawful activities. Since then, the Court granted Penn Engineering's Motion to Compel supplemental discovery related to Peninsula's (1) "Use of PEM marks and Common Law Marks in Printed Cross-Reference Charts," (2) "Use of Common Law marks in Peninsula's Online Search Tool," and (3) "Copying and publishing Penn Engineering's performance data as if it were Peninsula's."

The Court then issued an amended scheduling order permitting the parties to have one final round of summary judgment limited to the above issues relevant to the supplemental discovery. Both parties, unsurprisingly after this prolonged litigation, filed respective motions for summary judgment.

## LEGAL STANDARD

The Court grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To raise an issue of material fact, the non-moving party 'need not match, item for item, each piece of evidence proffered by the movant, but simply must exceed the 'mere scintilla' standard.'" *Carpenter v. Proctor & Gamble Disability Benefit Plan & Benefit Plans Tr.*, 229 F. App'x 170, 170-71 (3d Cir. 2007) (quoting *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993), *cert. denied*, 510 U.S. 994 (1993)).

The key to surviving summary judgment is evidence. *See Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.")). If the party moving for summary judgment has made a

3

*prima facie* case for summary judgment, "the opposing party must show that there is sufficient evidence for a jury to return a verdict in factor of the non-moving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted." *Carpenter*, 229 F. App'x at 171 (internal quotation marks omitted) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (citing *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109-10 (3d Cir. 1985)).

DISCUSSION

## I.   Penn Engineering's Motion for Summary Judgment

Penn Engineering filed its motion for summary judgment on the first four counts of the Second Amended Complaint for trademark infringement based on Peninsula using PEM marks in its online display ads. To analyze trademark infringement claims for likelihood of confusion, courts use the *Lapp* factors:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods . . . are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9)  the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;

(10)  other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 215 (3d Cir. 2000).

Here, Penn Engineering argues that Peninsula has "continue[d] to intentionally use PEM's famous mark PEM in [Peninsula's] online display ads and that such use was not a 'vendor mistake' as [Peninsula] has alleged."  For example, a search conducted on August 2, 2023 for "pem standoff" produced a sponsored search result for "Pem Standoff – Clinch Standoffs" underneath a URL directing the user to Peninsula's website, as demonstrated below:



Ex. 2 at 2, Doc. No. 355-4.

Penn Engineering's argument is a familiar one to the Court.  That is because Penn Engineering filed its first motion for summary judgment on the same exact basis, and the Court there found that "there is a genuine factual dispute regarding customer confusion for Peninsula's

visible uses of the PEM keywords in ad results." Mem. Op. at 10, Aug. 24, 2022, Doc. No. 314. Penn Engineering argues, however, that Peninsula has engaged in "new and continual visible use of the PEM mark" that demonstrates that Peninsula's use of the PEM mark "has clearly been intentional and purposeful" such that the fifth *Lapp* factor, the intent of the defendant in adopting the mark, now weighs so heavily in Penn Engineering's favor that no reasonable jury could believe Peninsula's argument that this was an "honest mistake by a vendor."

The Court is not convinced and sees no difference between the instant facts and those that existed over a year ago when summary judgment was first decided. Peninsula sums up Penn Engineering's argument as "while two displays of [Penn Engineering's] trademark might be a mistake . . . , three such displays indisputably cannot." Def.'s Mem. of Law in Opp'n, Doc. No. 359, at 4. Peninsula also presents evidence in the form of a declaration from its Marketing Director where she declares under oath that Peninsula's online ad vendor mistakenly permitted the PEM marks to appear in a limited number of advertisements. Dec. of Blake Gardiner ¶ 4, Doc. No. 359-2. Three is not a magic number here that eliminates a genuine issue of material fact. For the same reasons that the Court previously denied Penn Engineering's motion for summary judgment on Penn Engineering's trademark infringement claims, the Court denies Penn Engineering's instant motion.

## II. Peninsula's Motion for Summary Judgment

Peninsula filed a motion for summary judgment on multiple counts of Penn Engineering's Second Amended Complaint (1) to the extent that Penn Engineering's claims rely on Peninsula's use of a Peninsula website search tool because such activity does not constitute trademark infringement and (2) to the extent that Penn Engineering's claims rely on Peninsula's use of sales drawings because such drawings do not constitute advertising. The Court evaluates each of these in turn.

### A. Peninsula's Website Search Tool

Peninsula's website contains a search tool that permits customers to search for information on Peninsula's fasteners and other products. After entering his or her search query, Peninsula's website search tool may provide the user with a list of results of various Peninsula products. The user cannot purchase the fasteners directly from Peninsula's website from the generated search results but rather must directly interact with Peninsula sales staff to make a purchase. Peninsula argues (1) that customers inputting Penn Engineering's marks into the search tool does not constitute Peninsula's "use" of Penn Engineering's trademarks under the Lanham Act and (2) that there is no likelihood of confusion when a user searches for Penn Engineering marks on Peninsula's website and is then presented with Peninsula products.

#### 1. A Customer Inputting Penn Engineering's Marks on Peninsula's Website Constitutes Use of Those Trademarks Because of Peninsula's Meta Tags.

The Lanham Act states that "[a]ny person who shall, without the consent of the registrant . . . *use* in commerce any reproduction . . . of a registered mark in connection with" a sale where "such *use* is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action." 15 U.S.C. § 1114(1) (emphases added). Peninsula argues that customers inputting Penn Engineering's trademarks on the website search tool do not constitute Peninsula's use of those trademarks.

Peninsula largely relies on *Perfect 10, Inc. v. Giganews, Inc.*, No. CV11-07098 AHM (SHx), 2013 WL 2109963 (C.D. Cal. Mar. 8, 2013), *aff'd*, 847 F.3d 657 (9th Cir. 2017), for this argument. In *Giganews*, Giganews owned and operated websites that sold access to a program called USENET for a monthly fee. *Id.* at *2. The content on USENET was primarily user-driven where "the content that is stored on a USENET provider's server is generally uploaded by USENET users or subscribers." *Id.* at *1. Perfect 10 alleged that Giganews infringed on its marks

when those marks appeared on Giganews by way of users uploading Perfect 10's content and marks on USENET. *Id.* at *2.

However, the court held that the defendants did not use the plaintiff's marks "in a commercial transaction by merely offering a search function that allows third parties to search for images using Plaintiff's marks as search terms. The Court is unaware of any authority that would support such a broad construction of direct trademark infringement law[,]" and "it is insufficient for direct infringement purposes to allege that a defendant allows third parties to use the mark." *Id.* at *14. That was because, in part, Giganews was a website that allowed users to upload the plaintiff's marks to conduct product searches, *id.* at *1-2, but there was no allegation that Giganews was actually paid for the images that the users could obtain from the search tool. *Id.* at *14.

Penn Engineering argues that the difference here is that, once a customer conducts the search using a PEM mark, that customer is presented with Peninsula products that the he or she can then purchase by contacting Peninsula, resulting in Peninsula engaging in a commercial transaction, even if the customer has to call Peninsula to complete the purchase. Further, in *Giganews*, the plaintiff alleged that the content was posted by the website's users and subscribers, not by the defendant itself. *Giganews*, 2013 WL 2109963, at *2.

Peninsula's search algorithm can suggest its own products when a user types in Penn Engineering's marks because Peninsula uses those marks in its meta tags on its own website. In *J.G. Wentworth, S.S.C. Limited Partnership v. Settlement Funding LLC*, the court found that the defendant's incorporation of the plaintiff's marks in its meta tags constituted trademark use under the Lanham Act because "defendant's use of plaintiff's marks to trigger internet advertisements for itself is the type of use consistent with the language in the Lanham Act which makes it a violation to use in commerce protected marks in connection with the sale, offering for sale,

8

distribution, or advertising of any goods or services, or in connection with any goods or services." No. 06-597, 2007 WL 30115, at *6 (E.D. Pa. Jan. 4, 2007) (internal quotation marks omitted).

Here, although the customer inputs Penn Engineering's marks onto Peninsula's website search tool, the search tool constitutes use under the Lanham Act. In contrast with *Giganews* where the user input the actual *content* on the website, Peninsula here is the one providing the user with content on Peninsula's own site. Although the user is conducting the *search, Peninsula's* search algorithm is producing images of and links to *Peninsula products* as a result of that search, and Peninsula does so through its use of Penn Engineering's marks in Peninsula's meta tags. Similar to *J.G. Wentworth* where the use of meta tags were not analogous to private thoughts but rather "established an opportunity to reach consumers[,]" Peninsula's use of Penn Engineering's marks to produce Peninsula products in connection with commerce is the type of use consistent with the Lanham Act. *See id.* Thus, because Peninsula includes Penn Engineering's marks in its meta tags on Peninsula's website search tool that then directs the consumer to potentially purchase Peninsula products, the search tool constitutes use under the Lanham Act.

### 2. There is No Likelihood of Confusion When a Customer Uses Peninsula's Internal Search Tool.

Peninsula argues that the analysis required for determining whether its website search tool constitutes trademark infringement is similar to that required for keyword conquesting. The Court previously rejected Penn Engineering's argument that keyword conquesting constituted trademark infringement as conduct that could cause initial interest confusion and granted summary judgment for Peninsula on Penn Engineering's infringement claims that rely on keyword conquesting. Mem. Op. at 5, Aug. 24, 2022, Doc. No. 314.

Like other circuit courts of appeals, the Court of Appeals for the Third Circuit has recognized that "initial interest confusion is probative of a Lanham Act violation." *Checkpoint*

*Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 294 (3d Cir. 2001). Initial interest confusion is "confusion that creates initial customer interest, even though no actual sale is finally completed as a result of the confusion." *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 357 (3d Cir. 2007) (quoting 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:6 (4th ed. 2007)). Initial interest confusion is a type of "bait and switch" that "will affect the buying decisions of consumers in the market for the goods, effectively allowing the competitor to get its foot in the door by confusing consumers." *Checkpoint Sys.*, 269 F.3d at 294 (quoting *Dorr-Oliver, Inc. v. Fluid Quip, Inc.*, 94 F.3d 376, 382 (7th Cir. 1996)).

This Court previously granted summary judgment for Peninsula on the "hidden" keyword conquesting portions of Penn Engineering's trademark infringement claims because the links generated as a result of the search were "clearly labeled as belonging to Peninsula and there is no likelihood of confusion where the use of trademarks as trigger words is hidden from the consumer." Mem. Op. at 8-9, Aug. 24, 2022, Doc. No. 314. Now, Peninsula argues that this prior analysis "fully applies" to Penn Engineering's trademark infringement claims based on Peninsula's website search tool.

As this Court stated in its opinion on Penn Engineering's Motion to Compel when this issue first arose, "Penn Engineering protests that the search tool is in fact more analogous to one of Peninsula's cross-reference charts . . . which listed Penn Engineering marks alongside Peninsula substitutes on Peninsula's website." Mem. Op. at 6, June 22, 2023, Doc. No. 347. The Court previously denied summary judgment on the cross-reference charts "because whether the charts led to consumer confusion depended on the factual question of whether consumers might infer a business relationship between Peninsula and Penn Engineering by seeing Penn Engineering's marks on Peninsula's website." *Id.*

Although there are many instances in which courts have analyzed the use of meta tags and their relation to Internet search engines like Google, *see, e.g.*, *J.G. Wentworth*, 2007 WL 30115, the Court is unaware of any evaluating the use of meta tags within a company's own internal search tool that scours only that company's website. The Court is presented with the question of whether the use of another's marks in meta tags within an internal search engine is more akin to keyword conquesting, where summary judgment was warranted, or to a cross-reference chart, where summary judgment was not warranted. The Court holds that, at least in this case, that it is more akin to the former.

In the internet context, the initial interest confusion theory revolves around the fact that "the wrongful act is the defendant's use of the plaintiff's mark to 'divert' consumers to a website that 'consumers know' is not [the mark holder's] website." *Storus Corp. v. Aroa Mktg., Inc.*, No. 06-2454 MMC, 2008 WL 449835, at *4 (N.D. Cal. Feb. 15, 2008) (citing *Brookfield Comm., Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1062 (9th Cir. 1999)). In this case, there is no issue of customers being diverted from Penn Engineering's website onto Peninsula's website because the user is already on Peninsula's website in the first place. Or, in the terms that the Court of Appeals for the Third Circuit has used, there is no "bait and switch" where Peninsula is trying to get its foot in the door because Peninsula *has already* gotten its foot in the door by the fact that the consumer is on Peninsula's website. *See Checkpoint Sys.*, 269 F.3d at 294. In this instance for Penn Engineering, not "every bait and switch was a work of art"[6] because no "bait and switch" exists in the first place.

Penn Engineering argues that potential customers may have arrived at Peninsula's website through "unlawful means" that include the fact that Peninsula ads on Google have included Penn

---

[6]     Taylor Swift, *willow, on* evermore (Republic Records 2020).

Engineering marks.  Although the Court has found that there is a factual dispute as to whether this constitutes initial interest confusion, it does not mean that such initial interest confusion then extends to the customer using Peninsula's search tool.  By definition, initial interest confusion is "confusion that creates *initial* customer interest." *McNeil Nutritionals*, 511 F.3d at 357 (emphasis added).  Just as there cannot be two start times for one person running a marathon or two first days of work for someone starting a new job, it logically follows that there cannot be two points of initial interest for a customer.  Although the customer may experience initial customer interest when clicking on Peninsula's Google ad with Penn Engineering's marks, that user cannot experience *yet another* instance of *initial* interest once directed to Peninsula's website.

The question then becomes whether there is a likelihood of confusion when a customer conducts a search using Penn Engineering marks on Peninsula's website using Peninsula's internal search tool that conducts a search only on Peninsula's website.  After all, "[l]ikelihood of confusion is the keystone of trademark infringement." *Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co. LLC*, No. 13-cv-324 (RGA), 2017 WL 3528606, at *17 (D. Del. Aug. 16, 2017).

According to Penn Engineering, this likelihood of confusion occurs where a consumer may directly associate Penn Engineering's marks only with Peninsula's products, unlike in keyword conquesting where Peninsula is diverting the customer's interest to alternate goods.  As an example, Penn Engineering includes the below search results page.



Ex. 2 at 3, Doc. No. 361-4. Underneath the heading bearing the "Search Results for" language, according to Penn Engineering, the page displays Peninsula products "with no indication or disclaimer that these products are not PEM products." Penn Engineering argues that the potential customer on Peninsula's website might believe that the site is "under the guise of some affiliation or sponsorship" with Penn Engineering or believe that Peninsula is a "dealer, authorized distributor, or otherwise affiliated with PEM" and thus confuse the customer.

As stated above, however, the key to summary judgment is evidence. Penn Engineering has pointed to no part of the factual record where a single user has believed that Peninsula is such a dealer, authorized distributor, or otherwise affiliated with Penn Engineering when using Peninsula's search tool. The Court "cannot rest solely on assertions made in the pleadings, legal

memoranda, or argument" in finding for Penn Engineering here. *Berckeley Inv. Grp.*, 455 F.3d at 201. In fact, at oral argument, when asked whether Penn Engineering had any evidence of a customer on Peninsula's website being confused as to whether they were purchasing Peninsula or Penn Engineering products, counsel for Penn Engineering stated, "[a]nd in this case, we don't have any evidence of a customer going to the [Peninsula] website and being confused that oh, I thought I was getting a Penn Engineering product when I typed in the Penn Engineering number." Oral Arg. Tr. 25:18-22, Nov. 29, 2023. Therefore, the Court sees nothing supporting this argument beyond Penn Engineering's "assertions made in the pleadings, legal memoranda, or argument," *Berckeley Inv. Grp.*, 455 F.3d at 201, which do not defeat a motion for summary judgment.

The Court also finds that, as a matter of law, no reasonable jury could find that there is a likelihood of confusion in this case. As demonstrated in screenshot above, a customer is presented with only Peninsula products under a large banner at the top stating "PENCOM: Peninsula Components." This denotes to the customer that they are on Peninsula Components' website and being presented with products with names that include "NB Blind," "NAL Self-Clinching Floating Nuts, Locking" and "NA Self-Clinching Floating Nuts." The only potential acknowledgement of Penn Engineering's marks is in the heading "Search Results for: CLS-0420-2." However, this type of heading is no different from a Google search results page like that listed below:



*See* Mem. Op. at 6, Aug. 24, 2022, Doc. No. 314. The Peninsula website search tool reading "Search Results for: pem fasteners" with a list of Peninsula products with their own unique identifiers is no different than the Google search bar reading "pem fasteners" followed by a link to Peninsula's website. In other words, "the search results clearly identify the advertised links [or advertised products] as belonging to Peninsula." *Id.* at 8. Thus, the keyword conquesting analysis in the Court's previous opinion granting summary judgment where there was no dispute that the links, or search results here, "are clearly labeled as belonging to Peninsula" applies here as well. *See id.* at 5-9.

Furthermore, the fact that a consumer is already on Peninsula's website that shows only Peninsula's own products further demonstrates that there is no likelihood of confusion. If a customer went on to Samsung's website, searched for "Apple iPhone" and then was presented with a list of Samsung Galaxy phones labeled as such, that customer could not possibly be confused

into thinking he or she was purchasing an Apple iPhone when Apple and Samsung are two separate companies selling two separate and distinct products. Likewise, if a customer went to the Toyota website, searched for "Honda Civic" and was presented with a list of cars clearly labeled as Toyota Corollas, that person could not think that such presented options included a Honda Civic. The only difference here is that, instead of Peninsula's search results directly stating the name Peninsula, they include the part name. A customer could not be confused that a part name, wholly different from the part name entered in the website search tool, is in fact that same part name, and Penn Engineering has presented no evidence that any consumer has even searched for Penn Engineering products on Peninsula's website, let alone a customer who believes that he or she is purchasing Penn Engineering products when presented with Peninsula products.

Penn Engineering seemingly argues that, to avoid confusion, Peninsula must include an indication or disclaimer that its own products on its own website are not Penn Engineering products. *See* Pl.'s Mem. in Opp. to Summ. J. at 8, Doc. No. 361. However, this leads to a serious policy concern in that Peninsula, and every business as well, would have to include a disclaimer for every search that includes every different possible search term of a potential competitor. For example, it may require Toyota to include a separate disclaimer for every time a customer searches for "Honda Civic," "Ford Fusion," "Chevrolet Bolt," or any other countless car make and model that currently exists or will exist in the future. In this very case, it could compel Peninsula to put a disclaimer after a customer uses its website search tool for every separate competitor product such that it reads "This is not a Penn Engineering product," or "This is not a KD Fasteners product," etc. This could create an infinite number of disclaimers that a company would need so that it could account for every possible search, which is not a feasible avenue for each company, including small upstarts, to embark upon.

16

Penn Engineering also argues that the website search tool is more akin to a cross-reference chart where a reasonable jury could find customer confusion "in believing PEM's marks are those of [Peninsula] and [Peninsula] is increasing that confusion by providing results that associate [Peninsula's] part numbers with the original query of PEM's trademarks." The Court previously denied summary judgment on claims related to Peninsula's cross-reference charts where there was a factual dispute governing Peninsula's fair use affirmative defense. Mem. Op. at 15, Aug. 24, 2022, Doc. No. 314. The three factors analyzing whether a use is a permissible fair use despite likely confusion are:

(1) Is the use of plaintiff's mark necessary to describe (1) plaintiff's product or service and (2) defendant's product or service?

(2) Is only so much of the plaintiff's mark used as is necessary to describe plaintiff's products or services?

(3) Does the defendant's conduct or language reflect the true and accurate relationship between plaintiff and defendant's products or services?

*Century 21 Real Est. Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 228 (3d Cir. 2005). Regarding cross-reference charts, there was a dispute over whether the charts that listed the Penn Engineering product side-by-side with the Peninsula product demonstrated "a manufacturer-distributor relationship, or that Peninsula is a division of Penn[ ]Engineering or a division of a common parent." Mem. Op. at 15, Aug. 24, 2022, Doc. No. 314.

For the website search tool, however, *none* of Penn Engineering's information or marks are side-by-side with the corresponding Peninsula product. Instead, the user is presented only with Peninsula products on Peninsula's website with Peninsula's website heading at the top of the page. There is no indication of Penn Engineering's marks that could suggest a manufacturer-distributor or similar relationship other than the algorithm-generated language stating "Search results for: [customer entered query]" that includes Penn Engineering's marks *only if* the customer has entered it into the search tool him or herself. And Penn Engineering has not demonstrated that a single

17

customer has been confused in this instance when "[p]roof of actual confusion is 'highly probative' of likelihood of confusion." *Am. Cruise Lines*, 2017 WL 3528606, at *17 (citing *Checkpoint Sys.*, 269 F.3d at 291). Without a Penn Engineering mark by which a customer cross references the Peninsula product, the website search tool is more akin to keyword conquesting than a cross-reference chart.

This does not mean that a company's internal website search tool could never infringe on another's marks in violation of the Lanham Act. For example, had Penn Engineering presented evidence of customers consistently searching for its products on Peninsula's websites and then believing that the search results yielded Penn Engineering products, that would likely be enough for such claims to survive summary judgment. If a company's internal search tool stated, "Search for Competitor Products Here" and the results then read "Buy These Competitor Products" with the infringing company's own products underneath, that may also indicate a likelihood of confusion. But a company's website search tool that displays "Search Results for" a product that the customer him or herself enters that then displays only that company's products with those product names under the banner of the website itself does not create a likelihood of confusion when no facts indicate otherwise. Thus, the Court grants summary judgment on counts that depend on this narrow issue.

### B. **Peninsula's Use of Sales Drawings**

Peninsula also seeks summary judgment on Penn Engineering's theory of false advertising as they relate to Peninsula's sales drawings because the sales drawings were never widely disseminated and thus do not constitute commercial advertising. According to Peninsula, Peninsula would provide a single drawing of a single product to a single customer only when the customer requested that Penn Engineering sales drawing.

Penn Engineering argues that Peninsula is mischaracterizing its distribution of the sales drawings and that the sales drawings are really a part of Peninsula's marketing campaign. Penn Engineering argues that Peninsula has created over 2,000 sales drawings that Peninsula has distributed to hundreds of customers over a period of time spanning more than 25 years. For example, Penn Engineering relies on a letter from Peninsula in which Peninsula admitted that it created 199 new sales from the sales drawings and provided one of those drawings approximately 60 times to 30 different customers over approximately two years. Peninsula's Chief Operating Officer also testified at his deposition that the sales drawings are "generally available" to Peninsula's customers. At oral argument, Peninsula did not dispute these facts.

> "To establish a false advertising claim under the Lanham Act, a plaintiff must prove:
>
> 1) that the defendant has made false or misleading statements as to his own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc."

*Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011) (quoting *Warner-Lambert Co. v. Breathasure, Inc.*, 204 F.3d 87, 91-92 (3d Cir. 2000)).

"The threshold matter in addressing an alleged false statement actionable under 15 U.S.C. § 1125(a)(1)(B) is whether the statement constitutes 'commercial advertising or promotion.'" *Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 716 (E.D. Pa. 2014) (citing *Premier Comp Solutions, LLC v. Penn Nat'l Ins. Co.*, No. 07-1764, 2012 WL 1038818, at *7 (W.D. Pa. Mar. 28, 2012)). "In the absence of an express definition of 'commercial advertising or promotion' in the Lanham Act, courts have developed a four[-]element test to define these terms in accordance with

the Act's language and congressional intent." *Id.* at 717.[7] "Commercial advertising or promotion for purposes of the Lanham Act consists of (1) commercial speech; (2) by a defendant in commercial competition with the plaintiff; (3) designed to influence customers to buy the defendant's products; (4) that is *sufficiently disseminated to the relevant purchasing public* to constitute advertising or promotion within the industry." *Id.* (quoting *Synygy*, 51 F. Supp. 2d at 576) (emphasis added).  The fourth element is at issue here.

Peninsula in part relies on *Wakefern Food Corp. v. Marchese*, where the court found, at the motion to dismiss stage, that the defendant's false statements were not sufficiently disseminated to fall within the scope of prohibited activity under the Lanham Act because "purely private communications . . . that are not publicly disseminated are not 'advertising' or 'promotion' as contemplated by Section 1125(a)(1)(B)." No. 20-15949, 2021 WL 3783259, at *5 (D.N.J. Aug. 26, 2021).  Peninsula argues that its sales drawings are not published but are rather sent only upon request in a person-to-person manner like in *Wakefern*.

However, *Wakefern* concerned an individual, the defendant, calling a *broker to secure a building lease* while using the plaintiff's marks to secure a lease, *not* to sell products or engage in commerce using the plaintiff's marks themselves.  *Id.* at *1-2 (emphasis added).  Though at the motion to dismiss stage and not summary judgment, the *Wakefern* court noted that the question of whether false misrepresentations were sufficiently disseminated to the relevant purchasing public is "ordinarily a question of fact." *Id.* at 4.

---

[7]     It does not appear that the Court of Appeals for the Third Circuit has ever conclusively held that this four-part test is the proper inquiry to determine what constitutes "commercial advertising or promotion" for purposes of the Lanham Act.  However, district courts in the Third Circuit analyzing this provision of the Lanham Act have consistently relied on the four-part test first used in *Synygy, Inc. v. Scott-Levin, Inc.*, 51 F. Supp. 2d 570, 576-77 (E.D. Pa. 1999). *See, e.g.*, *Synthes*, 25 F. Supp. 3d at 717.  During oral argument, the parties did not contest the applicability of the four-part test.

Peninsula relies on a litany of other cases for the same proposition that individual disseminations of the sales drawings do not constitute commercial advertising under the Lanham Act. For example, Peninsula relies on language from the Court of Appeals for the First Circuit where the court held that "[t]o constitute advertising or promotion, commercial speech must at a bare minimum target a class or category of purchasers or potential purchasers, not merely particular individuals." *Podiatrist Ass'n, Inc. v. La Cruz Azul de Puerto Rico, Inc.*, 332 F.3d 6, 19 (1st Cir. 2003). Peninsula argues that all Peninsula is doing is targeting particular individuals who ask for the sales drawings and not targeting a class of purchasers.

However, there is a genuine issue of material fact as to whether Peninsula is targeting a broader class of consumers such that Peninsula is engaging in commercial advertising or promotion using the sales drawings. As Penn Engineering points out, the record demonstrates that Peninsula has sent these sales drawings to hundreds of individuals and not merely as a one-off occurrence in particularized one-on-one negotiations. For example, Peninsula's COO testified that the sales drawings are "generally available" to *all* potential customers. Buettner Dep., 199:4-23. The record also suggests that Peninsula made over 2,000 sales drawings over a span of 25 years, and that, from April 1, 2021 to April 12, 2023, Peninsula created 199 new sales drawings that Peninsula has provided approximately 60 times to approximately 30 of 1,250 Peninsula customers. Pl.'s Mem. in Opp. to Summ. J. at 13, Doc. No. 361; Ex. 9 at 2, Doc. No. 361-11. In other words, approximately 2.5% of Peninsula's customers over that two-year span received such sales drawings. This does not constitute a one-off outreach but rather could demonstrate that the sales drawings "are part of an organized campaign to penetrate the relevant market." *Cronin v. Bergmann*, No. 14-4663, 2014 WL 5285930, at *3 (E.D. Pa. Oct. 16, 2014) (quoting *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002)). Thus, the Court

denies Peninsula summary judgment as it pertains to any false advertising claims related to Peninsula's sales drawings.

## CONCLUSION

Penn Engineering brought its initial complaint against Peninsula almost five years ago in February 2019. In that time, the parties have waged innumerable formal battles over seemingly everything available to parties in civil litigation: countless discovery disputes, motions for sanctions, and two rounds of summary judgment. The informal battles total at least three times three. The parties now face the stark reality that, at least, there is no magical third time for summary judgment. Unless they can resolve this matter on their own, they will next face a jury, which will bring this liability saga to a close.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

22