**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Penn Engineering & Manufacturing Corp. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No.: 2:19-CV-00513-GEKP |
| | : | |
| Peninsula Components, Inc., | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFF'S TRIAL MEMORANDUM**

Pursuant to Court Order (Dkt. 381), Plaintiff Penn Engineering & Manufacturing Corp.

submits its trial memorandum.

**TABLE OF CONTENTS**

I.  GENERAL BACKGROUND ................................................................................. 1

II. STATEMENT OF THE EVIDENCE TO BE PRESENTED ................................. 2

  A.  PLAINTIFF'S CLAIMS ................................................................................. 2
    1. Background of Plaintiff ................................................................................. 2
      a.  PEM is a Global Leader in the Industrial Fastening Solutions Industry .................... 2
      b.  PEM's Extensive Product Line ................................................................. 2
      c.  PEM's Superior Product Quality ............................................................. 3
      d.  PEM Performance Data ........................................................................ 4
      e.  The Cost of Testing Performance Properties ................................................ 6
    2. Establishment of Trademark Rights ............................................................... 7
      a.  PEM's Famous Mark PEM, the PEM Family of Marks, Product Configuration Marks, and Common Law Marks ................................................................. 7
      b.  Advertising, Marketing and Promotion of PEM's Marks ................................. 10
  B.  PENCOM'S UNLAWFUL ACTIVITIES .......................................................... 11
    1. Keyword Conquesting ................................................................................. 11
    2. Use of the Mark "PEM" in Online Display Ads ............................................... 12
    3. Cross-Reference Charts ............................................................................... 13
    4. Metadata of Pencom's Website ..................................................................... 13
    5. Sale of Gray Market Goods ......................................................................... 14
    6. Online Product Search Tool ......................................................................... 14
    7. Copying PEM's Structural and Performance Data ........................................... 15
    8. False Equivalency Claim ............................................................................. 16
    9. Counterfeiting ........................................................................................... 17

III. ANTICIPATED LEGAL ISSUES AND SUPPORTING AUTHORITIES ................ 17

  A.  TRADEMARK INFRINGEMENT .................................................................. 17
    1. Elements of Proof for Trademark Infringement ............................................... 17
    2. Likelihood of Confusion Covers Confusion of Any Kind Including Sponsorship or Affiliation with Plaintiff ............................................................. 18
    3. *Lapp* Factors ........................................................................................... 18
    4. The Jury's Totality-of-the-Circumstances Analysis for Likelihood of Confusion ........ 19
    5. Actual Confusion Not Necessary .................................................................. 21
    6. Similarity of the Marks – The Most Important Factor ....................................... 21
    7. Strength of Plaintiff's Marks ....................................................................... 22
    8. Customer's Degree of Purchasing Care ......................................................... 22
    9. Defendant's Intent ..................................................................................... 23
    10. Initial Interest Confusion ........................................................................... 24
  B.  LEGAL STANDARD FOR FALSE ADVERTISING ........................................ 25
    1. Elements of Proof for False Advertising ........................................................ 25
    2. Falsity ...................................................................................................... 26

3. Deception ................................................................................................. 27

4. Materiality ............................................................................................... 29

5. Injury ...................................................................................................... 29

C.   LEGAL STANDARD FOR COUNTERFEITING ................................................... 30

D.   NOMINATIVE FAIR USE – COMPARATIVE ADVERTISING ................................ 31

1. Elements of Proof for Nominative Fair Use ............................................... 31

2. Necessity .................................................................................................. 32

3. Minimal Usage .......................................................................................... 33

4. Accuracy ................................................................................................... 33

E.   COMPARATIVE ADVERTISING .................................................................... 34

F.   FALSE ADVERTISING THROUGH SALES DRAWINGS ....................................... 35

1. Commercial Advertising ............................................................................ 35

2. Commercial Promotion .............................................................................. 38

G.   REVERSE ENGINEERING ........................................................................... 38

H.   FUNCTIONALITY OF PRODUCT CONFIGURATION TRADEMARK ........................ 39

1. Defendant's Burden to Prove Functionality ................................................ 39

2. *De Facto* Functionality of the Nut and Cavity Shown in the Double Square Marks Is Not
   A Bar To Trademark Registration .......................................................... 40

3. The Double Square Marks Are Not *De Jure* Functional ............................. 42

**IV.   REMEDIES** .......................................................................................... **44**

A.   BIFURCATION ......................................................................................... 44

B.   EQUITABLE RELIEF ................................................................................. 44

C.   RECOVERY OF DEFENDANT'S PROFITS ...................................................... 45

**V.   CONCLUSION** ...................................................................................... **46**

# TABLE OF AUTHORITIES

**CASES**

*1-800 Contacts, Inc. v. WhenU.com*, 309 F. Supp. 2d 467 (S.D.N.Y. 2003) ................................ 24

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198 (3d Cir. 2000) .......... *passim*

*Adams Mfg. Corp. v. Rea*, Civil Action No. 12-1430, 2014 U.S. Dist. LEXIS 31584 (W.D. Pa. Mar. 12, 2014) ....................................................................................................................... 43

*Alpha Pro Tech, Inc. v. VWR Int'l, LLC*, 2017 U.S. Dist. LEXIS 135507 (E.D. Pa. 2017)....................................................... 26, 27, 39

*Am. Eagle Outfitters, Inc. v. Walmart, Inc.*, No. 2:20-CV-00412-MJH, 2023 WL 1778751 (W.D. Pa. Feb. 6, 2023)............................................................................................................. 23

*Am. Needle & Novelty, Inc. v. Drew Pearson Mktg.*, 820 F. Supp. 1072 (N.D. Ill. 1993) ........... 37

*American Standard Inc. v. Scott & Fetzer Co.*, 200 U.S.P.Q. 457 (T.T.A.B. 1978)...................... 8

*AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979)........................................................ 24

*Amoco Production Co. v. Gambell*, 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) 44

*Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313 (3d Cir. 2015).......... 19

*Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228 (10th Cir. 2006) .............................................. 25

*Automobili Lamborghini, S.p.A. v. Johnson*, No. 5:13-cv-1136-TMP, 2014 U.S. Dist. LEXIS 120853 (N.D. Ala. Aug. 29, 2014) .......................................................................................... 41

*Basile Baumann Prost Cole & Assocs., Inc. v. BBP & Assocs. LLC*, 875 F. Supp. 2d 511 (D. Md. 2012)..................................................................................................................................... 29

*Blumenfeld Dev. Corp. v. Carnival CruiseLines, Inc.*, 669 F. Supp. 1297 (E.D. Pa. 1987).... 17, 19

*Bodum USA, Inc. v. A Top New Casting Inc.*, 927 F.3d 486 (7th Cir. 2019)................................. 41

*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036 (9th Cir. 1999)................ 24, 25

*Buying for the Home, LLC v. Humble Abode, LLC*, 459 F.Supp.2d 310 (D.N.J. 2006) .............. 34

*Cairns v. Franklin Mint Co.*, 292 F.3d 1139 (9th Cir. 2002) ....................................................... 31

*Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939 (3d Cir. 1993)..................................................... 26, 29

*Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532 (D.N.J. 2008)............................................... 30

*Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270 (3d Cir. 2001).... *passim*

*Christopher v. First Mut. Corp.*, 2008 WL 18153001 (E.D. Pa. 2008) ........................................ 28

*David's Bridal, Inc. v. House of Brides, Inc.*, 2010 WL 323306 (D.N.J. Jan. 20, 2010) .............. 34

*Dentsply Int'l, Inc. v. Kerr Mfg. Co.*, 732 F. Supp. 482 (D. Del. 1990) ................................. 40, 42

*Dominion Bank Shares Corp. v. Devon Holding Company, Inc.*, 690 F. Supp. 338 (E.D. Pa. 1988) ..................................................................................................................................... 21

*e-Bay, Inc. v. MerckExchange, LLC*, 547 U.S. 388 (2006) .......................................................... 44

*Ecolaire, Inc. v. Crissman*, 542 F. Supp. 196 (E.D. Pa. 1982)..................................................... 39

*Ecore Int'l, Inc. v. Downey*, 2015 U.S. Dist. LEXIS 1538 (E.D. Pa. 2015).................................. 27

*Envirosafe Servs., Inc. v. Envirosure Mgmt. Corp.*, Civil Action No. 87-4659, 1989 U.S. Dist. LEXIS 70 (E.D. Pa. Jan. 5, 1989) ........................................................................................ 40

*Fashion Boutique v. Fendi USA, Inc.*, 314 F.3d 48 (2d Cir.2002) ......................................... 37, 38

*First Am. Mktg. Corp. v. Canella*, No. 03-CV-812, 2004 U.S. Dist. LEXIS 2251 (E.D. Pa. Jan. 26, 2004)................................................................................................................................ 21

*Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466 (3rd Cir. 1994) ...................... *passim*

*Ford Motor Co. v. Summit Motor Prod., Inc.*, 930 F.2d 277 (3d Cir. 1991) ............................... 23

*Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463 (3d Cir. 2005) ........................... 19

*Fuji Kogyo Co., Ltd. v. Pac. Bay Int'l, Inc.*, 461 F.3d 675 (6th Cir. 2006) ................................ 40

*G&W Labs., Inc. v. Laser Pharm., LLC*, 2018 U.S. Dist. LEXIS 102132 (D.N.J. 2018)............ 27

*Garland Co. v. Ecology Roof Sys. Corp.*, 895 F. Supp. 274 (D. Kan. 1995) ............................... 38

*Greater Houst. Transp. Co. v. Uber Techs., Inc.*, 155 F. Supp. 3d 670 (S.D. Tex. 2015) ............ 30

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 2014 U.S. Dist. LEXIS 66616 (W.D. Pa. 2014)............................................................................................................................................. 27

*H&R Indus., Inc. v. Kirshner*, 899 F. Supp. 995 (E.D.N.Y. 1995) ............................................... 37

*In re Becton, Dickinson & Co.*, 675 F.3d 1368 (Fed. Cir. 2012) ........................................... 40, 42

*In re Ennco Display Sys. Inc.*, 56 U.S.P.Q.2d 1279 (T.T.A.B. 2000)............................................ 41

*In re Morton-Norwich Prods.*, 671 F.2d 1332, 1340-41 (C.C.P.A. 1982).................................... 40

*In re Parkway Mach. Corp.*, 52 U.S.P.Q.2d 1628 (T.T.A.B. 1999) ............................................. 41

*In re R.M. Smith, Inc.*, 734 F.2d 1482 (Fed. Cir. 1984)............................................................... 40

*Interpace v. Lapp*, 721 F.2d 460 (3d Cir. 1983) .................................................................. 19, 21

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 72 L. Ed. 2d 606, 102 S. Ct. 2182 (1982) ............................................................................................................................... 42

*J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F. 2d 1460 (Fed. Cir. 1991) ....................... 8

*Johnson Controls, Inc. v. Exide Corp.*, 152 F. Supp. 2d 1075 (N.D. Ill. 2001) ........................... 38

*Kaisha v. Lotte Int'l Am. Corp.*, No. 19-3010, 2021 U.S. App. LEXIS 7026 (3d Cir. Mar. 10, 2021)............................................................................................................................................. 43

*Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700 (3d Cir. 2004) ........................................... *passim*

*Licata & Co. v. Goldberg*, 812 F. Supp. 403 (S.D.N.Y. 1993)..................................................... 37

*Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 703 F. Supp. 2d 671 (W.D. Ky. 2010), aff'd, 679 F.3d 410 (6th Cir. 2012) ..................................................................................................... 41

*Max Daetwyler Corp. v. Input Graphics, Inc.*, 608 F. Supp. 1549 (E.D. Pa. 1985) .................... 28

*McNeilab, Inc. v. Am. Home Prods. Corp.*, 848 F.2d 34 (2d Cir. 1988) ...................................... 29

*Medical Graphics Corp. v. SensorMedics Corp.*, 872 F. Supp. 643 (D.Minn. 1994).................. 37

*Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247 (2d Cir. 2014) ................................................ 30

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254 (2d Cir. 1987).............................. 24

*Mobius Management Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1005 (S.D.N.Y. 1994)............................................................................................................................................. 35

*Morton-Norwich* Factors. *Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*, 986 F.3d 250 (3d Cir. 2021), as amended (Mar. 10, 2021) ............................................................................. 42

*Neuros Co. v. Kturbo, Inc.*, 698 F.3d 514 (7th Cir. 2012) ........................................................... 38

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578 (3d Cir. 2002) .............................................................................................................. 26, 28

*Nw. Strategies v. Buck Med. Servs.*, 927 F. Supp. 1343 (W.D. Wash. 1996) .............................. 37

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187 (3d Cir. 1990) ............. 17, 21, 44

*Pacific Telesis v. International Telesis Comms.*, 994 F.2d 1364 (9th Cir. 1993).......................... 25

*Pennzoil-Quaker State Co. v. Smith*, 2008 U.S. Dist. LEXIS 124298 (W.D. Pa. 2008).............. 28

*Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241 (3d Cir. 2011)................... 26, 28

*Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*, 292 F. Supp. 2d 594 (D.N.J. 2003) .................................................................................................................................... 27

*Playboy Enters. v. Universal Tel-A-Talk, Inc*., No. 96-6961, 1998 U.S. Dist. LEXIS 17282 (E.D. Pa. Nov. 2, 1998) ...................................................................................................................... 30

*Pom Wonderful Ltd. Liab. Co. v. Purely Juice, Inc.*, 2008 U.S. Dist. LEXIS 55426 (C.D. Cal. 2008) .................................................................................................................................... 29

*Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329 (8th Cir. 1997) ............................................... 30

*Primepoint, LLC v. PrimePay, Inc.*, 545 F. Supp. 2d 426 (D.N.J. 2008) ......................................... 7

*Qualitex Co. v. Jacobson Prods. Co*., 514 U.S. 159, 115 S. Ct. 1300 (1995) ................................ 42

*Res. Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134 (2d Cir. 1991) 28

*Rexall Sundown, Inc. v. Perrigo Co.*, 651 F.Supp.2d 9 (E.D.N.Y. 2009) .............................. 29, 39

*Robroy Indus.-Tex., LLC v. Thomas & Betts Corp.*, 2017 WL 1370545 (E.D. Tex. 2017) ........... 30

*Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175 (3d Cir. 2010) .................................. 20

*Schering-Plough Healthcare Prods. v. Neutrogena Corp.*, 2010 U.S. Dist. LEXIS 71003 (D. Del. 2010) .............................................................................................................................. 27, 29

*Schmidt, Long & Assoc., Inc. v. Aetna U.S. Healthcare, Inc.*, No. CIV.A.00-CV-3683, 2001 WL 856946 (E.D. Pa. July 26, 2001) ............................................................................ 36

*SecuraComm Consulting, Inc. v. Securacom, Inc.,* 166 F.3d 182 (3d Cir. 1999) ........................ 45

*Seven-Up Co. v. Coca-Cola Co*., 86 F.3d 1379 (5th Cir. 1996) ................................................... 35

*SI Handling Sys. v. Heisley*, 753 F.2d 1244 (3d Cir. 1985) ......................................................... 39

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134 (9th Cir. 1997) ................................... 30

*Synthes, Inc. v. Emerg Med., Inc.*, 25 F.Supp.3d 617 (E.D.Pa. 2014) ........................................ 37

*Synygy, Inc. v. Scott–Levin, Inc.,* 51 F.Supp.2d 570 (E.D.Pa.1999) ........................................... 35

*Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 46 U.S.P.Q.2d 1026 (7th Cir. 1998) ...... 43

*Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778 (9th Cir. 2002) ................................................. 40

*TrafFix Devices v. Mktg. Displays*, 532 U.S. 23, 121 S. Ct. 1255 (2001) ................................... 41

*Universal Elec. Corp. v. Baldwin*, 2018 WL 3707423 (W.D. Pa. Aug. 3, 2018) ......................... 34

*Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268 (Fed. Cir. 2002) ............................................ 40

*Weinberger v. Romero—Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) ............ 44

## STATUTES

15 U.S.C. § 1125 ......................................................................................................... 26, 30, 35, 38

15 U.S.C. § 1117 ....................................................................................................................... 30, 45

Lanham Act § 43 ...................................................................................................... 26, 35, 38

## OTHER AUTHORITIES

16 C.F.R. §14.15 ........................................................................................................................... 34

T.M.E.P. 1202.02 .......................................................................................................................... 41

## TREATISES

1 McCarthy on Trademarks and Unfair Competition § 7:69 (5th ed.) ............................................ 43

2 McCarthy on Trademarks and Unfair Competition §11:45 (5th ed.) .......................................... 31

3 A LouisAltman, *Callman on Unfair Competition, Trademarks & Monopolies* § 21:10 & n.139 ................................................................................................................ 23

3 McCarthy on Trademarks and Unfair Competition § 23:6 ........................................ 25

4 McCarthy on Trademarks and Unfair Competition § 23:112 (5th ed.) ...................... 24

4 McCarthy on Trademarks and Unfair Competition § 24:30 (5th ed.) ........................ 19

4 McCarthy on Trademarks and Unfair Competition § 24:33 (5th ed.) ........................ 20

4 McCarthy on Trademarks and Unfair Competition § 23:11 (5th ed.)........................ 31

4 McCarthy on Trademarks and Unfair Competition § 25:52 (4th ed.)........................ 34

5 McCarthy on Trademarks and Unfair Competition § 27:71 (5th ed.)......................... 38

Restatement (Third) of Unfair Competition § 21 (1995)............................................. 20

Restatement of Torts, § 729,Comment on Clause (b)f (1938) .................................... 25

## I.      GENERAL BACKGROUND

Plaintiff Penn Engineering & Manufacturing Corporation ("PEM" or "Plaintiff) is a well-known, global leader in the industrial fastening solutions industry.  Since its establishment in 1942, PEM has been designing and manufacturing a wide variety of fasteners and fastener installation equipment.  PEM has been issued more than 150 U.S. patents and owns more than 75 federally-registered trademarks for its products including its famous mark PEM and PEM family of marks.  Defendant Peninsula Components, Inc. d/b/a Pencom ("Pencom" or "Defendant") is a direct competitor of PEM and is unfairly and unlawfully competing with PEM.

Instead of focusing on development and promotion of its own reputation and brand, Defendant has been trading off the reputation and brand of PEM using two general schemes: (1) trademark infringement - unlawfully using more than 80 of PEM's trademarks, including the famous brand name PEM, in its Google Ads campaigns (keyword conquesting, infringing ad text, etc.), in printed product catalogs, and on its website; and (2) false advertising - copying and publishing the performance data of PEM's fasteners and claiming its fasteners possess those same performance properties even though it has not verified (independently or internally) that its fasteners actually possess those properties.  These activities suggest to the average customer that PEM and Defendant are related or affiliated in some way, and that Defendant's fasteners are structurally and functionally equivalent to PEM's fasteners, which they are not.

## II.    STATEMENT OF THE EVIDENCE TO BE PRESENTED

### A.    Plaintiff's Claims

#### 1.    Background of Plaintiff

##### a.    PEM is a Global Leader in the Industrial Fastening Solutions Industry

PEM will introduce overwhelming and indisputable evidence that it is a global leader in the industrial fastening solutions industry for diverse industries, including electronics, computer, telecommunications, medical, automotive, marine, aerospace/aircraft, and general manufacturing.  While unfamiliar to most lay people, the name PEM is to industrial fasteners what the name Apple is to cell phones.

PEM is a local company founded in 1942 by K.A. Swanstrom by inventing a revolutionary new fastener product: a self-clinching fastener that provides load-carrying threads in metal sheets that are too thin to be tapped ("Self-Clinching Fasteners"), which is the relevant fastener type in this dispute.  PEM started with just four fastener machines in a Doylestown, Pennsylvania, garage.  Since then, PEM has grown steadily and now has about 3,000 employees globally and an annual revenue in excess of 400 million dollars.

##### b.    PEM's Extensive Product Line

Since 1942, PEM has steadily expanded its product line by designing and developing a wide variety of fastening products, and by acquiring numerous companies which manufacture related goods.  PEM will introduce evidence of its history, expansive product line, and family of affiliates by using its comprehensive website, www.pemnet.com, as a demonstrative, along with numerous printed exhibits.  For example, PEM's affiliated companies now include PROFIL, PennAuto, Heyco, Haeger, Sherex Fastening Solutions, SI, and LinkTool Group.  PEM now has manufacturing and technical facilities in the United States, Europe, and Asia, including Danboro,

Pennsylvania; Winston-Salem, North Carolina; Galway, Ireland; Friedrichsdorf, Germany; and

Kunshan, China.  Over the past 80 years, PEM has manufactured and sold billions (literally) of

fastener products.

Innovation and development of new products have always been a hallmark of PEM.

Since 1942, PEM has been constantly inventing and improving its fastener products and making

significant investments each year for the design, development, testing, and certification of new

fastener products.  For instance, PEM plans to invest about $8,000,000 this year in product

development.  As the result of its commitment to research and development, PEM has been

issued more than 150 U.S. and foreign patents for fastener products, fastener installation

equipment, and fastener manufacturing methods.[1]

### c.      PEM's Superior Product Quality

In the fastener solutions industry, name and reputation are critical to a company's

continued success.  PEM's name and reputation are its most valuable assets.  Plaintiff will

introduce overwhelming and indisputable evidence that PEM has developed a reputation for

designing, manufacturing, and selling only the highest quality fastener products over the past 80

years.  PEM's fastener quality management system is ISO9001 registered, Department of

Defense QSLM approved, and can support DFARS clause 252.225-7014 requirements.  In

addition, PEM's manufacturing facilities are registered to Technical Specification ISO/TS 16949.

A current list of the industry quality approvals and certifications for PEM's manufacturing

facilities in the U.S. and overseas will be introduced.  PEM will also introduce evidence of

industry-recognized quality.

---

[1] PEM assigns all of its patent and trademark rights to a holding company, PEM Management, Inc., and is granted back an exclusive license under the patents and trademarks.

### d.    PEM Performance Data

It is important to understand some basic technology relating to the relevant fasteners in dispute because PEM's false advertising claim against Pencom is based on, among other things, Defendant's admitted copying of PEM's product performance data and publishing it as its own. Self-clinching fasteners are specifically designed to be clinched to thin sheets of metal, such as aluminum or stainless steel, and are used in a wide variety of industrial applications, each of which requires different performance properties. Therefore, the structural and performance properties of PEM's fasteners must be identified to professionals who intend to specify[2] them for a particular product. For example, in addition to each fastener's dimensions and material composition, PEM publishes performance data for the following performance properties of its fasteners:

1.    the force required to install the fastener into the metal sheet ("Installation" force);

2.    the force required to push a fastener out of the metal sheet ("Push-Out" force);

3.    the force required to pull a fastener thru the metal sheet ("Pull-Thru" force);

4.    the force required to twist or torque a fastener out of the metal sheet ("Torque-Out" force);

5.    the maximum tightening force on a fastener ("Max Tightening" force); and

6.    the minimum distance the mounting hole must be positioned from the edge of the metal sheet ("Min Hole Distance").

This data is collectively referred to as the Performance Data. PEM publishes its Performance Data in its digital and printed product brochures, which are publicly distributed to both current and prospective customers.

---

[2] In the engineering profession, "specify" with respect to a component of a product or assembly means to identify a particular component by product description. Engineers can specify a component made by a particular manufacturer only or allow equivalents. For example, the part may be specified as "PEM MPP-1mm-2" or may allow equivalents by stating "PEM MPP-1mm-2 or equivalent."

PEM will introduce uncontroverted evidence that its Performance Data was generated at great expense and effort over the past 80 years.  Each value is generated by testing multiple samples of each size of each fastener (Unified and Metric) according to written Fastener Test Specifications ("FTS") developed by PEM.  Testing is performed on a production lot, using production equipment and production personnel.

After multiple fasteners are tested, PEM performs a statistical analysis of the data and publishes performance values that are <u>based on</u> the average test results; however, the published values are <u>not averages</u>.  Instead, PEM purposely publishes a value *much more conservative* than the average to account for normal production variations.  The published value represents the *minimum allowable value*.  The testing also takes into account the worst-case manufacturing and installation conditions.  The actual value published by PEM is calculated using the following formula: $P_{published} = 80\%$ x $(P_{average} - 3\sigma)$ where P is the performance value and $\sigma$ is the standard deviation of the test data for the samples.  True mathematical averages are not published because engineers assume/believe that each fastener sold by PEM will possess the published structural and performance value shown in the charts.

Despite any disclaimer, engineers rely on the published performance value, in combination with a factor of safety, to design their products and specify a particular component on the manufacturing prints.   For example, if an engineer is designing a product that requires a self-clinching pin having 500 N of push-out force, the engineer references PEM's performance catalogs and selects a pin having a reported push-out force of at least 500 N.  The engineer expects that every pin supplied by PEM will have at least 500 N of push-out force.   The engineer cannot rely on a pin having a published *average* performance value of 500 N because statistically many of the pins would then have less than 500 N of push-out resistance.  Under

generally accepted engineering principles, none of the fasteners should possess less than 500 N of push-out resistance.   More importantly, the engineer does not know how far below (or above) the average some of the pins may be.   For example, the average of 440, 450, 500, 550 and 560 is 500.   In that example, some of the pins may have pushout resistance as low as 440 N, which may cause the end-product to fail.  The importance of this Performance Data to consumers cannot be overstated.

### e.        The Cost of Testing Performance Properties

Plaintiff will introduce testimony that the information contained in every PEM performance table is generated by testing *each part* number, i.e., size and material variation of that fastener, identified therein, not by estimation or extrapolation.  For example, it does not test certain sizes within a series of fasteners, and then use statistical extrapolation to estimate the performance properties of un-tested parts.  Every size of every series of fasteners is tested.  Parts with identical materials, clinch-geometries, and manufacturing process are grouped for testing (for example: SO-632, BSO-632, SO-6440, and BSO-6440 parts of all lengths are grouped with one test set).  PEM will introduce evidence that, based on several assumptions, the average cost to test and generate a performance table for a new product is about $14,000 and takes about 5 solid days of work to prepare.

PEM's fasteners are also periodically tested to ensure they continue to comply with its published structural and performance properties.  Once the manufacturing process has been established, each production lot is tested for plating and material conformance only.  If a customer requests performance certification with its order, PEM will perform that testing and provide a performance certification.  However, unless requested by the customer samples from each production lot are tested only in audit situations and period validation runs.  Over the past five years, PEM has spent an average of about $342,000 for routine testing at its four

manufacturing facilities in Danboro, PA; Galway Irelend; Winston, North Carolina; and Junshan, China.  As a result of its routine testing, design or manufacturing modifications, discovery of publication errors, etc., PEM periodically revises the data in its published tables to ensure those tables convey the most accurate and up-to-date information.

### 2.   Establishment of Trademark Rights

#### a.   PEM's Famous Mark PEM, the PEM Family of Marks, Product Configuration Marks, and Common Law Marks

Plaintiff will introduce uncontroverted evidence that it has used the mark PEM since at least as early as 1946 in commerce to advertise, promote and sell its fastener products and accessories, and to identify and distinguish its goods from the goods of other companies.  PEM was awarded its first U.S. Trademark Registration No. 732,947 for the mark PEM in 1962.  Since then, PEM has been awarded several additional, incontestable registrations for the mark.  For more than 70 years, PEM has continuously used and heavily promoted and advertised its products using the mark PEM in numerous industries.

Over the years, PEM has adopted more than 20 additional marks for its fastener products that incorporate the mark PEM such as , PEMFLEX and PEMHEX and has acquired rights in this "PEM Family of Marks."  A family of marks is defined as "a group of marks having a recognizable common characteristic, wherein the marks are comprised and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner." *Primepoint, LLC v. PrimePay, Inc.,* 545 F. Supp. 2d 426, 432 (D.N.J. 2008); Trademark Manual of Examining Procedure 1207.01(d)(xi) (July 2015).  The existence of a family of marks is an issue of fact based on the common formative component's distinctiveness, the family's use, advertising, promotion, and inclusion in the party's other marks.

7

*Primepoint, LLC,* 545 F. Supp. 2d at 433 (quoting *J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F. 2d 1460, 1463 (Fed. Cir. 1991)).  Recognition of the family is achieved when the pattern of usage of the common formative component is sufficient to be indicative of the source of goods. *J & J Snack Foods Corp,* 932 F. 2d at 1463.  PEM will introduce uncontroverted evidence that shows its PEM Family of Marks have been used and advertised in promotional and sales materials in a manner such that the purchasing public recognizes common ownership based upon the common formative component "pem". *See American Standard Inc. v. Scott & Fetzer Co.*, 200 U.S.P.Q. 457, 461 (T.T.A.B. 1978).

In addition to the PEM Family of Marks, PEM will introduce uncontroverted evidence showing that it owns numerous federally registered trademarks that protect the product configuration of many of its fasteners ("Product Configuration Marks").  Those marks are shown below, which is a screenshot of PEM's webpage entitled "Trademarks and Licensed Technologies" found at https://www.pemnet.com/trademarks-and-licensed-technologies/.



Of particular relevance to this case are the following: U.S. Reg. Nos. 1,400,893 for the mark ("Double Square 1"); and U.S. Reg. No. 3,404,061 for the mark ("Double Square 2").

PEM will also introduce uncontroverted evidence that it owns more than 100 "Common Law Marks." PEM uses these marks to identify the numerous different types/series of fasteners marks it commercializes, and the Common Law Marks form the prefix for the part number for each fastener. For example, PEM owns the common law mark ALA for floating self-clinching fasteners, and one example part number is ALA4-440-1-MD. The majority of the Common Law

Marks have been used since *at least as early as* October 1977.  Since their adoption, PEM has continuously used and heavily promoted each of the Common Law Marks in the same industries as identified above with respect to the mark PEM.

### b.   Advertising, Marketing and Promotion of PEM's Marks

PEM will introduce uncontroverted evidence that through its substantial marketing and advertising efforts, all of its marks have become famous in the fastening solutions industry, and recognized throughout the United States, and the world, as trademarks of PEM, and represent PEM's reputation as a producer of top quality fastener products and fastener installation equipment.  PEM's fastener products and fastener installation equipment bearing the mark PEM are marketed and sold throughout the entire world through: (1) an extensive network of distributors in the U.S. and dozens of foreign countries; (2) its extensive interactive website, *www.pemnet.com*; (3) national and international trade shows; (4) numerous national and international trade journals; (5) independent technical representatives; and (6) its own direct sales/technical force.

PEM's evidence will also show that many of PEM's distributors utilize PEM's automated catalog on their websites.  All authorized distributors are authorized to incorporate on their websites the same marketing information that appears on PEM's website by linking the distributors' websites to PEM's website.  This program enables the distributors to be absolutely certain that they always have the most up-to-date information displayed on their websites.  It is one more step to remind PEM's customers that the only way they can be assured of getting genuine PEM fasteners is to buy from a PEM-authorized distributor.  Because of this unique arrangement, available only to PEM-authorized distributors, it is much more likely that customers and potential customers will mistakenly believe Defendant is affiliated with PEM if,

10

or when, they see the same information on Defendant's website that Defendant copied from PEM's website and posted on its website.

Over the past 10 years, PEM has spent more than $10,000,000 to advertise and promote its products under its trademarks in the United States and throughout the world, steadily increasing its marketing budget over time. In fact, this year PEM has budgeted $1,900,000 for marketing purposes.

### B. Pencom's Unlawful Activities

Defendant is not affiliated in any way with PEM, and is not a licensee, an authorized distributor, or an authorized reseller of PEM's products.  Pencom has no authorization, expressed or implied, to use any of PEM's marks.  In fact, PEM and Defendant are direct competitors in the fastener industry.  Similar to the fastener products offered by PEM, Pencom also sells self-clinching nuts, self-clinching standoffs, pins and bushes, inserts for plastic, self-clinching studs, panel fastener assemblies, spring-loaded plungers, rivet nuts, etc.  PEM's customers include contract manufacturing organizations (CMO's), sheet metal fabricators, original equipment manufacturers (OEM's), design engineers, mechanical engineers, CAD designers, and packaging engineers, which largely overlap with Pencom's primary customer base.  Defendant also resells and distributes fasteners and other products of more than 55 other companies.

Defendant has been using a combination of unlawful activities to trade off the goodwill of PEM and convince prospective customers that it is somehow sponsored or affiliated with PEM, perhaps as a division, authorized distributor, or related company.  Defendant admits that it intentionally participates in the activities described below.

### 1. Keyword Conquesting

PEM will present evidence that Defendant has been using Google Ads since 2014. Defendant's Google Ads campaign has exclusively focused on PEM as a competitor, and targeted

11

PEM's customers and potential customers.  According to various Google Ads keyword reports produced during discovery, Defendant has used numerous keywords that include PEM's famous trademark PEM, and paid to display Defendant's ads when a user searches for those PEM-related search terms.  Some of the keywords Pencom has been using include: "pem sheet metal", "pem nut installation", "pem nuts", "pem self clinching fasteners", "pem clinch nut", "pem stud installation", "pem self clinching nuts", "Pem Fasteners", and "PEM Stud", to name just a few.  Defendant's paid online advertisements often display at the top of the "results" page.

### 2.      Use of the Mark "PEM" in Online Display Ads

As part of its Google Ads online advertising campaigns, Pencom displays many different ads.  PEM will introduce uncontroverted evidence that in many of those ads, Pencom used PEM's famous mark "PEM".  In most cases, the mark PEM was associated with Pencom's company name, phone number, and website address.  More specifically, in response to a Google query using the term "pem fasteners", one of Pencom's online advertisements displayed, at the top of the "hits" list, as follows: "Pem Fasteners | Leading OEM Solutions Provider | pencomsf.com" and "Huge Selection of Quality Pem Fasteners To Fit your Needs."  A true and correct screenshot of this ad, taken on February 4, 2020, is shown below:



Pem Fasteners | Leading OEM Solutions Provider | pencomsf.com
[Ad] www.pencomsf.com/ ▾   (650) 593-3288
Huge Selection Of Quality **Pem Fasteners** To Fit Your Needs. Request A Quote Today! Types: **Nuts**, Screws, Self-Clinching **Hardware**, Spacers, Standoffs, Washers, Guide Pins, Thumb Screws, Plastic Inserts, Captive Screws.
View Our Products · Contact Us Now · Peninsula Components

This same screenshot was attached as exhibit 1 to the Complaint.  The phone number and URL (website address) listed above are owned by Defendant, not PEM.  PEM will present evidence of

many similar ads that included "PEM" in the ad copy, i.e., printed text of the advertisement displayed on screen.

### 3.      Cross-Reference Charts

Pencom admits that it has been distributing printed product brochures that include cross-reference charts, which include the mark PEM and more than 80 of PEM's Common Law Marks to cross-reference and associate Defendant's products to PEM's products, or vice versa (collectively, the "Printed Cross-Reference Charts").  The Printed Cross-Reference Charts are distributed to both existing and prospective customers.  Defendant admits that it has been distributing these various Printed Cross-Reference Charts to prospective customers since at least May 2010.

Pencom has also published a digital cross-reference chart entitled "PEM® Series Substitute Cross Reference" on its website, which includes the mark PEM and at least 69 of PEM's Common Law Marks to cross-reference and associate Pencom products to PEM products (the "Digital Cross-Reference Chart").  The Digital Cross-Reference Chart was first published on Pencom's website *www.pencomsf.com*, which is seen by customers and prospective customers, as early as May 2018.

### 4.      Metadata of Pencom's Website

The data shown in the Digital Cross-Reference Chart was coded within the metadata and searchable text of Pencom's website.  The marks found in Pencom's website metadata, also called metatags, included the mark PEM as well as numerous Common Law Marks such as NB, B, BS, BSO4, BSOA, BSOS, CFHA, CLA, CLS, CLSS, S, SS, CSOS, TB, NHL, FE, FEO, etc. Therefore, even without participation in the Google Ads program, Pencom's website would have been listed in the results of a search for the mark PEM or any of the Common Law Marks.

5.      **Sale of Gray Market Goods**

Defendant admits that it is not an authorized distributor of PEM's fastener products but it further admits that it has purchased them from other distributors and resold them to its customers and PEM's existing customers. Defendant purchased PEM fasteners from authorized PEM distributors, repackaged them into packages or containers bearing the name "Pencom" or "Peninsula", and resold them to its customers as "genuine PEM parts." Pencom does not provide customer service, or any warranty, for the PEM fasteners it resells.

6.      **Online Product Search Tool**

In response to this lawsuit, Pencom installed on its website a search tool to replace the Digital Cross-Reference Chart. A true and correct screenshot of Pencom's search tool is shown below. The Search Tool has two data fields, as shown below: (1) Pencom part number search field; and (2) Competitor part number search field.



The Search Tool enables a customer to enter PEM's part number or product name in the lower field ("competitor part number"). Then, the Search Tool populates the upper field ("PENCOM part number") with the part number of a counterpart product sold by Pencom.[3] For example, if PEM's trademark "SL" is entered into the lower "competitor part number" field, the

---

[3] A recent survey of Pencom's website shows that Pencom has once again changed the search tool, now using only one input field. www.pencomsf.com (last accessed Jan 6, 2022). However, entering one of PEM's trademarks still triggers a set of relevant search results that show Pencom parts, with links to additional pages.

Search Tool displays a number of Pencom's NEL Locknuts, as shown below, which Pencom presumably presents to the user as equivalent substitutes, while warning the user that "When second sourcing PENCOM's products, PENCOM recommends that the part is [sic] tested in the application to ensure that it will meet all performance requirements."



This screenshot was taken from Pencom's website and shows only the first three matching Pencom part numbers.  The search results reveal the type of product, the Pencom part number and a "Competitor Substitute" part number, "SL," which is PEM's part number, without disclosing that "SL" is PEM's mark, which the Search Tool has to "know" internally in order to associate Pencom's products with PEM's products.

### 7.    Copying PEM's Structural and Performance Data

The industry standard method for generating performance data is through controlled tests on samples of the product, which PEM has done at a significant cost as described above.

Defendant admits that instead of testing the performance properties of relevant fasteners, it simply copies the performance data published by PEM and publishes it as its own.  Defendant admits that it publishes the copied performance data on its website and distributes sales drawings and product brochures that include the copied performance data to prospective customers.

According to the test reports Pencom produced in discovery, out of the thousands of parts in its repertoire, Pencom had only tested a meager 51 of its products.[4]  But even after testing those few, Defendant only published the performance data for 7 of the 51 products it tested.[5]  But even for those seven products that Pencom tested and for which it also published performance data, none of the published data resemble the actual test results.  In fact, the actual test results consistently contradict the published performance data.  Some values Pencom published are higher than the actual test results while others are lower than the test results.  PEM will present summary tables of the performance data that Pencom copied as well as Pencom's test results.

### 8.    False Equivalency Claim

Pencom's use of the term "substitute" in its Cross Reference Charts and Online Search Tool when comparing its products to PEM's products, and its use of copied Performance Data, is a false representation that the products are equivalent in every respect and for every application ("False Equivalency Claim").

---

[4] Some of the 51 products had multiple configurations, i.e. aluminum sheet vs. steel sheet, such that the total number of configurations tested is 84, resulting in 84 sets of test data for 51 products.

[5]  Some of the seven products were tested on both aluminum and steel sheets, resulting in 10 configurations.  The other 44 products (51 – 7) never had their performance data published although Pencom had test results for those 44 products.

### 9. Counterfeiting

PEM will present evidence that Defendant has acquired, used and sold counterfeit PEM products bearing one of PEM's marks.  Defendant acquired counterfeit PEM fasteners from manufacturers/distributors not affiliated with, or authorized by, PEM to make or sell PEM fasteners.  Defendant knew, or clearly should have known, that the fasteners were not genuine when it sold them.

## III.  ANTICIPATED LEGAL ISSUES AND SUPPORTING AUTHORITIES

### A.  Trademark Infringement

#### 1.  Elements of Proof for Trademark Infringement

PEM has pleaded separate counts for trademark infringement under Section 32 of the Lanham Act, false designation of origin under Section 43(a) of the Lanham Act, and common law trademark infringement.  For PEM to prevail, PEM must prove by a preponderance of the evidence that: (1) PEM's mark is valid and legally protectable; (2) PEM owns the rights in the mark; and (3) Defendant's use of the infringing mark to identify its fastener products is likely to cause confusion concerning the source, sponsorship, or affiliation of those goods. *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990); *Blumenfeld Dev. Corp. v. Carnival CruiseLines, Inc.*, 669 F. Supp. 1297, 1317 (E.D. Pa. 1987).

The first two requirements, ownership and validity, are proven where a mark is federally registered and has become incontestable under the Lanham Act. *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3rd Cir. 1994).  Under Section 33 of the Lanham Act, PEM's registered marks are presumed to be valid, and PEM is presumed to be the owner with the "exclusive right to use" the marks in commerce. 15 U.S.C. §1115 (a) (emphasis added).  PEM's exclusive right to use each of the above-listed marks is incontestable pursuant to section 15 of the Lanham Act. 15 U.S.C. §1065.

### 2. Likelihood of Confusion Covers Confusion of Any Kind Including Sponsorship or Affiliation with Plaintiff

Likelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or services identified ty a similar mark. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 211 (3d Cir. 2000) (internal quotations and citations omitted). The language of the Lanham Act is broad enough to cover "the use of trademarks which are likely to cause confusion, mistake, or deception *of any kind*, not merely of purchasers nor simply as to source of origin." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700 (3d Cir. 2004) (emphasis in original). In this case, consumers are most likely to believe that Defendant is affiliated somehow with PEM, such as being an authorized distributor.

### 3. *Lapp* Factors

In the Third Circuit, the non-exclusive list of factors (commonly referred to as the *Lapp* factors) that may be considered during a likelihood of confusion analysis for both competing and non-competing goods are the following:

(1) degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising

(5) the intent of the defendant in adopting the mark;

(6) evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of function; and

(10) other facts suggesting thatthe consuming public might expect the prior owner

> to manufacture a product in the Defendants' market, or that he is likely to
> expand into that market.

*A&H Sportswear*, 237 F.3d at 213; *Interpace v. Lapp*, 721 F.2d 460, 463 (3d Cir. 1983).  Any

doubts as to whether a likelihood of confusion exists must be resolved in favor of the senior user.

*Blumenfeld*, 669 F. Supp. at 1320.  "The *Lapp* factors are best understood as 'tools to guide a

qualitative decision.' None of them in itself is determinative and each must be 'weighed and

balanced' based on the particular facts of the case." *Arrowpoint Capital Corp. v. Arrowpoint*

*Asset Mgmt., LLC*, 793 F.3d 313, 320 (3d Cir. 2015) (*quoting Kos Pharms., Inc. v. Andrx Corp.*,

369 F.3d 700, 709 (3d Cir. 2004)). (emphasis in original).  The *Lapp* factors are a non-exhaustive

list of considerations to determine likelihood of confusion. *Freedom Card, Inc. v. JPMorgan*

*Chase & Co.*, 432 F.3d 463, 470 (3d Cir. 2005) ("In deciding whether similar marks create a

likelihood of confusion, we have adopted a non-exhaustive test using 10 factors that have come

to be known as the '*Lapp* factors.'") (emphasis in original).

### 4. The Jury's Totality-of-the-Circumstances Analysis for Likelihood of Confusion

Third Circuit precedent makes clear that in "all cases involving the likelihood of

confusion under the Lanham Act, courts should employ *all the relevant Lapp factors* and weigh

each factor to determine whether in the *totality of the circumstances* marketplace confusion is

likely." *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 297 (3d Cir.

2001) (emphasis added) (citing *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d

198, 215 (3d Cir. 2000); *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 476 n.11

(3d Cir. 1994)).  In fact, this is a bedrock principle with respect to the likelihood-of-confusion

analysis that is recognized in each circuit. *See* 4 McCarthy on Trademarks and Unfair

Competition § 24:30 (5th ed.) ("Each of the circuits has emphasized in one way or another that

no one of the foundational factors is determinative, but rather that *all are to be weighed and*

*balanced one against the other*.") (emphasis added); *see also* Restatement (Third) of Unfair

Competition § 21 (1995) ("The likelihood of confusion depends on the *interplay of all the*

*factors that constitute the marketing environment* in which the designation is used.") (emphasis

added).

Whether any particular marketing activity creates a likelihood of confusion *itself* is not

the question.  Rather, the relevant inquiry is to examine *all the relevant factors* and weigh them

to determine whether in the *totality of the circumstances*, the defendant's use of the plaintiff's

mark is likely to create marketplace confusion. *Checkpoint*, 269 F.3d at 297.  In *Fisons*, the

Third Circuit noted that the district court misapplied the law when it failed to consider two of the

*Lapp* factors (similarities in channels of trade and target audience) because the plaintiff failed to

produce evidence of actual confusion.  The court stated: "In *Lapp*, we did not discount the

strength of plaintiff's case in one area because of weakness in another; we weighed each factor

separately.  More importantly, while evidence of actual confusion would strengthen plaintiff's

case, it is not essential." *Fisons Horticulture, Inc. v. Vigoro Ind.*, 30 F.3d 466, 476 (3d Cir. 1994)

(emphasis in original).  Indeed, "it is legal error for the district court to fail to weigh and balance

all of the *Lapp* factors." 4 McCarthy on Trademarks and Unfair Competition § 24:33 (5th ed.)

(emphasis in original) (citing *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 711 (3d Cir.

2004) (finding that the district court erred in only considering two of the ten *Lapp* factors and

"not making the relevant comparisons which the *Lapp* test identifies.") (internal quotation marks

omitted) (emphasis in original)).  It follows that the failure to consider evidence relevant to each

*Lapp* factor is also an error. *See Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 183

(3d Cir. 2010) (noting that the district court "failed to discuss much of the evidence" and erred

by addressing only three *Lapp* factors).

### 5.      Actual Confusion Not Necessary

To establish a likelihood of confusion, Plaintiff need <u>not</u> provide evidence of actual confusion.  Likelihood of confusion is established if consumers seeing Defendant's marks would assume that Defendant's services are "associated with" the services provided by whoever is the owner of Plaintiff's marks. *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3d Cir. 1994).  "[W]hile evidence of actual confusion would strengthen plaintiff's case, it is not essential." *Id*. at 476.

### 6.      Similarity of the Marks – The Most Important Factor

The single most important factor in determining likelihood of confusion is the similarity of the marks. *A&H Sportswear*, 237 F.3d at 216.  "The showing of proof plaintiff must make for this requirement [likelihood of confusion] depends on whether the goods or services offered by the trademark owner and the alleged infringer are in direct competition." *Fisons*, 30 F.3d at 472. Under Third Circuit law, "[w]here the trademark owner and the alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself." *Id*. (quoting *Lapp*, 721 F.2d at 462); *Opticians*, 920 F.2d at 195; *A&H Sportswear*, 237 F.3d at 214; *First Am. Mktg. Corp. v. Canella,* No. 03-CV-812, 2004 U.S. Dist. LEXIS 2251 (E.D. Pa. Jan. 26, 2004), at *4.

Where the trademark owner and the accused infringer deal in competing goods or services, as is the case in the instant case, the Court need only compare the respective marks themselves to determine whether a likelihood of confusion exists. *Lapp,* 721 F.2d at 460; *Dominion Bank Shares Corp. v. Devon Holding Company, Inc.,* 690 F. Supp. 338, 346 (E.D. Pa. 1988).  "If products are directly competing, and the marks are clearly very similar, *a district judge should feel free to consider only the similarity of the marks themselves*. . . Moreover, the court need not apply each and every factor; when goods are directly competing, both precedent

21

and common sense counsel that the similarity of the marks takes on great prominence." *A&H Sportswear,* 237 F.3d at 214 (emphasis added).

PEM will introduce uncontroverted evidence that Defendant is using *identically* all of PEM's marks (*Lapp* factor 1), and that the parties are direct competitors selling the same goods (*Lapp* factor 9) through the same marketing channels (*Lapp* factor 7) to the same customers (*Lapp* factor 8).  The greater the similarity in advertising and marketing medium, the greater the likelihood that defendant will cause confusion. *Kos*, 369 F.3d at 722; *Checkpoint*, 269 F.3d at 288-89.  From these facts alone, the jury may find likelihood of confusion.

### 7.      Strength of Plaintiff's Marks

PEM will introduce uncontroverted evidence that its mark PEM is strong and famous, and that its Common Law Marks are also strong (*Lapp* factor 2).  In the Third Circuit, the strength of the mark is measured by (1) the distinctiveness or conceptual strength of the mark; and (2) the commercial strength or marketplace recognition of the mark. *A&H Sportswear*, 237 F.3d at 221; *Fisons*, 30 F.3d at 478.  The first prong of the test weighs the inherent features of the mark, while the second prong weighs the factual evidence of marketplace recognition. *A&H Sportswear*, 237 F.3d at 221.

### 8.      Customer's Degree of Purchasing Care

PEM will also introduce evidence that the positions/titles of customers and prospective customers for Pencom's respective goods vary greatly, and range in sophistication from "design engineer" at the most sophisticated end to sheet-metal fabricator machine operator at the least sophisticated end.  Therefore, confusion among their unsophisticated consumers must also be considered. "Where both professionals and the general public are relevant consumers, 'the standard of care to be exercised . . . will be equal to that of the least sophisticated consumer in the class.'" *Kos*, 369 F.3d at 716 (citing *Checkpoint Systems, Inc. v. Check Point Software*

*Technologies*, 269 F.3d 270, 285 (3d Cir. 2001)).  Therefore, likelihood of confusion must be surveyed from the perspective of the unsophisticated consumer that does not carefully investigate the source of goods. *See Ford Motor Co. v. Summit Motor Prod., Inc.*, 930 F.2d 277, 297 (3d Cir. 1991).  And, even if great care is taken by customers when purchasing fastener products, "it has been held that the care with which consumers select a product does not impact the association they may make regarding sponsorship of another product or service; therefore even a high degree of care would have little effect on confusion of *sponsorship*." *Kos*, 369 F.3d at 717, citing 3A LouisAltman, *Callman on Unfair Competition, Trademarks & Monopolies* § 21:10 & n.139 (emphasis added).

### 9.    Defendant's Intent

"Evidence of a defendant's intent is not a prerequisite for finding a Lanham Act violation; however, such evidence weighs heavily in favor of finding a likelihood of confusion." *Am. Eagle Outfitters, Inc. v. Walmart, Inc.*, No. 2:20-CV-00412-MJH, 2023 WL 1778751, at *4 (W.D. Pa. Feb. 6, 2023) (citing *Checkpoint Sys.*, 269 F.3d at 286).

Evidence of intentional, willful, and admitted adoption of a mark that is closely similar to the senior user's mark weighs strongly in favor of finding a likelihood of confusion. *Kos,* 369 F.3d at 721; *Checkpoint*, 269 F.3d at 286.  The adequacy and care with which a defendant investigates and evaluates its proposed mark, and its knowledge of similar marks or allegations of potential confusion, are highly relevant. *Kos*, 369 F.3d at 721; *Fisons*, 30 F.3d at 480.  A junior party's intent will indicate a likelihood of confusion in the marketplace if an intent to confuse consumers is demonstrated via purposeful manipulation of the junior user's mark to resemble the senior user's mark. *A&H Sportswear*, 237 F.3d at 225-26.

"Use of the mark alone is not sufficiently probative of such intent. The plaintiff must show that the defendant intended the public to believe that the plaintiff endorsed or somehow

supported its products or services." *Century 21 Real Est. Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 227 (3d Cir. 2005). "There are myriad factors to which a plaintiff may point to demonstrate that a defendant intended to confuse the public as to its relationship with the plaintiff." *Id*. "For example, courts in traditional trademark infringement cases have considered a defendant's persistence in adopting a mark despite being warned of potential confusion, *Kos Pharms., Inc. v. Andrx Corp.,* 369 F.3d 700, 721 (3d Cir.2004), and evidence of a defendant's bad faith, *A & H Sportswear II,* 237 F.3d at 226." *Century 21 Real Est. Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 227 (3d Cir. 2005).

When a company knowingly adopts a mark similar to another's mark, the court should presume intent to deceive the public. *See AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 354 (9th Cir. 1979); *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1059 (9th Cir. 1999) ("An inference of confusion has similarly been deemed appropriate where a mark is adopted with the intent to deceive the public.").

"The intent of the defendant-infringer is also relevant evidence on the issue of awarding profits and damages, and the amount thereof." 4 McCarthy on Trademarks and Unfair Competition § 23:112 (5th ed.).

### 10.    Initial Interest Confusion

Where a party captures a customer's interest using another's mark, the party may be liable for infringement based on the theory of initial interest confusion, even where a purchaser knows the source of the goods and no actual sale is completed. *See generally 1-800 Contacts, Inc. v. WhenU.com*, 309 F. Supp. 2d 467, 491 (S.D.N.Y. 2003) rev'd on other grounds, *1-800 Contacts, Inc. v. WhenU.com*, 414 F.3d 400 (2d Cir. 2005) (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254 (2d Cir. 1987) (affirming and noting that the district court's concerns focused on the *probability* that potential purchasers would be misled into an initial

interest in the defendant) (emphasisadded); 3 J. McCarthy on Trademarks and Unfair Competition, § 23:6 ("[Trademark infringement] can be based upon confusion that creates initial customer interest, even though no actual sale is finally completed as a result of the confusion"). Simply put, where an infringer uses the goodwill associated with another's trademark to lure consumers to the infringer's products, the infringer has violated the Lanham Act. *See Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1239 (10th Cir. 2006) (noting that the defendant's attempt to divert traffic to its website using the plaintiff's trademarks on its website and metatags constituted a Lanham Act violation).

As the Ninth Circuit has recognized, "[t]he law has long been established that if an infringer 'adopts his designation with the intent of deriving benefit from the reputation of the trade-mark or trade name, its intent may be sufficient to justify the inference that there are confusing similarities.'" *Brookfield*, 174 F.3d at 1059 (9th Cir. 1999) (citing *Pacific Telesis v. International Telesis Comms.*, 994 F.2d 1364, 1369 (9th Cir. 1993); Restatement of Torts, § 729, Comment on Clause (b)f (1938)). This scenario, where diverted sales occur even though the consumer is not confused, is actionable in the Third Circuit under the theory of initial interest confusion. *See Checkpoint*, 269 F.3d at 292.

**B.     Legal Standard for False Advertising**

**1.     Elements of Proof for False Advertising**

In addition to prohibiting an entity from falsely designating the origin of, or creating confusion as to the source of, its goods or services, *i.e.* false designation of origin, Section 43(a) of the Lanham Act also prohibits an entity from making false representations of the properties of its goods or services, *i.e.*, false advertising. Section 43(a)(1)(B) reads:

> Any person who, on or in connection with any goods or services, or any container
> for goods, uses in commerce any word, term, name, symbol, or device, or any

combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which- . . .

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Lanham Act § 43(a)(1)(B), 15 U.S.C. § 1125(a)(1)(B).  To prevail on a false advertising claim under Section 43(a) of the Lanham Act, a plaintiff must prove that: (1) the defendant has made false or misleading statements about its own product or the plaintiff's; (2) there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc. *Alpha Pro Tech, Inc. v. VWR Int'l, LLC*, 2017 WL 3671264, at *13 (E.D. Pa. 2017) (citing *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011) ) (internal quotation marks and citations omitted).

### 2.    Falsity

Falsity is the cornerstone for false advertising claims.  Falsity may be established in one of two ways under Section 43(a) of the Lanham Act: (1) an advertisement may be literally false on its face; or (2) the advertisement may be literally true, but it is likely to mislead and confuse consumers. *Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir. 1993) .  "[A]lthough the plaintiff normally has the burden to demonstrate that the defendant's advertising claim is false, a court may find that a completely unsubstantiated advertising claim by the defendant is *per se* false without additional evidence from the plaintiff to that effect." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co*., 290 F.3d 578, 590 (3d Cir. 2002) (observing that Johnson & Johnson failed to "argue or present any evidence to show that [Mylanta Night Time Strength] was specifically formulated for night time heartburn or that its

product actually remedies heartburn at night more effectively than heartburn during the daytime," and affirming the District Court's conclusion that Johnson & Johnson's advertising claim of Night Time Strength is completely unsubstantiated and *per se* false); *see also Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*, 292 F. Supp. 2d 594, 607 (D.N.J. 2003) ("We find that GSKCH does not have any evidence to support its claim that doctors prefer NicoDerm over Nicotrol . . . and therefore that claim is per se false."). An advertising claim that is *per se* false is literally false. *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 2014 U.S. Dist. LEXIS 66616, at *24 (W.D. Pa. 2014) (citing *Novartis* about *per se* false claims, the court found that the defendant's statement is literally false because the defendant failed to produce any evidence to support its "more powerful steam" claim).

### 3.    Deception

In a false advertising action under Section 43(a) of the Lanham Act, "[w]hen the advertisements are literally false, courts may grant relief without reference to consumer confusion; injury is presumed." *Schering-Plough Healthcare Prods. v. Neutrogena Corp.*, 2010 U.S. Dist. LEXIS 71003, at *9 (D. Del. 2010). And "the plaintiff is not required to demonstrate the consumer was misled." *G&W Labs., Inc. v. Laser Pharm., LLC*, 2018 U.S. Dist. LEXIS 102132, at *19 (D.N.J. 2018). In the Third Circuit, this presumption of deception and materiality is available when the plaintiff is seeking injunctive relief instead of, or in addition to, seeking damages. *Alpha Pro Tech, Inc. v. VWR Int'l, LLC*, 2017 U.S. Dist. LEXIS 135507, at *39 (E.D. Pa. 2017) (citing *Ecore Int'l, Inc. v. Downey*, 2015 U.S. Dist. LEXIS 1538, at *12 (E.D. Pa. 2015)). The Third Circuit Court has ruled that "[w]hen consumer deception can be determined by examining the challenged name or advertising on its face, the plaintiff is excused from the burden of demonstrating actual deception through the use of a consumer survey." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 587

27

(3d Cir. 2002) ; *see also Max Daetwyler Corp. v. Input Graphics, Inc.*, 608 F. Supp. 1549, 1554 (E.D. Pa. 1985) ("I conclude that consumer surveys, although useful to the finder of fact in many Lanham Act cases, are not required as a matter of law to establish consumer deception."). According to this Court, a deceptive act is "the act of intentionally giving a false impression" or "a tort arising from a false representation made knowingly or recklessly with the intent that another person should detrimentally rely on it." *Christopher v. First Mut. Corp.*, 2008 WL 1815300, at *11 (E.D. Pa. 2008).

Defendant's false performance data claim and false equivalent substitute claim, in combination with the other infringing acts described above, are a textbook case of intentional false and deceptive advertising. *See Pennzoil-Quaker State Co. v. Smith*, 2008 U.S. Dist. LEXIS 124298, at *104 (W.D. Pa. 2008) (Plaintiff's motion for summary judgment on false advertising, *inter alia*, was granted against a defendant who was not the plaintiff's authorized distributor but used the plaintiff's trademark and logo sign to lure potential customers to his store and then sell competing products). The uncontroverted evidence will show that Defendant has been purchasing online ads, and publishing the false Performance Data for the sole purpose of deceiving potential customers about its fasteners' alleged equivalency to PEM's fasteners. *See Res. Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 140 (2d Cir. 1991) ("the expenditure by a competitor of substantial funds in an effort to deceive consumers and influence their purchasing decisions justifies the existence of a presumption that consumers are, in fact, being deceived.").

In a false advertising case under the Lanham Act, "actual deception or a tendency to deceive is presumed if a plaintiff proves that an advertisement is unambiguous and literally false." *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011). And

the presumption appears to cover materiality as well. *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir. 1993) ("When a merchandising statement or representation is literally or explicitly false, the court may grant relief without reference to the advertisement's impact on the buying public.").

When a defendant's advertising directly compares its product and the plaintiff's product, the plaintiff clearly is the target, and "concerns . . . regarding speculative injury do not arise." *McNeilab, Inc. v. Am. Home Prods. Corp.*, 848 F.2d 34, 38 (2d Cir. 1988). In that circumstance, there is no need for a factual inquiry into whether the misrepresentations can be linked to harm to the plaintiff; rather, injury may be presumed.

### 4. Materiality

The fact that Defendant's false advertising pertains to the very nature of its products, performance characteristics, establishes its materiality. *See Pom Wonderful Ltd. Liab. Co. v. Purely Juice, Inc.*, 2008 U.S. Dist. LEXIS 55426, at *29-30 (C.D. Cal. 2008) ("The fact that Purely Juice's false advertising pertained to the very nature of its juice product establishes its materiality."). "A statement is material if it describes a product or service as having a characteristic that most consumers would find appealing." *Basile Baumann Prost Cole & Assocs., Inc. v. BBP & Assocs. LLC*, 875 F. Supp. 2d 511, 529 (D. Md. 2012). Statements comparing one product to another, as Defendant has done, have been deemed material when they convey a message of "equivalence as to the competing products formulation and/or efficacy." *Rexall Sundown, Inc. v. Perrigo Co.*, 651 F.Supp.2d 9 (E.D.N.Y 2009).

### 5. Injury

Since PEM has shown, *supra*, that Defendant's advertisements are literally false, PEM is entitled to the presumption of injury. *Schering-Plough Healthcare Prods. v. Neutrogena Corp.*, 2010 U.S. Dist. LEXIS 71003, at *9 (D. Del. 2010) ("When the advertisements are literally

29

false, . . . injury is presumed.").  Moreover, injury is presumed in Lanham Act cases when the defendant has directly and falsely compared its product to the plaintiff's product.  At least three Courts of Appeals and many District Courts have presumed likely injury when the defendant made misrepresentations while comparing its product to the plaintiff's product. *See, e.g.*, *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 261 (2d Cir. 2014); *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1334 (8th Cir. 1997); *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1146 (9th Cir. 1997); *Robroy Indus.-Tex., LLC v. Thomas & Betts Corp.*, 2017 WL 1370545, at *5 (E.D. Tex. 2017); *Greater Houst. Transp. Co. v. Uber Techs., Inc.*, 155 F. Supp. 3d 670, 703-04 (S.D. Tex. 2015). In addition, "[n]o circuit appears to have rejected" the presumption of causation that the infringer caused the injury with false statements. *Robroy*, 2017 WL 1370545, at *3.

## C.     Legal Standard for Counterfeiting

The Lanham Act defines a "counterfeit mark" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. 1127.  Trademark counterfeiting has been defined as "the act of producing or selling a product with a sham trademark that is an intentional and calculated reproduction of the genuine trademark." *Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 536 n.2 (D.N.J. 2008) (citing *Playboy Enters. v. Universal Tel-A-Talk, Inc*., No. 96-6961, 1998 U.S. Dist. LEXIS 17282, at *7 (E.D. Pa. Nov. 2, 1998)).  To establish federal trademark counterfeiting, PEM must prove that (1) PENCOM infringed a registered trademark in violation of the Lanham Act, and (2) intentionally used the trademark knowing that it was counterfeit or was willfully blind to such use.[6] *Id*. at 536-37 (citing *Playboy*, at *7); see also 15 U.S.C. § 1117.  The only distinction between the standard for

---

[6] *Id*. at 536-37 (citing *Playboy*, at *7); see also 15 U.S.C. § 1117.

federal trademark counterfeiting and the standard for establishing infringement is that PEM must

show that PENCOM intentionally used PEM's trademark, knowing that it was a counterfeit. *Id.*

### D.       Nominative Fair Use – Comparative Advertising

There are two types of fair use in trademark law: classic fair use and nominative fair use.

2 McCarthy on Trademarks and Unfair Competition §11:45 (5th ed.).  The affirmative defense of

"fair use" covers only classic fair use and nominative fair use, and not all non-infringing uses of

a mark. *Id*.  Defendant is claiming that its use of PEM's trademarks is permissible under the

doctrine of nominative fair use.

Nominative fair use is the use of another's trademark to identify the trademark owner's

goods or services. *Id.*  According to the Ninth Circuit, "[t]he nominative fair use analysis is

appropriate where a defendant has used the plaintiff's mark to describe the plaintiff's product,

even if the defendant's ultimate goal is to describe his own product." 4 McCarthy on Trademarks

and Unfair Competition §23:11 (5th ed.) citing *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1151

(9th Cir. 2002).  Examples of nominative fair use include: comparing specific, factually-verifiable

properties of products; identifying the products a shop is authorized to repair; advertising the

products a retailer is authorized to sell; and, identifying an employee's previous employer. *Id.*

### 1.       Elements of Proof for Nominative Fair Use

In considering the defense of nominative fair use in trademark actions, the Third Circuit

adopted a two-step approach for nominative fair use cases. *Century 21*, 425 F.3d at 211. First, the

plaintiff must show that there is a likelihood of confusion based on defendant's use of plaintiff's

mark. *Id*. at 222.  Then, once the plaintiff shows a likelihood of confusion, the burden shifts to

the defendant to show that its use of the plaintiff's mark is fair. *Id*.

To successfully show that its use of the plaintiff's mark is fair, the defendant must prove

that its use of the plaintiff's mark satisfies *all three* of the following elements:

31

(1) the use of plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service;

(2) the defendant uses only so much of the plaintiff's mark as is necessary to describe plaintiff's products or services; and

(3) the defendant's conduct or language reflects the true and accurate relationship between plaintiff and defendant's products or services.

*Id.* at 228.

## 2. Necessity

To satisfy the first prong of nominative fair use, a defendant must show that the identification of a plaintiff's product would be rendered "significantly more difficult" without the use of the mark <u>and</u> that the use of the plaintiff's mark is <u>necessary</u> to describe both the defendant's and plaintiff's products. *Century 21,* 425 F.3d at 228-29. The more that defendant's product can be independently identified without the use of the plaintiff's mark, the more likely the use is not fair. *Id.* at 229. But the "entirely appropriate" question to ask is "whether defendant's use of [plaintiff's mark], at all, is necessary to accurately describe what defendant does or sells, or whether its reference to plaintiff's mark is actually gratuitous." *Id*.

PEM will introduce evidence showing that Defendant's use of PEM's marks was entirely unnecessary and its use was actually gratuitous. PEM's evidence is based on the nature of the product, industry practice, Defendant's admissions, and common sense. The relevant fasteners are <u>staple goods</u>[7] that can be fully and accurately described, and in fact are more appropriately described, using technical specifications such as drawings, dimensions, tolerances, thread codes, and material descriptions. Industry practice shows that these fasteners are fully and accurately described using the aforementioned technical specifications, not by referencing PEM's marks or

---

[7] The relevant fasteners are not consumables, such as razor blades or printer cartridges, for which Pencom sells a replacement when the original wears out or is depleted. They are permanent fasteners for constructing a wide range of products.

any other competitor's marks.  Several of Defendant's employees, including its President testified that the use of PEM's trademarks is not "necessary" to fully and accurately describe Defendant's fasteners.  Finally, PEM is one of numerous competitors that sell the relevant goods. Yet, Defendant does not use any of its other competitors' trademarks to describe its goods.

### 3.     Minimal Usage

The second prong tests "only whether the *quantum* of the plaintiff's mark used by the defendant was appropriate." *Century 21,* 425 F.3d at 230 (emphasis in original).  The proper focus is on whether "*only so much* of plaintiff's *mark* as is reasonably necessary to identify plaintiff's product or service has been used by defendant." *Id.* (emphasis in original).

PEM will introduce evidence that there is no need at all to use PEM's marks to describe the Defendant's relevant products.  Therefore, there simply isn't any minimum threshold.  At best, it might be fair for Defendant to tersely identify PEM as a competitor such as by stating "Pencom sells parts that compete with PEM" or some variant thereof.  Instead, Defendant uses the mark PEM and over 80 Common Law Marks in the numerous activities described above.

### 4.     Accuracy

The third prong asks whether "the defendant's conduct or language reflect the true and accurate relationship between plaintiff and defendant's products or services." *Century 21*, 425 F.3d at 230.  In this analysis, the court can consider the defendant's failure to state or explain some aspect of the relationship. *Id.* at 231.

PEM will introduce evidence showing that Defendant's website, product fliers, sales drawings, and cross-reference charts do not state that its goods are not made by PEM, and contain no statement whatsoever that disclaims sponsorship or affiliation with PEM.  To the contrary, Defendant's unlawful activities suggest that Defendant wanted customers, and prospective customers, to believe that the parties may have a manufacturer-distributor

relationship, or that Defendant is a division of PEM or a division of a common parent.

Defendant's only statement (not including the use of the mark PEM) on its website or advertising

materials that refers to PEM is not a disclaimer at all!  The statement appears in small font at the

bottom of the Digital Cross-Reference Chart and reads: "PEM is a registered trademark of Penn

Engineering."  When combined with Defendant's unlawful activities, this statement is

"manifestly confusing." *See David's Bridal, Inc. v. House of Brides, Inc.*, 2010 WL 323306

(D.N.J. Jan. 20, 2010) (the statements "Designer: Compare to David's Bridal" and "Compare to

David's Bridal wedding dresses are 30% to 40% off David's Bridal suggested retail price!" failed

to reflect the true and accurate relationship between plaintiff's and defendant's products, as a

reasonable reader could conclude that defenant sold plaintiff's products).  This statement

suggests that Defendant is an authorized distributor or reseller of PEM, or is selling authentic

PEM products.

### E.   Comparative Advertising

Comparative advertising comprises the act of truthfully and non-deceptively comparing

competing products in advertising, and in doing so, identifying the competitor's goods by

trademark. *Buying for the Home, LLC v. Humble Abode, LLC*, 459 F.Supp.2d 310, 329 (D.N.J.

2006) (citing 4 McCarthy on Trademarks and Unfair Competition §25:52 (4th ed.)).  Specifically,

comparative advertising "compares alternative brands on objectively measurable attributes or

price." *FTC Policy Statement on Comparative Advertising*, 16 C.F.R. §14.15, n.1.  Comparative

advertising usually requires statements that are "specific in nature, . . . objectively verifiable and

comparatively measurable." *Universal Elec. Corp. v. Baldwin*, 2018 WL 3707423, at 8 (W.D. Pa.

Aug. 3, 2018).  Defendant has separately pled nominative fair use and comparative advertising as

affirmative defenses.  However, "the comparative advertising defense . . . falls under the

umbrella of 'nominative fair use.'" *Buying for the Home, LLC,* 459 F. Supp. 2d at 329 (applying

the two-part approach to nominative fair use cases, as adopted by the Third Circuit in *Century 21*, while analyzing the plaintiff's affirmative defense of comparative advertising against the defendant's counterclaim of trademark infringement) (citing *Century 21,* 425 F.3d at 214).

Since the comparative advertising defense is analyzed under the nominative fair use test, and since it has been shown, *supra*, that Defendant's combined marketing activities are not non-infringing activities under the nominative fair use doctrine, it follows that the combined marketing activities are not non-infringing activities under the comparative advertising doctrine.

### F.   False Advertising Through Sales Drawings

### 1.   Commercial Advertising

Under Section 43(a) of the Lanham Act, any person who makes a "false or misleading description of fact, or false or misleading representation of fact," which "in *commercial advertising or promotion*, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities," shall be liable for false advertising. 15 U.S.C. 1125 (emphasis added).  "Commercial advertising or promotion for purposes of the Lanham Act consists of (1) commercial speech; (2) by a defendant in commercial competition with the plaintiff; (3) designed to influence customers to buy the defendant's products; (4) that is sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within the industry." *Synygy, Inc. v. Scott–Levin, Inc.,* 51 F.Supp.2d 570, 576 (E.D.Pa.1999).  Even singular or very limited targeted solicitations have been held to comprise commercial advertising where the purpose of the solicitation was to procure sales. *See, e.g.*, *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1386 (5th Cir. 1996); *Mobius Management Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1005, 1020-21 (S.D.N.Y. 1994).  This court has stated that "where the potential purchasers in the market are relatively limited in number, even a single promotional presentation to an individual purchaser

may be enough to trigger the protections of the [Lanham Act]." *Schmidt, Long & Assoc., Inc. v. Aetna U.S. Healthcare, Inc., No. CIV.A.00-CV-3683, 2001 WL 856946, at \*11 (E.D. Pa. July 26, 2001), (citing Seven-Up Co. v. Coca-Cola Co,* 86 F.3d 1379, 1386 (5th Cir. 1996)).

Defendant admits to creating and distributing to customers hundreds of sales drawings that include the Performance Data it copied from PEM.  As a defense, Defendant argued that such activity was purely a private communication.[8]  PEM will introduce compelling evidence that the sheer volume, inherent and admitted nature, and long-term, widespread distribution of defendant's sales drawings comprise commercial advertising.

Defendant's sales drawings are distributed primarily for the purpose of consummating sales of its products.  Defendant admits that once a prospective customer finds a fastener in which it has an interest via Defendant's website, it often requests a Sales Drawing from Defendant to qualify Defendant's products for the customer's applications to obtain information regarding installation of Defendant's products, or to obtain information it needs to compare dimensions and performance of Defendant's products to other manufacturers' similar products. During initial and supplemental discovery, Defendant produced approximately 2,170 drawings labeled "Sales Drawings", which it had created over a 25-year period.  Roughly 45% of those drawings contain Performance Data.  For one short time period, April 2021 to April 2023, Defendant admitted to having created 199 new sales drawings containing Performance Data, and having distributed 60 (approximately 30%) of those sales drawings to customers.  Applying that same 30% distribution rate, approximately 650 of the total tally of those Sales Drawings have

---

[8] This issue was previously briefed by the parties on three occasions, first with respect to PEM's Motion to Compel Updated Sales Information (Dkt. 333) (original and supplemental briefing), and later with respect to Defendant's Motion for Partial Summary Judgment Regarding Its Website Search Tool and Sales Drawings (Dkt. 353).  For judicial economy, PEM incorporates its previous briefing on this issue (Dkt. 333-1, 339, and 363) and summarizes its position herein.

been distributed to customers over the past 25 years!  This evidence highlights Defendant's use

of its sales drawings as "part of an organized campaign to penetrate the relevant market."  *See*

*Synthes, Inc. v. Emerg Med., Inc.*, 25 F.Supp.3d 617, 717 (E.D.Pa. 2014) citing *Fashion*

*Boutique v. Fendi USA, Inc.,* 314 F.3d 48, 56–57 (2d Cir.2002).

PEM will also introduce evidence rebutting Defendant's characterization of its sales

drawings as purely private communications.  Among other reasons, Defendant admitted that: (1)

its sales drawings are generally available for its customers; (2) Defendant's sales drawings are

not customized in any way; they are all stock, advertising materials, just like all other stock,

advertising materials businesses create and distribute for the purpose of increasing sales; (3) and,

the sales drawings are created ahead of time *in anticipation of a yet-unknown customer's request*.

The type of customer solicitation that is excluded from the definition of "commercial

advertising" under the Lanham Act is very narrow, focused and limited, as shown by the

following collection of cases:  *Am. Needle & Novelty, Inc. v. Drew Pearson Mktg.*, 820 F. Supp.

1072, 1077-78 (N.D. Ill. 1993) (*Single letter*, *privately addressed* to a non-consuming licensor by

the licensee regarding the business practices and financial condition of the plaintiff); *Medical*

*Graphics Corp. v. SensorMedics Corp*., 872 F. Supp. 643, 650 (D.Minn. 1994) (Statements made

by one of a handful of sales representatives to an individual potential customer); *Licata & Co. v.*

*Goldberg*, 812 F. Supp. 403, 408 (S.D.N.Y. 1993) (Oral conversations by an individual sales

representative to an individual customer concerning matters which an ordinary listener would

recognize as personal opinion); *Nw. Strategies v. Buck Med. Servs.*, 927 F. Supp. 1343, 1346

(W.D. Wash. 1996) (False statement in a bid proposal that was not disseminated in interstate

commerce); *H&R Indus., Inc. v. Kirshner*, 899 F. Supp. 995, 1005 (E.D.N.Y. 1995) (A

disparaging memorandum defendant *gave to two people); Garland Co. v. Ecology Roof Sys.*

*Corp.*, 895 F. Supp. 274, 279 (D. Kan. 1995) (A *single letter* that disparaged the plaintiff);

*Johnson Controls, Inc. v. Exide Corp.*, 152 F. Supp. 2d 1075, 1081-82 (N.D. Ill. 2001) (A false

presentation made to a *single customer* in the context of negotiating a transaction).

### 2.   Commercial Promotion

Section 43(a)(1)(B) of the Lanham Act applies to "commercial advertising <u>or</u>

promotion." 15 U.S.C. § 1125 (emphasis added).  "Commercial advertising" is not synonymous

with "promotion."  The difference between the two was explained by the Second Circuit, as

follows:

> We conclude that the distinction between advertising and promotion lies in the
> form of the representation. Although advertising is generally understood to
> consist of widespread communication through print or broadcast media,
> "promotion" may take other forms of publicity used in the relevant industry, such
> as displays at trade shows and sales presentations to buyers.

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc*., 314 F.3d 48, 57 (2d Cir. 2002).

Similarly, the Seventh Circuit noted that: "If 'advertising or promotion' just meant 'advertising,'

then 'promotion' would do no work in the statute." *Neuros Co. v. Kturbo, Inc*., 698 F.3d 514,

522 (7th Cir. 2012).  The *Neuros* court recognized that "there are industries in which

promotion—a systematic communicative endeavor to persuade possible customers to buy the

seller's product—takes a form other than publishing or broadcasting." *Id.*; see also 5 McCarthy

on Trademarks and Unfair Competition § 27:71 (5th ed.).  Based on Defendant's own

explanation, widespread distribution of its sales drawings for 25 years clearly comprises a

"systematic communicative endeavor to persuade possible customers to buy [Defendant's]

product." *See id.*

### G.   Reverse Engineering

As a defense to copying PEM's Performance Data, Defendant claims that its fasteners

were reverse-engineered from PEM's fasteners, and therefore have the same performance

properties.  However, to prove that it properly reverse-engineered PEM's fasteners, Defendant

was required to first describe a specific, proper procedure[9] for reverse engineering the fasteners,

and then show how it fully complied with such a procedure. *See Alpha Pro Tech, Inc. v. VWR*

*Int'l, LLC,* No. 12-1615, 2017 U.S. Dist. LEXIS 135507, at *20 (E.D. Pa. Aug. 21, 2017)

("Reverse engineering involves 'starting with the known product and working backward to

divine the process which aided in its manufacture.'") (citing *SI Handling Sys. v. Heisley*, 753

F.2d 1244, 1255 (3d Cir. 1985)); *see also Ecolaire, Inc. v. Crissman*, 542 F. Supp. 196, 203 (E.D.

Pa. 1982) (describing a procedure for reverse engineering as a "process involv[ing] a series of

steps by which a part is obtained, measurements are taken, drawings prepared, analysis of

metallurgical components is obtained, and, finally, after patterns or molds are made, the part is

produced.").  Both PEM's and Defendant's technical experts agree that two steps were required

to properly reverse-engineer PEM's fasteners: (1) correctly copy the dimensions; and (2)

correctly copy the hardness. The evidence will show that Defendant never tested the hardness of

its fasteners, and therefore cannot claim to have properly reverse-engineered PEM's fasteners.

*Rexall Sundown, Inc. v. Perrigo Co.*, F.Supp.2d 9, 30 (E.D.N.Y. 2009)

### H.    Functionality of Product Configuration Trademark

#### 1.    Defendant's Burden to Prove Functionality

PEM owns incontestable U.S. Reg. Nos. 1,400,893 for the mark  ("Double

Square 1") and U.S. Reg. No. 3,404,061 for the mark ("Double Square 2").   Since

these registrations are incontestable, ownership and validity are proven. *Fisons Horticulture, Inc.*

---

[9] Depending on the technology, there may be one or more procedures.

*v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3rd Cir. 1994).  Therefore, Defendant has the burden of establishing a *prima facie* case of functionality. *Envirosafe Servs., Inc. v. Envirosure Mgmt. Corp.*, Civil Action No. 87-4659, 1989 U.S. Dist. LEXIS 70, at *3 (E.D. Pa. Jan. 5, 1989) ("a registered trademark that has been entered on the principal trademark register. . . . is prima facie evidence of the registrant's exclusive right to use the registered mark.").

> ### 2.   *De Facto* Functionality of the Nut and Cavity Shown in the Double Square Marks Is Not A Bar To Trademark Registration

"The analysis of functionality begins with a question about the *de facto* functionality of the product." *Dentsply Int'l, Inc. v. Kerr Mfg. Co.*, 732 F. Supp. 482, 486 (D. Del. 1990) (emphasis added).  *De Facto* functionality "simply means that a design has a function," *In re Becton, Dickinson & Co.*, 675 F.3d 1368, 1373-74 (Fed. Cir. 2012), like a bottle of any design, which inherently has the function of holding fluid. *Valu Eng'g, Inc. v. Rexnord Corp.*, 278 F.3d 1268, 1274 (Fed. Cir. 2002) (citing *In re R.M. Smith, Inc.*, 734 F.2d 1482, 1484 (Fed. Cir. 1984)). And *de facto* functionality "does not necessarily defeat [trademark] registrability." *Id*. (citing *In re Morton-Norwich Prods*., 671 F.2d 1332, 1337 (C.C.P.A. 1982)); *see also Fuji Kogyo Co., Ltd. v. Pac. Bay Int'l, Inc*., 461 F.3d 675, 685 (6th Cir. 2006) (finding the *de jure* versus *de facto* distinction a "helpful doctrine" and confirming that "[d]e facto functionality does not necessarily defeat registrability."); *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 785 (9th Cir. 2002) ("De jure, or legal, functionality must be distinguished from de facto functionality which still may support trademark protection.").  Although it no longer distinguishes *de facto* functionality from *de jure* functionality in assessing whether a product feature or configuration is functional because the Supreme Court did not make such a distinction in recent cases,[10] the USPTO <u>still maintains</u>

---

[10] *Traffix Devices v. Mktg. Displays*, 532 U.S. 23, 121 S. Ct. 1255 (2001); *Wal-Mart Stores v. Samara Bros*., 529 U.S. 205, 120 S. Ct. 1339 (2000); and *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 115 S. Ct. 1300 (1995).

that "[*d*]*e facto* functionality is not a ground for refusal [of trademark registration]." T.M.E.P. 1202.02(a)(iii)(B) (current, as of July 2021) (citing *In re Ennco Display Sys. Inc.*, 56 U.S.P.Q.2d 1279, 1282 (T.T.A.B. 2000); *In re Parkway Mach. Corp.*, 52 U.S.P.Q.2d 1628, 1631 n.4 (T.T.A.B. 1999)).

The Supreme Court noted that "product design almost invariably serves purposes other than source identification." *TrafFix Devices v. Mktg. Displays*, 532 U.S. 23, 29, 121 S. Ct. 1255 (2001). And courts have consistently found trademarks with *de facto* functionality to be registrable. *See Automobili Lamborghini, S.p.A. v. Johnson*, No. 5:13-cv-1136-TMP, 2014 U.S. Dist. LEXIS 120853, at *18 (N.D. Ala. Aug. 29, 2014) (affirming Lamborghini's trademark registration of its scissor doors although they open upwardly to avoid scraping the curb due to how low the car is to the ground); *Bodum USA, Inc. v. A Top New Casting Inc.*, 927 F.3d 486, 492–94 (7th Cir. 2019) (affirming the trademark registration of the Bodum French press coffee maker's C-shaped handle although it provides a method to hold the container, pour liquid from it, and arguably provide a more secure grip); and *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 703 F. Supp. 2d 671 (W.D. Ky. 2010), aff'd, 679 F.3d 410 (6th Cir. 2012) (affirming the trademark registration of the Maker's Mark whiskey bottle's useful dripping wax seal, which seals the bottle).

The parties generally agree on how a self-clinching, floating nut assembly is designed and operates. PEM will introduce expert testimony that a floating nut need not have a square nut seated in a square cavity of the retainer ("square-in-square configuration"), which undermines Defendant's functionality argument. PEM's expert will testify that the nut and cavity need not be square. Any configuration would work so long as the nut is small enough (relative to the size of the cavity) so that the nut can float, but large enough so that it cannot fully rotate. Moreover, the

outer configuration (shape of the outer walls) of the nut need not even have the same configuration as the inner configuration (shape of the inner walls) of the cavity.

### 3. The Double Square Marks Are Not *De Jure* Functional

Begun with a question about *de facto* functionality, "the analysis [of functionality] continues into a question of *de jure* functionality, that is, is the product in a particular shape because the product works better in that shape or, put another way, is the shape of a product a utilitarian design of a utilitarian object." *Dentsply Int'l, Inc. v. Kerr Mfg. Co*., 732 F. Supp. 482, 486 (D. Del. 1990) (citing *In re Morton-Norwich Prods.*, 671 F.2d 1332, 1338-39 (C.C.P.A. 1982)) (emphasis added).  In *TrafFix*, the Supreme Court held that "in general terms, a product feature is functional, and cannot serve as a trademark, if it is *essential* to the use or purpose of the article or if it affects the *cost or quality* of the article." *TrafFix Devices v. Mktg. Displays*, 532 U.S. 23, 32, 121 S. Ct. 1255, 1261 (2001) (emphasis added) (citing *Qualitex Co. v. Jacobson Prods. Co*., 514 U.S. 159, 165, 115 S. Ct. 1300, 1304 (1995) (quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850, n.10, 72 L. Ed. 2d 606, 102 S. Ct. 2182 (1982))). The Supreme Court held that "a functional feature is one the exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage." *TrafFix Devices v. Mktg. Displays*, 532 U.S. 23, 32 (2001) (citing *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995)) (alteration in original) (internal quotation marks omitted).  In line with the *de jure* functionality question posited by the *Dentsply* court, the Third Circuit Court described "several ways to prove functionality," that are similar to the time-honored *Morton-Norwich* Factors. *Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*, 986 F.3d 250, 258 (3d Cir. 2021), as amended (Mar. 10, 2021); *see also In re Morton-Norwich Prods.*, 671 F.2d 1332, 1340-41 (C.C.P.A. 1982); *In re Becton, Dickinson & Co.*, 675 F.3d 1368, 1374-75 (Fed. Cir. 2012) (reversing TTAB's decision for failure to properly apply the *Morton-Norwich* four-factor test); *Adams Mfg.*

*Corp. v. Rea*, Civil Action No. 12-1430, 2014 U.S. Dist. LEXIS 31584, at *11-12 (W.D. Pa. Mar. 12, 2014) (affirming TTAB's decision based on the *Morton-Norwich* factors).

In a recent case, the Third Circuit Court seemingly improperly broadened the Supreme Court's functionality test by ruling that functional designs need not be essential, but useful. *Kaisha v. Lotte Int'l Am. Corp.*, No. 19-3010, 2021 U.S. App. LEXIS 7026, at *9 (3d Cir. Mar. 10, 2021) ("if a design gives a product an edge in usefulness, then it is functional").[11]  However, despite such broad language, the court examined the full complement of factors set forth in the *Morton-Norwich* four-factor test.  In *Kaisha v. Lotte Int'l Am. Corp*, the Third Circuit Court applied the following four-factor functionality test to find that a chocolate-covered cookie stick was functional:

>   (1) Evidence can directly show that a feature or design makes a product work better;
>   (2) It is "strong evidence" of functionality that a product's marketer touts a feature's usefulness;
>   (3) A utility patent is strong evidence that the features therein claimed are functional; and
>   (4) If there are only a few ways to design a product, the design is functional.

*Kaisha v. Lotte Int'l Am. Corp*., No. 19-3010, 2021 U.S. App. LEXIS 7026, at *13-14 (3d Cir. Mar. 10, 2021).  PEM will introduce evidence relating to each of these factors.  PEM will also introduce evidence of hypothetical designs to prove non-functionality and the availability of numerous alternate designs. 1 McCarthy on Trademarks and Unfair Competition, § 7:69 (5th ed.); *see also Thomas & Betts Corp. v. Panduit Corp*., 138 F.3d 277, 299, 46 U.S.P.Q.2d 1026 (7th Cir. 1998) ("There is no requirement that the alternative shapes must have been successfully marketed in order to show that effective competition is possible.").

---

[11] US Supreme Court certiorari denied by *Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp*., 2021 U.S. LEXIS 5382 (U.S., Nov. 1, 2021).

## IV.    REMEDIES

### A.    Bifurcation

On January 16, 2024, the Court ordered that the jury will hear issues on liability only and the Court will hear damages issues, if needed. Order (Dkt. 391).  Since proof of damages will be demonstrated in a separate hearing before the Court, PEM only summarizes its requested remedies.  Further legal analysis on damages will be provided once liability has been established, or sooner at the Court's request.

### B.    Equitable Relief

Plaintiff is entitled to a permanent injunction upon establishing the elements from *e-Bay, Inc. v. MerckExchange, LLC,* 547 U.S. 388, 391 (2006).  "[A] plaintiff seeking a permanent injunction must . . . . demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (citing *Weinberger v. Romero—Barcelo*, 456 U.S. 305, 311–313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982); *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)).

It is recognized that irreparable injury follows from the loss of control of reputation and goodwill caused by trademark infringement. *Opticians*, 920 F.2d at 195.

Plaintiff seeks a permanent injunction enjoining Defendant from using Plaintiff's famous mark PEM, all of its other federally-registered marks, and its Common Law Marks in any manner in conjunction with fastener products including, but not limited to:

1.    Using Plaintiff's trademarks in advertising and on product packaging;

2. Using any of Plaintiff's marks in any cross-reference chart published by Defendant or in any comparative way with PennEngineering's products;

3. Purchasing any of Plaintiff's trademarks as a keyword in the Google Ads program or other similar program provided by any other search engine;

4. Selling the "Double Dart" fastener products and/or any other product configurations confusingly similar to Plaintiff's trademarked designs; and

5. Selling any PEM products without written authorization from PEM.

Plaintiff also seeks a permanent injunction enjoining Defendant from:

1. Copying and/or publishing Plaintiff's performance data and technical specifications;

2. Publishing any performance data and technical specifications for which it has no independent verification of such data and specifications; and

3. Copying and distributing Plaintiff's product drawings.

### C.    Recovery of Defendant's Profits

A party who establishes infringement of a registered mark "shall be entitled, . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff and (3) the cost of the action." 15 U.S.C. §1117(A).  Furthermore, it is recognized that in assessing profits, the plaintiff shall be required to prove the defendant's sales only. *Id.*

The principles of equity that would make an accounting of profits appropriate include: (1) if the defendant is unjustly enriched; (2) if the plaintiff sustained damages from the infringement; or (3) if an accounting is necessary to deter a willful infringer from doing so again. *See SecuraComm Consulting, Inc. v. Securacom, Inc.,* 166 F.3d 182 (3d Cir. 1999) (proof that infringer acted willfully may justify an award of profits granted to deter an infringer's egregious misconduct.)  Willful intent to confuse or deceive may be found from a deliberate decision to use a name dangerously close to the name used by the plaintiff and to continue with such use despite being warned of the confusing similarity. *See Kos,* 369 F.3d at 700.

It is not enough to deny an accounting of profits that plaintiff cannot show actual damages because a successful trademark infringement claim leads to a presumption of diversion

of sales. *See Sabinsa Corp. v. Creative Compounds, LLC*, No. CIV.A. 04-4239 DMC, 2011 WL 3236096, at *4 (D.N.J. July 27, 2011). "It is not enough to say Plaintiff did not present evidence of confusion; Defendant must itself present evidence that the customers were not actually confused." *Id*.

In balancing the factors, the Court may conclude that a disgorgement of profits is warranted because of likelihood of confusion exists and there is a presumption of a diversion of sales which the Defendants failed to overcome. See *Sabinsa* at *8 (awarding a disgorgement of approximately $139,000 in profits upon evidence of a likelihood of confusion where the defendant did not overcome the presumption of a diversion of sales).

Based solely on a "disgorgement" theory of Defendant's profits, PennEngineering's damages are itemized and calculated in Plaintiff's initial Expert Report on Damages, which is designated Highly Confidential Attorneys' Eyes Only, which will be provided to the Court but not filed in ECF based on the Court's oral instruction during the parties' last pretrial conference.

## V.    CONCLUSION

Based on the foregoing, Plaintiff will request: (1) a permanent injunction against Defendant's use of any of PEM's marks or Performance Data; (2) a permanent injunction against Defendant making any representation of equivalency between the parties' fasteners; (3) damages measured by Defendant's profits; and (4) a recovery of reasonable attorney's fees and costs.

Respectfully submitted,

Dated: February 9, 2024               Ryder, Mazzeo & Konieczny LLC


/s/ Joseph M. Konieczny, Sr.
jkonieczny@rmkiplaw.com
Frank A. Mazzeo
fmazzeo@rmkiplaw.com
Ryder, Mazzeo & Konieczny LLC
P.O. Box 670
Plymouth Meeting, PA 19462
Tel: (610) 940-1962
Fax: (610) 940-1963

Kent E. Baldauf, Jr. (pro hac vice)
kbaldauf@webblaw.com
Cecilia R. Dickson (pro hac vice)
cdickson@webblaw.com
Barry J. Coyne (pro hac vice)
bcoyne@webblaw.com
The Webb Law Firm
One Gateway Center
420 Ft. Duquesne Blvd, Suite 1200
Pittsburgh, PA 15222
Tel: (412) 471-8815

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of Plaintiff's Trial Memorandum was filed electronically on the date set forth below, and served electronically on Richard A. Nebb, Igor Shoiket, Michael E. Dergosits, and Samuel W. Silver, attorneys for defendant, via the court's automatic Notice of Electronic Filing.  Said documents are available for viewing and downloading from the U.S. District Court Eastern District of Pennsylvania ECF system.

Date: February 9, 2024                                  /s/ Joseph M. Konieczny, Sr.